## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| CHARLES J. and DIANE GILES, and | : | |
| LAURINE SPIVEY, | : | |
| individually and on behalf of all | : | |
| others similarly situated, | : | |
| | : | |
| Plaintiffs, | : | Civil Action |
| | : | No. 11-6239 (JBS-KMW) |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| PHELAN HALLINAN & SCHMIEG, LLP, | : | |
| PHELAN HALLINAN & SCHMIEG, P.C., | : | |
| LAWRENCE T. PHELAN, FRANCIS S. HALLINAN, | : | |
| DANIEL G. SCHMIEG, ROSEMARIE DIAMOND, | : | |
| FULL SPECTRUM SERVICES, INC., and | : | |
| LAND TITLE SERVICES OF NEW JERSEY, INC., | : | |
| WELLS FARGO & COMPANY, and | : | |
| WELLS FARGO BANK, N.A. | : | |
| | : | |
| Defendants. | : | |

## AMENDED CLASS ACTION COMPLAINT

BHN LAW FIRM
John G. Narkin
Five Hidden Creek
Swedesboro, New Jersey 08085-1857
Tel: (856) 472-2402

- and -

HARWOOD FEFFER LLP
Robert I. Harwood
James G. Flynn
488 Madison Avenue, 8th Floor
New York, New York 10022
Tel: (212) 935-7400

Attorneys for Plaintiffs and the Proposed Class

## **TABLE OF CONTENTS**

I.   SUMMARY OF ALLEGATIONS.................................................................................2

II.  JURISDICTION AND VENUE...............................................................................5

III. PARTIES.................................................................................................................6

     A.   The Representative Homeowners..............................................................6

     B.   Defendants................................................................................................6

IV.  FACTUAL ALLEGATIONS..................................................................................8

     A.   Foreclosure Processes of the Phelan Firm and WFB..................................8

     B.   The Representative Defendants Were Harmed
         by Defendants' Misconduct.....................................................................24

         Plaintiffs Charles J. and Diane Giles ......................................................23

         Plaintiff Laurine Spivey..........................................................................36

     C.   Other Homeowners Have Been Harmed By the Same Pattern
         of Fraudulent Misconduct By the Phelan Firm and WFB.......................49

         The Phelan Firm......................................................................................49

         Wells Fargo Bank, N.A............................................................................54

     D.   The Foreclosure Fraud Scandal Confirms  Unlawful Practices.......................59

         Judicial Action in New Jersey..................................................................61

         Federal Consent Orders and Government Investigations.........................64

V.   CLASS ACTION ALLEGATIONS.........................................................................68

VI.  CLAIMS FOR RELIEF..........................................................................................73

         COUNT ONE: RICO.............................................................................73

i

    A.    The Enterprise...................................................................... 73

    B.     Predicate Acts of Mail and Wire Fraud.............................74

    C.    Conduct of the Enterprise's Affairs......................................79

    D.   Pattern of Racketeering Activity...................................…......81

    E.    Damages Caused By Defendants' Scheme.........................83

COUNT TWO: NJCFA......................................................................84

COUNT THREE: UTPCPL........................................................…....85

COUNT FOUR: BREACH OF CONTRACT................................................86

COUNT FIVE:   MONEY HAD AND RECEIVED..........................................88

COUNT SIX:   NEGLIGENCE..............................................................88

VII.   JURY TRIAL DEMAND................................................................89

VIII. PRAYER FOR RELIEF.................................................................90

On behalf of themselves and all others situated similarly, Charles J. and Diane Giles, and Laurine Spivey (collectively, "Plaintiffs," "Homeowners" or "Representative Homeowners") bring this proposed class action against Defendants for damages and injunctive relief.

Except for allegations concerning their own activities, the Representative Homeowners' allegations are based on information and belief obtained through a two-and-a half-year investigation by their counsel. This investigation includes:

1)      Witness information;

2)      Review and analysis of federal and state court filings and other public records;

3)      Review and analysis of legal journals, Congressional testimony, Securities and Exchange Commission ("SEC") filings, and news media reports;

4)      Review and analysis of documents disseminated by, among other government authorities, the United States Department of Justice, the Federal Trade Commission, the Federal Reserve System, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the United States Department of Housing and Urban Development, the Federal Housing Finance Agency, the Consumer Financial Protection Bureau;  members of the National Association of Attorneys General, and the New Jersey  Administrative Office of the Courts; and

5)       Review and analysis of documents disseminated by government-sponsored enterprises ("GSEs"), including the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac").

Additional evidence confirming the truth of the Homeowners' allegations will be established through discovery.

## I. <u>SUMMARY OF ALLEGATIONS</u>

1.      This is a proposed class action on behalf of all homeowners who, during the period from January 1, 2005 through the present ("Class Period"), were:

(a)   Defendants in New Jersey or Pennsylvania mortgage foreclosure actions prosecuted by Phelan Hallinan & Schmieg, P.C. or Phelan Hallinan & Schmieg, LLP,  and  (b) damaged by one or both of the following abusive foreclosure practices:

i)  Preparation, execution and notarization of fraudulent  court documents and property records used to initiate and prosecute improper foreclosure actions in the name of Wachovia Bank, N.A. and/or U.S. Bank, N.A., as purported "Trustee for the Pooling and Servicing Agreement dated as of November 1, 2004, Asset-Backed Pass-Through Certificate Series 2004-WWF1," and/or

ii) Imposition of inflated or fabricated fees for "default management services" that exceed amounts specified in uniform fee schedules disseminated to foreclosure law firms by Fannie Mae and Freddie Mac or otherwise exceed prevailing industry standards.

2.      Integral to their scheme to inflate or fabricate foreclosure-related fees charged to homeowners threatened with loss of their homes, Defendants systematically bring foreclosure actions in the name of entities that do not possess (a) legal ownership of homeowners' mortgages or notes and (b) legal standing to sue homeowners obligated under those instruments.  With speed and profit as their paramount objectives, Defendants file foreclosure lawsuits without undertaking even rudimentary investigation of basic facts concerning mortgage ownership and legal standing.

3.      To create an illusion of mortgage ownership and standing, Defendants systematically create and use (a) falsified mortgage assignments and other property records filed with county agencies, and (b) complaints, certifications, verifications, affidavits, motions, praecipes and other legal documents filed in New Jersey and

Pennsylvania state courts, which contain untrue statements of material fact purportedly based "on personal knowledge" of employees of the Phelan firm, related entities and servicer clients (*See* pages 24-35, 36-41 below).

4.    While the underlying validity or invalidity of Defendants' foreclosure judgments is not an issue in this lawsuit, Defendants are liable for _fraudulent practices_ they systematically employed in prosecuting wrongful foreclosure actions and in thereby obtaining millions of dollars in inflated or fabricated fees from homeowners.

5.    Defendants' false and misleading statements concerning mortgage ownership and legal standing operate as a fraud on the judicial system. They also (a) burden distressed homeowners with unnecessary attorneys' fees and other unessential expenses that undermine their ability to remain in their homes, and (b) contrive for Defendants illegitimate opportunities to foist inflated or fabricated foreclosure fees upon delinquent borrowers desperate to save their property.[1]

6.    Fraudulent foreclosure-related fees obtained by Defendants from financially distressed homeowners include, by way of non-exhaustive example, overstated and objectively unreasonable charges not authorized by contract or otherwise permitted by law for (a) services allegedly performed by foreclosing counsel; (b) real estate title searches; (c) property appraisals, including so-called "broker price opinions" ("BPOs"); (d) property inspection and/or maintenance; and (e) unexplained, undocumented and duplicative activities.  *See* below at pages 34, 41-48.

---

[1] The pervasive practice among mortgage servicers and their law firms of filing fraudulently executed or notarized legal documents (sometimes called "robo-signing") has been reported extensively in the national news media since September 2010.  *See, e.g.*, Scott Pelley, *Mortgage Paperwork Mess: The Next Housing Shock?*, CBS 60 MINUTES, April 3, 2011, http://www.cbsnews.com/video/watch/?id=7361572n&tag=related:photovideo; and Lisa Myers, Rich Gardella and John W. Schoen, *No End In Sight To Foreclosure Quagmire*, NBC NIGHTLY NEWS/MSNBC.COM, May 9, 2011, http://www.msnbc.msn.com/id/42881365/.

The term "Piling On" describes the practice of "mortgage companies hitting families already in financial trouble with unfair fees and questionable practices to make it tougher for them to save their homes."[2] These spurious charges are also known as "junk fees."[3]

7.    One judge in the Eastern District of Louisiana who has examined the systematic practices of WFB estimates that inflated or fabricated "default-management" fees generate potentially "billions [of dollars] in improperly earned revenue" to WFB alone.[4]

8.    The fraudulent schemes have been undertaken on an institutionalized basis through the knowing participation and coordination of each Defendant.

9.    The Homeowners seek recovery of actual and statutory damages sustained because of Defendants' wrongful conduct.

10.    The Homeowners also seek equitable and injunctive relief, including Court appointment, at Defendants' expense, of:

- A forensic accounting firm to audit Defendants' files for the purpose of quantifying Defendants' ill-gotten gains; and

- A special master to (a) recommend business management and accounting procedures that the Phelan firm must adopt and implement to avoid future

---

[2]    NBC's *Today* program, May 7, 2008, http://today.msnbc.msn.com/id/21134540/vp/24480566#24480566. *See also* Gretchen Morgenson and Jonathan D. Glaser, *Foreclosure Machine Thrives on Woes*, N.Y.TIMES, Mar. 30, 2008 http://www.nytimes.com/2008/03/30/business/30mills.html?_r=1&sq=morgenson&st=nyt&scp=8&pagewanted=all; Adam J. Levitan and Tara Twomey, *Mortgage Servicing* (2011), GEORGETOWN LAW FACULTY AND OTHER WORKS, Paper 498, at 41-45; 43, 28 Yale J. On Reg. 1 (2011) ("Levitan and Twomey Paper"), http://scholarship.law.georgetown.edu/cgi/viewcontent.cgi?article=1497&context=facpub

[3]    Testimony dated December 1, 2010 by Chapman University School of Law Professor Kurt Eggert before the Senate Committee on Banking, Housing and Urban Affairs ("Eggert Testimony"), at 2, 8-10, http://banking.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=2ab0a78e-12ee-4cf8-bb70-745d0d0372ab

[4]    *In re Jones*, 2009 Bankr. LEXIS 3317, at *31, and n. 59 (Bankr. E.D.La. Oct. 1, 2009).

mortgage foreclosure abuses and (b) monitor compliance by the Phelan firm with business management and accounting procedures directed by the Court.

## II.   <u>JURISDICTION AND VENUE</u>

11.   This proposed class action is instituted against Defendants for injuries sustained by financially distressed homeowners resulting from Defendants' violations of the Racketeer Influenced and Corruption Act ("RICO"), 18 U.S.C. §1962(c); the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56.8-1 *et seq*.; and the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201 *et seq*. To remedy these violations, Plaintiffs seek actual and statutory damages (including treble damages), together with costs of suit and reasonable attorneys' fees.  Federal question jurisdiction is conferred upon this Court by 18 U.S.C. § 1964(c); 15 U.S.C. § 1692k(d); and 28 U.S.C. §§ 1331, 1334 and 1337.

12.   The Homeowners also seek actual damages for breach of contract, money had and received, and negligence.

13.   In addition to actual and statutory damages, the Homeowners seek equitable relief in the form identified above at ¶10.

14.   The Court may adjudicate the Homeowners' common law claims under principles of pendent jurisdiction.

15.   Under the Class Action Fairness Act of 2005, federal jurisdiction over class actions also exists where, as here, any member of a plaintiff class is a citizen of a state different from any defendant, and the aggregated amount in controversy exceeds five million dollars.  *See* 28 U.S.C. §§ 1332(d)(2) and (6).

16.    This Court has *in personam* jurisdiction over Defendants, *inter alia*, because Defendants live in, maintain offices, have employees and agents, and regularly transact business within this District.

17.    Venue is proper in this District because many of the events giving rise to the Homeowners' claims occurred in this District.

### III.    PARTIES

### A.    The Representative Homeowners

18.    Plaintiffs Charles J. and Diane Giles, husband and wife, were homeowners who reside in Barnegat Township, Ocean County, New Jersey.

19.    Plaintiff Laurine Spivey is a homeowner who resides in Philadelphia, Pennsylvania.

### B.    Defendants

20.    Defendant Phellan Hallinan & Schmieg, LLC ("Phelan LLC") is a high-volume mortgage foreclosure law firm having its principal place of business at 617 J.F.K. Boulevard, Suite 1400, Philadelphia, Pennsylvania 19103.

21.    Also organized and operating as a professional corporation under the laws of the State of New Jersey, the Phelan firm maintains a principal office at 400 Fellowship Road, Suite 100, Mount Laurel, New Jersey 08054.  The Phelan firm maintains another office at One Gateway Center, 11th Floor, Newark, New Jersey 07102.  In New Jersey, the Phelan firm is known as Phelan Hallinan & Schmieg, P.C. ("Phelan P.C.").[5]

---

[5]  On November 1, 2010, the Phelan firm opened an office at 888 SE 3rd Ave, Suite 201, Fort Lauderdale, FL 33316 under the name Phelan Hallinan PLC.  The Phelan firm's entry into the lucrative Florida foreclosure market coincides with the implosion of a once profitable operation run by David J. Stern, who owned a high-volume foreclosure law practice similar to the Phelan firm, as well as a company known as DJSP Enterprises, Inc., which purportedly provided title searches, litigation support and other "default management services" to

22.     Defendant Lawrence T. Phelan ("Larry Phelan") is the principal equity partner of the Phelan firm.  Although he is not licensed to practice law in New Jersey, Larry Phelan serves as president and major shareholder of Phelan P.C.  He has an approximately 49% ownership interest in Phelan LLC and an approximately 41% interest in Phelan P.C.

23.     Defendant Francis S. Hallinan ("Frank Hallinan") is an equity partner of the Phelan firm.  Hallinan is administrator of the firm.

24.     Defendant Daniel G. Schmieg ("Dan Schmieg") is an equity partner of the Phelan firm.

25.     Defendant Rosemarie Diamond is an attorney with the Phelan firm who has responsibility for the firm's New Jersey operations.

26.     Defendant Full Spectrum Services, Inc. ("Full Spectrum"), formerly known as Foreclosure Review Services, Inc. and now operating through an entity called FSS Acquisitions, Inc., is a New Jersey business located at 400 Fellowship Road, Suite 200, Mount Laurel, New Jersey 08054.  Full Spectrum is owned and controlled by Larry Phelan, Frank Hallinan, and Dan Schmieg.  Full Spectrum purportedly provides services to law firms in Pennsylvania and New Jersey, including process serving, mortgage and judgment searches, and publication of legal notices.

---

its foreclosure firm founder.  *See* Julie Kay, *Law Firms Descend on Florida to Take Over Foreclosure Business*, AM LAW.COM, Oct. 5, 2011;
http://www.law.com/jsp/article.jsp?id=1202517889234&Law_Firms_Descend_on_Florida_to_Take_Over_Foreclosure_Business&slreturn=1; Andy Kroll, *Fannie and Freddie's Foreclosure Barons*, MOTHER JONES, Aug. 4, 2010, http://motherjones.com/politics/2010/07/david-j-stern-djsp-foreclosure-fannie-freddie?page=1; Andy Kroll, *Foreclosure King David Stern Shuttering His Law Firm*, MOTHER JONES, Mar. 7, 2011, http://motherjones.com/2011/03/foreclosure-david-stern-shutters-law-firm-florida.  Phelan Hallinan PLC is now Freddie Mac designated counsel in Florida.  *See* http://www.freddiemac.com/service/msp/pdf/desigcounsel.pdf.

27.     Defendant Land Title Services of New Jersey, Inc. ("Land Title Services" or "LTS") is a New Jersey corporation located at 400 Fellowship Road, Suite 220, Mount Laurel, New Jersey 08054.  Along with its affiliate, Land Services - PA, LTS is owned and controlled by Larry Phelan, Frank Hallinan, and Dan Schmieg.  LTS provides title searches and other real property services to the Phelan firm and its mortgage servicer clients.

28.     Defendant Wells Fargo & Company, a Delaware corporation, is a diversified financial services company maintaining principal executive offices at 420 Montgomery Street, San Francisco, California 94163.

29.      Defendant WFB is a banking association chartered in Sioux Falls, South Dakota, with principal offices at 420 Montgomery Street, San Francisco, California 94163. WFB originates and services residential mortgages through its division Wells Fargo Home Mortgage or its trade name America's Servicing Company ("ASC").  They maintain principal places of business at 7000 Vista Dr., West Des Moines, Iowa 50266-93 and 3476 Stateview Boulevard, Fort Mill, South Carolina 29715.

## IV.    FACTUAL ALLEGATIONS

### A.    Foreclosure Processes of the Phelan Firm and WFB

30.     For the past decade, most residential mortgages have been sold (*i.e*, "securitized") by original lenders to investment banking firms that package revenue streams of pooled mortgages into instruments known as Residential Mortgage Backed Securities ("RMBS").  These instruments are purchased by investors and traded in public securities markets.[6] Financial institutions (*i.e.*, "Trustees") are designated as legal owners

---

[6]   In 2009, nearly 90% of first-lien residential mortgages originated were securitized.  Levitan and Twomey Paper at 12, *citing*, 2 INSIDE MORTG. FIN., THE 2010 MORTGAGE MARKET STATISTICAL ANNUAL 10 (2010) at 3.

of the securitized loans held in trusts administered by Trustees for the benefit of RMBS investors.

31.     Mortgage servicers like WFB are hired to collect income from homeowners' mortgage payments, which they transmit to Trustees for distribution to investors.  When homeowners fail to make payments required under their mortgages (*i.e.*, they "default" on their obligations), servicers are authorized to take reasonable action, at the homeowners' expense, to cure the default (*i.e.*, recover past due payments and costs incurred in doing so) and to restore the income-producing value of the mortgage assets, including, if necessary, by foreclosure proceedings to liquidate mortgaged property at public auctions (*i.e.*, "Sheriff's Sales").  The legal duties of Trustees and mortgage servicers are defined in documents known as Pooling and Servicing Agreements ("PSAs").

32.     Mortgage servicers obtain revenue in three ways: (a) a fixed fee for each loan, typically between .25% and .50% of the principal amount; (b) "float" income from interest accrued between the time when servicers receive homeowners' mortgage payments and when those payments are transmitted to Trustees; and (c) "default management" fees charged to delinquent homeowners, which servicers are permitted to keep as compensation for their work.

33.     Fannie Mae and Freddie Mac are the largest mortgage investors in the United States, collectively owning or guaranteeing about half of all outstanding mortgage debt nationwide.  Servicers hired by the GSEs are required to abide by highly specific guidelines, including the requirement that legal work for foreclosures must be referred to a few law firms in each state that have been granted "designated counsel" or "retained attorney" status.  Fannie Mae and Freddie Mac define the maximum rate of fees that can be charged

by foreclosure law firms, as well as the maximum time in which foreclosures must be brought to conclusion.  *See* below at pages 11-13, 37 and 43-47.  Because of their market dominance, Fannie Mae and Freddie Mac have established prevailing industry standards that govern both mortgage servicers and their foreclosure law firms.

34.     Mortgage servicers like WFB are assisted by technologically sophisticated companies like Lender Processing Services, Inc. ("LPS") (and its wholly owned subsidiary, LPS Default Solutions, Inc. ("LPS Fidelity")) and CoreLogic, Inc. (which in 2010 was spun off from the financial services business unit of The First American Corporation).

35.     According to LPS, the company's mortgage servicing platform ("MSP") is "the undisputed market leader with more than 50 percent of mortgages in the U.S. by dollar volume serviced on this computer platform."  MSP is an integrated program that automates all areas of loan servicing.[7]

36.     LPS's technology products include LPS Desktop, a web-based "workflow" information system used by servicers to process communications, information and data throughout the entire lifecycle of residential mortgages.[8] VendorScape is a comparable product marketed to the foreclosure industry by CoreLogic.  Both LPS Desktop and VendorScape are designed for use with MSP.

37.     Mortgage servicers require outside foreclosure lawyers to purchase and pay license fees to use technology products sold by LPS and CoreLogic.  These companies also provide "default management solutions" to mortgage servicers, which "outsource" many of their administrative and support functions to LPS and CoreLogic.  Among other functions,

---

[7] http://www.lpsvcs.com/Products/Mortgage/Servicing/ServicingPlatform/MSP/Pages/default.aspx.

[8] http://www.lpsvcs.com/Products/Mortgage/Default/BankruptcyandForeclosure/Pages/default.aspx  and http://www.lpsvcs.com/Products/Mortgage/Servicing/ProcessManagement/Pages/default.aspx.

LPS and CoreLogic refer servicers' cases to outside counsel, whose performance is monitored closely by these companies throughout the foreclosure process through LPS Desktop or VendorScape.

38.     Servicers pay nothing for default management services provided by LPS.  To avail themselves of these no-cost amenities, mortgage servicers are required by LPS to execute confidential "Default Services Agreements" ("DSAs") with LPS Fidelity, under which servicers must hire foreclosure lawyers who are members of an association of attorneys retained and managed by LPS Fidelity ("Fidelity Network").  Fidelity Network attorneys receive foreclosure and bankruptcy case referrals and assignments from LPS Fidelity through LPS Desktop.

39.     As a condition to membership in the Fidelity Network (and thus the opportunity to gain a steady flow of referrals), foreclosure lawyers must enter into a "Network Agreement" with LPS Fidelity and Local Counsel Agreements with servicers using LPS's "default management services."   These agreements obligate Fidelity Network members (a) to pay steep "technology" and "administrative" fees to LPS Fidelity, in exchange for which they obtain case referrals generating low, fixed-rate fees for all legal services provided and (b) accept rigorous demands on and oversight of their professional practices.

40.     To finish their assignments as quickly as possible (the common bottom-line requirement of servicers and GSEs like Fannie Mae and Freddie Mac), foreclosure lawyers must comply with strict timelines[9] in ramming their actions through the judicial system.

---

[9] *See* Fannie Mae Servicing Guidelines, Foreclosure Timelines (June 6, 2011) (specifying "maximum number of allowable days between referral to attorney (or trustee) and foreclosure sale date"), https://www.efanniemae.com/sf/guides/ssg/relatedservicinginfo/pdf/foreclosuretimeframes.pdf.

With speed as their overriding priority,[10] these lawyers have been discouraged from communicating with their mortgage servicer clients. Because all communications are transmitted through LPS Desktop or VendorScape, the flow of all information exchanged between mortgage servicers and their foreclosure attorneys is effectively managed by LPS and CoreLogic.

41. LPS tracks its network attorneys through an internal metric known as Attorney Performance Reviews ("APR"), which ranks foreclosure lawyers based on how fast they perform their tasks.[11] Appearing on the computer screens of Fidelity Network attorneys equipped with LPS Desktop are blinking "traffic" lights indicating the status of the attorneys' performance. Green represents satisfactory promptness. Yellow represents an alarming level of slowness. Red represents a warning of tardiness that could lead to financial penalties,[12] suspension of referrals or termination from the network. If Fidelity Network attorneys fail to achieve minimally acceptable APR ratings, their ability to receive

---

[10] *See* Ariana Eunjung Cha and Zachary A. Goldfarb, *For Foreclosure Processors Hired By Mortgage Lenders, Speed Equaled Money*, WASH. POST, Oct. 16, 2010,
 http://www.washingtonpost.com/wp-dyn/content/article/2010/10/15/AR2010101506541.html.

[11] As LPS explained, "[w]hen [servicer] clients refer a loan to local counsel through LPS Foreclosure Solutions, Inc., the loan timeline is managed until resolution. Clients identify the unique requirements of their portfolios, and the loans are processed through LPS Foreclosure Solutions, Inc. to ensure the most efficient outcome. Internal time limitations for key events are set, and active monitoring is conducted to minimize the overall timeframe from referral to resolution. The loan-level data is reported to LPS partners [*i.e,.* servicers]on a daily basis using LPS Desktop...."

[12] "Dilatory" servicers are subject to payment of "compensatory fees" to Freddie Mac and Fannie Mae if their foreclosure law firms do not meet mandatory timeline requirements. *See* Freddie Mac, *Servicer Alignment Initiative*, Pub. No. 887, June 3, 2011, at 5, http://www.freddiemac.com/service/factsheets/pdf/servicing_alignment.pdf, and Fannie Mae, *Servicer Alignment Initiative – Overview for Fannie Mae Servicers*, April 28, 2011, at 4, https://www.efanniemae.com/sf/servicing/pdf/saioverview.pdf; *see also* Letter dated November 16, 2011 from U.S. Rep. Elijah E. Cummings (D.Md.) to Edward Demarco, Acting Director of Federal Housing Finance Agency, http://www.scribd.com/doc/74533762/Cummings-to-Edward-DeMarco-11-16-11.
By contrast, foreclosure lawyers who race single-mindedly to begin and complete foreclosures receive industry awards and financial bonuses. *See* Jennifer Anthony and Lynn McNamee, *FNFS APR Random Audit Program*, THE SUMMIT (newsletter produced by LPS predecessor Fidelity National Foreclosure Solutions, Inc.), Oct. 2006 (Vol. 2, Issue 3) at 9-11, http://www.scribd.com/doc/65934051/FNFS-2006-Summit-Newsletter.

lucrative foreclosure work is impaired or eliminated.  Conversely, high APR ratings obtained through very quick foreclosures translates into potentially thousands of new cases and enormous profits, generated in large part by owned-and-controlled companies set up by foreclosure lawyers to charge fees for "default management services" such as title searches, BPOs and property inspections.

42.    Foreclosure lawyers accept slim profit margins for their foreclosure work and they surrender their professional independence for one reason.  To remain viable in their competitive industry, they have no alternative.

43.    As Cherry Hill, New Jersey foreclosure lawyer Mark J. Udren testified in other litigation:

> [My firm] is one of many law firms that conduct a high volume foreclosure bankruptcy practice and if a lender requires that a law firm enter into an agreement with its agent, a servicing company such as Fidelity, [the law firm] has no choice but to participate in such a program if it wants to do business."[13]

44.    However understandable the foreclosure lawyers' economic justification might be, judges have criticized servicers and their high-volume foreclosure law firms for fostering a corrosive "assembly line" culture of practicing law.[14]

45.    Having won the race with its competition, the Phelan firm describes itself as the "premier default services operation" in Pennsylvania and New Jersey. The Phelan firm achieved this status through a barebones staff of about 20 lawyers.  In 2008 alone, the Phelan firm handled an estimated 24,000 to 26,000 foreclosure cases in Pennsylvania and New Jersey, representing almost every loan servicer, including WFB.  In 2009 and 2010,

---

[13]   *In re Taylor*, 407 B.R. 618, 638 (Bankr. E.D.Pa.. 2009), *sustained on appeal*, 2011 U.S. App. LEXIS 17651 (3d Cir. Aug. 24, 2011).

[14]   *In re Taylor*, 407 B.R. at 641, *quoting*, *In re Parsley*, 384 B.R. 138, 183  (Bankr. S.D.Tex. 2008).

Phelan firm, Full Spectrum and LTS obtained approximately $48 million from just _one_ of its many other clients.  *See* below at pages 20-21.

46.     Because of the colossal volume of foreclosure cases it handles and the haste with which it disposes of them, the Phelan firm is a Fannie Mae "retained attorney" and a Freddie Mac "designated counsel" in both New Jersey and Pennsylvania.  Apropos of its achievements in meeting and exceeding the requirements of its clients, the Phelan firm calls its newsletter "THE TIMELINE."[15]

47.     The Phelan firm otherwise boasts about the "speed and efficiency" with which the firm plows through its foreclosure cases.  According to a 2009 version of the Phelan firm's web site, its speed is accomplished through the firm's ability to "leverage technology" by "completely computeriz[ing]" its office with "every case management and invoice reporting syste[m]" used in the foreclosure industry.  In addition, the web site attempted to contrast the Phelan firm from other foreclosure firms by emphasizing the fact that it "owns and controls the majority of its vendors to ensure as quick as possible turnaround time as humanly possible.  We also operate our own investigation services in both states [i.e., New Jersey and Pennsylvania] to locate defendants for service of process.  Valuable time is saved in the initial service stage and the crucial sale stage."

48.     While cutting off a longstanding business relationship with a former title search partner in March 2005, Larry Phelan described his "business model in the ever-changing foreclosure ... industry."  In an e-mail to Anthony R. Angelo, president of Aracor Search and Abstract Services, Inc. ("Aracor"), Larry Phelan, on behalf of himself and his partners, explained:

---

[15]   *See* http://www.fedphe.com/pages/newsletter.htm.

- "Years ago, Freddie Mac asserted its investor rights over law firms nation-wide and instituted strict time frames.  Law firms had to and continue to perform to the highest standards for the prized designated counsel status.  [Predecessor firm] Federman & Phelan had to change over night [sic] or go out of business.  Through hard and smart work, we adapted quickly and became one of the premier mortgage foreclosure firms in the country."

- "We are now experiencing another significant change in our industry.  In-house [mortgage servicer] client default operations are being turned over to First American [now CoreLogic, Inc.] and [LPS] Fidelity. These two (2) title giants are outsourcing the foreclosure and bankruptcy referrals for a price, a very high price. … So, the title world has changed dramatically in the last two years, and *drastically* in just the last 9 months.  So what do we do? We change.  We have to change.  We have to realize that the cheese has been moved and reinvent ourselves to protect our income streams."  (Emphasis in original)

- Phelan Hallinan & Schmieg has three (3) equity partners and four (4) non-equity partners, with more associates looking to enhance their status.  As important and key to the law firm's success is a core group [of] about twelve (12) middle managers, who are viewed as valued colleagues, all of whom are responsible for bringing in and keeping the legal work that creates the vendor related work, whether it is title, service [of process], investigations, closings etc."

- "The changes in the industry with outsource fees and other mandatory costs all cut deep into the firm's profit margins and leave the title area as one of the last areas of profit.  We must therefore rearrange our business model. …"

- *Land Title Services, LTS, a company fully controlled and managed by the law firm*, was established in the beginning of [2005] and has moved quickly to adapt to the new title business environment. The goal was to implement a radical new approach to the title product process. … LTS outsources almost all of the typing work to India.  LTS, in conjunction with Foreclosure Review Services ("FRS"), hired a large number of courthouse abstractors as employees and positioned them throughout the state to handle a high volume of search work, resulting in a very low price per search.  Then, LTS management instituted a business process utilizing local and India personnel to electronically process the work overseas and at night. …  Not only is the search work much less expensive than that charged by Aracor (or any other title

15

> search vendor), the expected turnaround time once fully operational is about three (3) to five (5) business days of a typed and examined product. ... Most important, under this process, LTS is making more than four (4) times the profit of Aracor, and with less than 80% the number of employees. Accordingly, this is our new *law firm-title business model.* It would be stupid to do anything else."

(Emphasis supplied).

49.     A copy of Larry Phelan's March 31, 2005 e-mail to Angelo is attached here as Exhibit A.

50.     The cost savings yielded by the Phelan firm's "radical new approach to the title product process" are not passed on to foreclosed-upon homeowners, who are instead systematically overcharged for cut-rate "title products" delivered by LTS. Moreover, "title products" obtained by the Phelan firm from its "fully controlled and managed" abstract company are often worthless because they fail to accomplish their fundamental purpose – to identify proper legal owners of properties and mortgages subject to the Phelan firm's foreclosure proceedings.

51.     The Phelan firm's unreliable "title products" and its automatic pilot foreclosure system torment even financially secure homeowners who never miss a mortgage payment. One example was chronicled in June 2010 by KYW television reporter Ben Simmoneau, who interviewed Judi and Ed Worrall of Chester County, Pennsylvania concerning the Phelan firm's effort to kick them out of their home through a Sheriff's Sale – despite a glaring misidentification of the Worralls' address in foreclosure documents associated with the default of a neighbor. For several months, the Worralls repeatedly called the error to the attention of Phelan firm attorneys, who assured them that the firm was "aware of the situation" and had already "addressed" the issue. When the Worralls

later discovered that -- despite the Phelan firm's false assurances -- their home was still scheduled for Sheriff's Sale, they contacted their local television station.

52.     To help the Worralls, Simmoneau on four occasions unsuccessfully called the Phelan firm seeking cancellation of the Sheriff's Sale.  Unable to persuade the Phelan firm to correct its obvious mistake, Simmoneau and his camera crew visited the Phelan firm's Center City Philadelphia offices, only to be refused entry to the firm's offices.  This visit was captured on videotape, showing Simmoneau stranded at a closed and locked front door, trying in vain to discuss the seriousness of the Worrell's problem with a Phelan firm employee through a speaker box.  After ignoring more than three months of persistent complaint by the Worralls and Simmoneau (and only when it was confronted with the prospect of losing business because of negative publicity), the Phelan firm, without explaining its callous conduct, finally withdrew its Sheriff's Sale listing for the Worralls' home.[16]

53.     Other homeowners are not as fortunate as Mr. and Ms. Worrall.  Nor is the unnecessary trouble visited upon the Worrells an insubstantial or isolated mistake. Instead, this and similar improper speed-driven and profit-maximizing foreclosure activities by the Phelan firm and its servicer clients are institutionalized, systematic and inexpensively automated -- all dictated by the financial imperatives of the "ever-changing foreclosure industry" described by Larry Phelan at ¶¶ 48-49 above.

---

[16] *See* http://homeequitytheft-cases-articles.blogspot.com/2010/06/pa-couple-current-on-house-payments.html.

54. The "business model" put into action by the Phelan firm[17] (and a few other likeminded foreclosure firms) has been phenomenally successful.  That success was recognized on Wall Street, which laid the foundation for the paradigm in the first place when it created esoteric investment vehicles like RMBSs.

55. In June, 2010, a Georgia company named Prommis Solutions Holdings, Inc. ("Prommis") filed a preliminary prospectus ("Prospectus") with the SEC in connection with a proposed public stock offering ("Proposed IPO") underwritten by Credit Suisse and Deutsche Bank Securities.[18] The Prospectus stated that "the market for residential mortgage default resolution processing services in the United States was approximately $4.0 billion."

56. Prommis, owned in majority part by Grant Hill Partners, LLC, a Boston-based hedge fund, was established on February 24, 2006.  At that time, the fund paid $137 million for the non-legal "mortgage default resolution processing operations" (*i.e.*, "back-office operations") of McCalla Raymer, LLC, a foreclosure law firm in Atlanta.[19] The managing partner of McCalla retained a 9.4% ownership interest in Prommis, which he hoped to cash out and sell to investors in the Proposed IPO.[20] That law firm managing partner also served as Chief Executive Officer of Prommis from February 2006 to January 2008, in addition to

---

[17]  One casualty of "business model" implemented by Larry Phelan was his former partner, Frank Federman, who was forced to "retire" from the law firm he founded.  It also included the rebranding of his firm from "Federman & Phelan" to "Phelan, Hallinan & Schmieg."

[18]  A copy of the Prospectus is available at  http://www.faqs.org/sec-filings/100621/Prommis-Solutions-Holding-Corp_S-1.A/.

[19] McCalla Raymer and MR Default Services are same entities criticized by Judge Jeff Bohm for debasing the judicial system through their "assembly line" culture of practicing law.  *In re Parsley*, 384 B.R. 138, 183 (Bankr. S.D.Tex. 2008), *cited with approval* in *In re Taylor*, 407 B.R. 618, 641 (Bankr. E.D.Pa. 2009).

[20] Formed out of the "back-office operations" of the now defunct Law Offices of David J Stern, DJSP Enterprises, Inc. issued shares through a similar public offering in which Stern personally received nearly $60 million.  *See* Julie Creswell and Barry Meier, *Bet on Foreclosure Boom Turns Sour for Investors*, N.Y. TIMES, Feb. 1, 2011, http://www.nytimes.com/2011/02/02/business/02stern.html?pagewanted=all.

his duties as Chairman of the Board from February 2006 to May 1, 2010, when he became Prommis's Vice Chairman of the Board.

57.     Underscoring the strong economic interest of law firms and their interconnected "back-office operations" in favor of fee-generating foreclosures rather loan modifications, Prommis's prospectus disclosed to prospective investors the "risk" that:

> Government programs related to home ownership and the mortgage market and voluntary foreclosure relief efforts by mortgage lenders and servicers may reduce the number of foreclosures or restrict mortgage servicers' remedies in foreclosure, which may adversely affect our revenue and results of operations.  Federal and state governments and agencies and certain courts have proposed and in many cases enacted or adopted programs, regulations and rules in response to the increasing number of mortgage defaults and foreclosures in recent years.  Additional programs, regulations and rules may be implemented, any of which may impose new restrictions or requirements on the processing of foreclosures, decrease the number of foreclosures and bankruptcies that we process and adversely affect our revenue and results of operations.

> Prospectus at 11-12.

58.     The profitability of foreclosure law firms' "back office operations" is also illustrated by the large amount of money paid by Fannie Mae to the Phelan firm and to the "default management service" companies established, owned and controlled by the Phelan firm's three equity partners.

59.     At page 240 of its Annual Report on Form 10-K filed with the SEC on February 24, 2011,[21] Fannie Mae disclosed that:

  a)  In 2010, Phelan LLC invoiced approximately $8.5 million in legal fees relating to work performed for Fannie Mae;

  b)  In 2010, Phelan P.C. invoiced approximately $6.8 million in legal fees relating to work performed for Fannie Mae;

---

[21]  *See* http://www.fanniemae.com/ir/pdf/earnings/2010/10k_2010.pdf.

c)  In 2010, Phelan LLC invoiced approximately $17.9 million in "third-party costs" relating to Fannie Mae matters;

d)  In 2010, Phelan P.C. invoiced approximately $11.2 million in "third-party costs" relating to Fannie Mae matters;

e)  In 2009, Phelan LLC invoiced approximately $6.8 million in legal fees relating to work performed for Fannie Mae;

f)  In 2009, Phelan P.C. invoiced approximately $4.7 million in legal fees relating to work performed for Fannie Mae;

g)  In 2009, Phelan LLC invoiced approximately $15.3 million in "third-party costs" relating to Fannie Mae matters;

h)  In 2009, Phelan P.C. invoiced approximately $6.7 million in "third-party costs" relating to Fannie Mae matters;

i)  In 2010, Full Spectrum Holdings LLC[22] billed the Phelan firm approximately $12.9 million for "work" performed on Fannie Mae matters, approximately 44% of the third-party vendor fees identified in subparagraphs (c) and (d) above; and

j)  In 2009, Full Spectrum Holdings LLC billed the Phelan firm approximately $8.3 million for "work" performed on Fannie Mae matters, approximately 38% of the third-party vendor fees identified in subparagraphs (g) and (h) above.

60.    From Fannie Mae (*one single source*, not including profitable business from many different entities, including Freddie Mac, other GSEs, WFB and other mortgage servicers), the Phelan firm, with only an undersized cadre of lawyers and three equity partners, obtained approximately $26.8 million in legal fees in 2009 and 2010 from Fannie Mae, whose flat-rate fee in Pennsylvania and New Jersey foreclosure actions is $1,300 per case.

---

[22]  Full Spectrum Holdings LLC, the holding company for Full Spectrum and Land Title Services, is wholly owned by Larry Phelan, Frank Hallinan, and Dan Schmieg.

61.     From *one single source* (Fannie Mae), Full Spectrum and Land Title Services obtained approximately $21.2 million in third-party vendor fees in 2009 and 2010.

62.     *From one single source (Fannie Mae), the Phelan firm, Full Spectrum and Land Title Services obtained approximately $48 million in foreclosure fees in 2009 and 2010.*

63.     As  Adam Levitin and Tara Twomey explained, institutionalized piling on of junk fees by mortgage servicers and their foreclosure law firms (often through captive "default  management  service"  affiliates)  is  an  inherent  consequence  of  misaligned economic incentives: "Because servicers are permitted to retain ancillary fees, they have an incentive to charge borrowers as much in fees as they can, even if the fees are not provided for by the mortgage loan documents or a direct contract.[23]

64.     Taking full advantage of these incentives to pile on and hide junk fees, servicers like WFB (and lawyers like those in the Phelan firm) file as many foreclosure cases as they can, quickly and by any means possible, even if their overstretched staffs cannot handle them properly, and even when there is no evidence of ownership of allegedly defaulted mortgages.[24]

65.     According to an "*Interagency Review of Foreclosure Policies and Procedures*" ("Interagency Report") released in April 2011 by the Federal Reserve System, the Office of the Comptroller of the Currency and the Office of Thrift Supervision, "At the end of the fourth quarter of 2010, nearly 54 million first-lien mortgage loans were outstanding, 2.4 million of which were at some point in the foreclosure process.  Additionally, two million

---

[23]    Levitan and Twomey Paper at 43-45.

[24]    Levitan and Twomey Paper at 5 ("[A] a servicer is not necessarily interested in maximizing the value of a loan for the mortgage investors…. Defaulted homeowners find themselves streamlined to foreclosure, rather than to loan workouts.  The result is elevated foreclosure levels").  *See also* Diane E. Thompson, *Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior: Servicer Compensation and Its Consequences*, NAT'L CONSUMER LAW CTR. (2009), and Prommis Prospectus quoted above at ¶ 57.

21

mortgages were 90 or more days past due and at an elevated risk of foreclosure.  New foreclosures are on pace to approach 2.5 million by the end of 2011."[25]

66.     Before foreclosure activity temporarily declined after the mortgage servicer scandal broke nationally in September 2010, the volume of mortgage delinquencies and foreclosures exploded between January 1, 2005 and December, 2009.

67.     As the following chart illustrates,[26] in December 2005, fewer than five percent of the nation's 51.6 homes with mortgages were in default, with about .48 percent of them in foreclosure.  By December 2009, the number of mortgaged homes in default spiked to nearly 11 percent, with 4 percent of these homes in foreclosure.



68.     Behind the statistics are families struggling during the continuing economic crisis known as the "Great Recession."  As the Pew Charitable Trust stated in 2009, "[f]oreclosure can have a devastating impact on homeowners and their families.  It can ruin their credit for years, adversely affect their jobs and children's schooling, and take away

---

[25]     *See* Interagency Report at 5, available at http://cdn.americanbanker.com/media/pdfs/interagency-413.pdf.

[26]     *See* http://cr4re.com/charts/charts.html?Delinquency#category=Delinquency&chart=LPSMay2011.JPG.

what for many Americans is their principal investment opportunity and chance to get ahead."[27]

69.    The lives of many of these families have been turned upside down by the fraudulent foreclosure schemes alleged in this Complaint.

70.    The machinery that drives Defendants' foreclosure juggernaut has been running at an accelerating pace since at least January 1, 2005.  In that time, the Phelan firm and WFB have missed few opportunities to use the institutionalized apparatus they erected to profit at the expense of distressed homeowners.

**B.    The Representative Homeowners Were Harmed by Defendants' Misconduct**

71.    Along with thousands of other Class members, the Representative Homeowners have been damaged substantially by Defendants' systematic fraudulent foreclosure practices.

**Plaintiffs Charles J. and Diane Giles**

**Improper Foreclosure Action by the Phelan Firm and WFB on Behalf of "Wachovia"**

72.    Plaintiff Charles J. Giles ("Charlie Giles") was an emergency medical technician who became medically disabled after trying to help others escape the fire and smoke of the World Trade Center on September 11, 2001 and during later search efforts at Ground Zero.  Dust and debris invaded his lungs, which caused numerous hospitalizations, difficult medical procedures and constant pharmaceutical treatments.  Charlie Giles' life-threatening health conditions still diminish the quality of his life every day.[28]

---

[27] *See Defaulting on the American Dream*, PEW CHARITABLE TRUST, April 2009,   at 11-12, www.pewcenteronthestates.org/uploadedFiles/PCS_DefaultingOnTheDream_Report_FINAL041508_01.pdf.

[28] *See* New Jersey 101.5 FM Radio video at http://www.youtube.com/watch?v=cql9WZK5Rn4.

73.     After September 11th, Charlie Giles moved to a home at the Jersey shore in Barnegat Township, where he lived with his wife, Diane, and two daughters, Kaitlin and Clarissa.  When Charlie's physical problems worsened, he became unable to work.  His medical bills skyrocketed past $200,000 as bureaucratic delays held up first-responder benefit payments from the New York State government.

74.     When Charlie and Diane Giles fell behind on their mortgage, the Phelan firm filed a foreclosure Complaint against them on February 16, 2007 in the Superior Court, Chancery Division for Ocean County, New Jersey ("Ocean County Court"), Docket No.  F-4671-07.

75.     Paragraph 4 of the Complaint against Mr. and Mrs. Giles (purportedly signed by defendant Rosemarie Diamond) alleged that "holder of the obligation and Mortgage" was an entity called "Wachovia Bank, N.A., Trustee for the Pooling and Servicing Agreement dated as of November 1, 2004, Asset-Backed Pass-Through Certificate Series 2004-WWF1," pursuant to a "written assignment" from Argent Mortgage Company LLC ("Argent") to Wachovia that was "about to be recorded."  Although one Court observed that it is "not at all clear" what kind of institution or thing the named plaintiff claims to be,[29] for purposes of simplicity, it shall be referred to here as the "Park Place Trust."

76.     Paragraph 6 of the Complaint also alleged that, other than the mortgage originated by Argent, the prospective assignment and legal documents evidencing the Giles' marriage, "no other instruments appear of record which may affect the premises" in which the Giles lived.

---

[29] *See Schwend v. U.S. Bank, N.A.*, 2010 U.S. Dist. LEXIS 127915, at *7 (E.D.Mo. Dec. 3, 2010).  *See also* below at pages 32-33.

77.    The following is Rosemarie Diamond's "signature" as it appears in the Complaint against Charlie and Diane Giles:

PHELAN, HALLINAN, & SCHMIEG, P.C.

Rosemarie Diamond, Esquire
Attorneys for Plaintiff

78.    In connection with the filing of this Complaint, Rosemarie Diamond also signed and filed with the Ocean County Court two Certifications: (a) one pursuant to Rule 4:5-1, attesting that "all parties who should be joined in this action have been joined" and (b) the other pursuant to Rule 4-5-1(b)(2), attesting that "prior to filing the within Complaint, [Ms. Diamond] caused a title search of the public record to be made for the purpose of identifying any lien holders  or other persons or entities with an interest in the property that is the subject of this foreclosure."

79.    Except perhaps for the one identified in ¶78(b), the above-referenced representations ascribed to Rosemarie Diamond in the foreclosure Complaint were false. Even if literal truth was mixed in with the falsity, Ms. Diamond's representation that she ordered a "title search of the public record" was materially misleading because any cut-rate title search obtained by the Phelan firm from Land Title Services in its foreclosure action against Charlie and Diane Giles was incomplete and inaccurate.

80.    When the Complaint was filed and at all times since, the Phelan firm and Rosemarie Diamond had no authority to act on behalf of Wachovia in connection with Charlie and Diane Giles' mortgage.  However, the Phelan firm, at the command of WFB and through fraudulent means, prosecuted a mortgage foreclosure action against the Giles

through default judgment, writ of execution, the scheduling of a Sheriff's Sale, and a below-market distress sale of the Giles' home.

81.     On April 18, 2007, *after* the Phelan firm filed its foreclosure Complaint against Charlie and Diane Giles, employees or agents of Larry Phelan, Frank Hallinan, and Dan Schmieg recorded two purported assignments of the Giles' mortgage with the County Clerk of Ocean County, New Jersey ("Ocean County Clerk").

82.     The first "assignment," which was purportedly notarized on September 28, 2004, attempted to convey ownership of the Giles' mortgage from Argent (the loan originator) to Ameriquest Mortgage Company ("Ameriquest," the "seller" of a pool of mortgages packaged into the Park Place Trust).[30] Although the Complaint represented that only *one* assignment from Argent to "Wachovia" was "about to be recorded," the purpose of this additional assignment was to convey legal ownership of the Giles' mortgage to Ameriquest so that it could be included in the pool of mortgages that Park Place Securities, Inc. (the "depositor," an affiliate of Ameriquest) attempted to package into RMBS certificates sold to investors through a public offering underwritten by Morgan Stanley, Bear, Stearns & Co. Inc., and Goldman, Sachs & Co.[31]

83.     The second "assignment" (also purportedly notarized on September 28, 2004 and recorded simultaneously with the first) purportedly re-conveyed ownership of the Giles' mortgage from Ameriquest to Wachovia, "as Trustee" of the Park Place Trust.  The

---

[30] In 2006, Ameriquest, once the nation's largest sub-prime lender, entered into a $325 million settlement with attorneys general of 49 states who charged Ameriquest with unlawful predatory lending practices. Press Release, *Miller: Ameriquest Will Pay $325 Million and Reform its Lending Practices*, IOWA ATTY. GEN, Jan. 23, 2006, http://www.iowa.gov/government/ag/latest_news/releases/jan_2006/Ameriquest_Iowa.html.  Ameriquest went out of business on or about August 31, 2007, while ACC Capital Holdings LLC, the parent of both Ameriquest and Argent, sold Argent's subprime loan origination business to Cititgroup, which changed the name of that business to Citi Residential Lending.  *See* Dash, *Citigroup Buys Parts of a Troubled Mortgage Lender*, N.Y. TIMES, Sept 1, 2007, http://www.nytimes.com/2007/09/01/business/01citi.html.

[31] *See* Prospectus Supplement for Park Place Trust, available at http://www.secinfo.com/dqTm6.128d.htm.

objective of this assignment was to re-transfer ownership of the Giles' mortgage to a party that had ostensible legal standing to bring a mortgage foreclosure action against Charlie and Diane Giles.

84.     Whether or not the first "assignment" effectively transferred legal ownership of the Giles' mortgage to Ameriquest, *Wachovia was not Trustee of the Park Place Trust on February 16, 2007, when the Phelan firm filed its foreclosure Complaint against Charlie and Diane Giles on behalf of "Wachovia."  Nor was Wachovia was Trustee of the Park Place Trust on April 18, 2007, when the employees or agents of Larry Phelan, Frank Hallinan, and Dan Schmieg recorded an after-the-fact "assignment" to Wachovia.  Nor was Wachovia was Trustee of the Park Place Trust on June 5, 2007, when the Phelan firm obtained a default judgment against the Giles on behalf of "Wachovia" – or at any time since.*  In simple terms, Wachovia had no legal authority to act on behalf of the Park Place Trust.  Neither WFB nor the Phelan firm had legal authority to act on behalf of Wachovia.

85.     This is because, *on December 30, 2005*, Wachovia sold its entire corporate trust and institutional custody portfolio to a different financial institution, U.S. Bank, N.A. After that sale, Wachovia had no ownership interest in Charlie and Diane Giles' mortgage, if it ever did, and Wachovia had no legal standing to sue the Giles in the foreclosure action that WFB improperly directed the Phelan firm to prosecute.

86.     Unaware of the Phelan firm's complicated subterfuge, Charlie and Diane Giles did not contest the foreclosure Complaint.  On April 5, 2008, the Phelan firm filed with the Ocean County Clerk (a) a request for a default judgment against the Giles and (b) a certification of default.  Both documents were purportedly signed by Rosemarie Diamond. As shown below, the signature attributed to Ms. Diamond on this document does not bear

27

the slightest resemblance to handwriting attributed to her on the foreclosure Complaint and Certifications:

PHELAN HALLINAN & SCHMIEG, PC

By: _Rosemarie Diamond_
Rosemarie Diamond

87.    On June 5, 2007, the Ocean County Court entered a default judgment against Charlie and Diane Giles, authorizing a Sheriff's Sale of their home and determining that "Wachovia" was entitled to recover from the Giles an amount of $204,391.70, plus costs of suit and legal fees in an amount of $2,193.92.

88.    Charlie and Diane Giles put their house up for sale and attempted to negotiate a resolution of their debt with representatives of WFB and the Phelan firm, including Rosemarie Diamond.

89.    The Giles hired an attorney, Jerry J. Dasti, Esquire ("Mr. Dasti"), to protect their legal interests.  By letter dated July 12, 2007, Mr. Dasti wrote to the Phelan firm (a) advising it of his representation of Charlie and Diane Giles and (b) requesting that all future communications concerning his clients be forwarded to his office.

90.   The Phelan firm obtained a writ of execution on the judgment it procured on behalf of "Wachovia."   By certified letter dated July 27, 2007 from Debbie Williams, a Phelan firm legal assistant, Charlie and Diane Giles, still believing that productive workout discussions were under way with Rosemarie Diamond and others, were shocked to learn for the first time that a Sherriff's Sale of their home had been scheduled for "August 21, 2207 [sic]."  The Phelan firm did not send a copy of this communication to Mr. Dasti.

28

91.    The Sheriff's Sale scheduled for August 21, 2007 was adjourned by the Ocean County Sheriff.

92.    On September 12, 2007, Charlie Giles filed with the Ocean County Court an Emergency Application for a Stay of the Sheriff's sale, which was later adjourned to September 18, 2007.  In his application, Charlie Giles explained his dire health conditions to the Court, as well as the reasons why he suffered from them.  He also told the Court about his rising medical expenses, and the three-time reduction that he and Diane made to the asking price of the home they had put up for sale.  Charlie Giles informed the Court that, according to a township-wide assessment, the fair market value of his home was $287,700.

**Wachovia Warned the Phelan Firm and WFB That They Were Acting Improperly in The Name of a Party Without Legal Standing to Sue**

93.    After the Ocean County Court postponed the Sheriffs' Sale until October 30, 2007, friends and supporters of Charles and Diane Giles asked Wachovia's corporate headquarters for help.  It was only because of this appeal that Wachovia found out that the Phelan firm was acting in its name without authorization, a finding that Wachovia shared with Mr. Dasti.

94.    On October 23, 2007, Mark A. Farmer ("Mr. Farmer"), senior vice president and assistant general counsel of Wachovia, sent an e-mail to Mr. Dasti, thanking him for giving Wachovia "the name of the Plaintiffs firm" in the Giles foreclosure action (*i.e.*, the Phelan firm) and advising Mr. Dasti that Mr. Farmer "contacted the attorney handling the matter and informed him that Wachovia has not been the Trustee of the subject Pooling and Servicing Agreement since 12/30/05."

95.     On October 24, 2007, Mr. Farmer sent a letter by U.S. mail and e-mail to Vladimir Palma, an associate attorney working under Rosemarie Diamond's direction.  Mr. Farmer wrote:

> Dear Mr. Palma:
>
> This letter is to confirm your voice message to me this morning and our subsequent conversation wherein you advised that you were able to reach your client [*i.e.*, servicer WFB] and verify that Wachovia Bank, N.A. is not the proper Plaintiff as named in the referenced foreclosure action.  Accordingly, your client has voluntarily agreed to postpone the sale date to November 19, 2007.  During the interim, it is my understanding that you are awaiting the name of the proper Plaintiff from your client.  Thereafter, you will file a motion to correct the name of the Plaintiff and ensure that the County records properly reflect the name of the true holder of the mortgage.
>
> As you are aware since Wachovia Bank, N.A. is not the Trustee and not the holder of the subject mortgage we are unable to address Mr. Charles Giles' situation.  Thank you for your prompt attention to this matter and your efforts to correct the public record.  I look forward to receipt of an Order deleting the name Wachovia Bank, N.A. from the foreclosure action and recorded evidence correcting the public records.
>
>          Sincerely,
>
>          */s/ Mark A. Farmer*
>          Mark A. Farmer
>
>          Senior Vice President & Assistant General Counsel
>          Wachovia Corporation for its subsidiary Wachovia Bank, N.A.

A copy of Mr. Farmer's letter is attached here at Exhibit B.

96.     While popular support for Charlie and Diane Giles resonated at the highest levels of Wachovia's corporate management, a fundraiser was held at the community volunteer fire company in Barnegat Township on October 27, 2007.  The fundraiser was attended by the township's mayor, council members, nearly 100 firefighters and police

officers, the Police Benevolent Association and other concerned neighbors, including a group of middle-school students.  They collected about $5,000.  Given the overriding speed and cost-slashing automation that controls their actions, this was not nearly enough to convince the Phelan firm and WFB to allow Charles and Diane Giles more time to sell or save their home.

97.     On November 15, 2007, presumably in response to the executive-level protest by Mr. Farmer, the Phelan firm filed a motion, memorandum and attorney certification with the Ocean County Court seeking an Order "[r]escinding the assignment [to Wachovia] and amending all pleadings to correct the Plaintiff to U.S. Bank as Trustee" ("Motion to Rescind and Correct").  Because U.S. Bank purchased Wachovia's corporate trust and institutional custody portfolio on December 30, 2005, long before the filing of the Phelan firm's foreclosure Complaint against Mr. and Mrs. Giles, the Phelan firm had no choice but to admit that (a) its Complaint "incorrectly named" "Wachovia Bank. N.A." as plaintiff and as "Trustee" of the Park Place Trust, and (b) the Phelan firm and WFB erroneously identified the actual "holder" of the [Giles'] note and mortgage."  Despite the Phelan firm's certified representation to the Ocean County Court that the Giles' "note and mortgage was ... sold by Ameriquest Mortgage Company to Plaintiff, U.S. Bank as Trustee," this conclusion was based on nothing more than unfounded speculation.

98.     Speculation aside, the Phelan firm made no effort to present evidence demonstrating that:

- ownership of the assets of the Park Place Trust was transferred to (and continuously thereafter resided in) U.S. Bank; and

- Charlie and Diane Giles' mortgage was transferred to (and at all times thereafter remained part of) the pool of securitized mortgages in the Park Place Trust.

99.     While it is certain that Wachovia had no legal interest in or authority to act on behalf of the Park Place Trust when the Phelan firm filed its foreclosure Complaint and obtained a default judgment against the Giles, U.S. Bank also lacked standing to maintain foreclosure actions on behalf of homeowners whose mortgages were purportedly transferred to the Park Place Trust.  *See Schwend v. U.S. Bank, N.A.*, 2010 U.S. Dist. LEXIS 127915, at *6-*8 (E.D. Mo., Dec. 3, 2010).

100.    As the Court in *Schwend* held in denying U.S. Bank's motion to dismiss a homeowner's state law claim for wrongful foreclosure:

> [T]here is nothing in the record to show how US Bank, Wachovia Bank, or "Pooling and Servicing Agreement dated as of November 1, 2004" came to be the holder of this note.... From the record here it is not at all clear that US Bank was the lawful holder of the note with the power to foreclose, and if it was not, the claim for wrongful foreclosure is more than plausible.[32]

*Id.*  (Emphasis supplied).

101.    Rather than prove a chain of title to the Giles' mortgage leading to U.S. Bank, as it was required to do under New Jersey law,[33] the Phelan firm tried to offload blame onto

---

[32]  If U.S. Bank actually did succeed Wachovia as trustee for Park Place Trust, there would be ample legal documentation evidencing U.S. Bank's appointment.  Under paragraph 807 of the Pooling and Servicing Agreement dated as of November 1, 2004 ("Park Place PSA"), a resigning trustee must provide *written notice* of its resignation to (1) the depositor, Park Place Securities, Inc., (2) the NIMS insurer; (3) the master servicer, WFB, and (4) the beneficial owners of the trust assets, the certificateholders (collectively, "Mandatory Notified Entities").  Under paragraph 808 of the Park Place PSA, any successor trustee must "*execute, acknowledge and deliver*" to the Mandatory Notified Entities a formal "instrument accepting [its] appointment" as trustee.  A copy of the Park Place PSA is available at http://www.scribd.com/doc/66065721/Pooling-and-Servicing-Agreement-dated-as-of-November-1-2004-Asset-Backed-Pass-Through-Certificate-Series-2004-WWF1.  Even if Wachovia and U.S. Bank did execute an agreement of some kind regarding transfer of Wachovia's trust operations to U.S. Bank, there is apparently no document demonstrating that the U.S. Bank acquired and maintained legal ownership of the Giles' mortgage or any other mortgage supposedly part of the Park Place Trust.

[33]  Under New Jersey law, a party seeking to foreclose a mortgage must own or control the underlying debt.  *Bank of New York v. Raftogianis*, 2010 N.J. Super. LEXIS 221, at *3 (Ch. Div. 2010). Without a showing of such ownership or control, a purported mortgagee lacks standing to proceed with a foreclosure action, and a complaint must be dismissed.  *Id.* at *33. To establish standing to maintain a foreclosure action, a plaintiff must have ownership or

its client, WFB, whose "records, [allegedly] through mistake and inadvertence, named the holder of the note and mortgage as Wachovia Bank, N.A. as Trustee."  According to the Phelan firm's brief in support of its Motion to Rescind and Correct, this "servicer error" had "no effect on the validity of the subject mortgage" because "neither U.S. Bank nor Defendants are in no way prejudiced [sic]" insofar as Mr. and Ms. Giles "have always communicated with the servicer, America's Servicing Company [*i.e.*, WFB]."

102.    To stave off what they were misled to believe was an inevitable loss of their home (and depleted of any remaining financial or emotional resources with which to stop the Phelan firm and WFB's foreclosure prosecution), Charlie and Diane Giles were forced to surrender and accept a "low ball" offer to buy their home in early December 2007.

### Fraudulent Expense Claims by the Phelan Firm and WFB

103.    By an impersonal "Dear Mortgagor" letter dated and faxed on December 10, 2007, Jessica Hansbury, a Phelan firm staff member, responded to Mr. Dasti's request for a "payoff amount" on his clients' mortgage.  In that letter, written on behalf of WFB, the Phelan firm represented falsely that Charlie and Diane Giles owed $223,704 on their mortgage, including an unfathomable $7,817 in "Legal Fees and Costs through December 10, 2007" and "Property Inspections/BPO" fees in an amount of $340.

104.    Aware that his clients were in deep financial trouble, Mr. Dasti objected to the fraudulently manufactured junk fees sought by the Phelan firm and WFB.

105.    On January 15, 2008, Charlie and Diane Giles lost their home.  They sold it to eager buyers at a below-market price of $238,000 -- $49,000 less than its assessed value.

---

control of the underlying debt as of the date of the filing of the complaint.  *Id.* at *34. Under Rule 4:64-1(b)(10), when a foreclosure plaintiff is not the original mortgagee or the original nominee mortgagee, a complaint must recite "all assignments in the chain of title."  *Id.* at *45.  None of this essential information was provided by the Phelan firm or WFB to justify their improper foreclosure action against the Giles.

Although Mr. Dasti's objections caused WFB to remove much of the bogus "Legal Fees and Costs" and "Property Inspections/BPO" fees claimed by the Phelan firm in its December 10, 2007 fax, Charlie and Diane Giles suffered financial damages, not only in the home equity wiped out through their coerced distress sale, but through $2,500 in legal fees they were required to pay Mr. Dasti and other counsel at closing.

**The Phelan Firm and WFB Ignored Wachovia's Warning About Its Lack of Standing**

106.    On January 18, 2008, three days after the Giles' distress sale, the Ocean County Court tried to clean up the legal mess left over from the botched foreclosure action prosecuted by the Phelan firm and WFB.  The Court entered an Order that (a) granted the Phelan firm's Motion to Rescind and Correct and (b) preserved the Giles' rights "as to all affirmative claims" resulting from the Phelan firm's wrongful foreclosure activities.  The Phelan firm "voluntarily" dismissed its case.  The harm done to Charlie and Diane Giles did not go away.[34]

107.    On March 12, 2008, the Phelan firm filed one additional document with the Ocean County Clerk, a discharge of a *lis pendens* on Charlie and Diane Giles' former home. Although the Phelan firm's Motion to Amend and Correct dated November 14, 2008 argued to the Ocean County Court that it was necessary to "amen[d] all pleadings to correctly identify the foreclosing Plaintiff as U.S. Bank as Trustee," the Phelan firm continued to identify <u>*Wachovia*</u> as plaintiff in the caption of the *lis pendens* document it filed with the Ocean County Clerk three months later.

---

[34]  *See* Philadelphia NBC-10 television interview with Mr. and Ms. Giles,
http://www.nbcphiladelphia.com/news/local/Sick_9_11_Responder_Wins_Medical_Compensation_Case_Philadelphia.html

108.   Rosemarie Diamond purportedly signed the Discharge of Lis Pendens.  Her "signature" on this legal document appears below:[35]



Rosemarie Diamond, Esquire
Attorneys for Plaintiff

**Plaintiff Laurine Spivey**

**Subsequent  Improper Foreclosure Action in the Name of "Wachovia"**

109.   Despite its conclusive knowledge that Wachovia had no legal ownership in the pool of securitized mortgages held by the Park Place Trust after December 30, 2005, the Phelan firm and WFB nevertheless prosecuted a substantively identical Pennsylvania mortgage foreclosure action against Plaintiff Laurine Spivey on behalf of "Wachovia."

110.   At the direction of WFB, on December 28, 2007, the Phelan firm began a mortgage foreclosure action against Ms. Spivey through the filing of a Complaint in the Philadelphia County Court of Common Pleas ("Philadelphia Court"), Case No. 07-004303. The Complaint, purportedly signed by Frank Hallinan,[36] averred that the mortgagee seeking foreclosure of Ms. Spivey's property was an entity called "Wachovia Bank, N.A., Trustee for the Pooling and Servicing Agreement dated as of November 1, 2004, Asset-Backed Pass-Through Certificate Series 2004-WWF1" -- the same improperly named "plaintiff" in the foreclosure action brought earlier by the Phelan firm and WFB against Charlie and Diane Giles.

---

[35]  Compare this signature with the different handwriting shown at ¶¶ 77, 86 above.
[36]  Compare the many different "signatures" ascribed to Frank Hallinan in Exhibit C.

111. In paragraph 3 of its Complaint against Laurine Spivey, the Phelan firm alleged that:

> On 09/17/2004 mortgagor(s) made, executed and delivered a mortgage upon the premises hereinafter described to ARGENT MORTGAGE COMPANY, LLC ("Argent") which mortgage is recorded in the Office of the Recorder of PHILADELPHIA County, in Instrument No: 51141053.  By Assignment of Mortgage recorded 03/14/07 the mortgage was assigned to PLAINTIFF (*i.e.*, "*Wachovia," as Trustee for the Park Place Trust*) which assignment is recorded in DOCUMENT ID: 51649091. The mortgage and assignment(s), if any, are matters of public record and are incorporated by reference in accordance with Pa.C.C.P. 1019(g); which rule relieves the Plaintiff from its obligation to attach documents to pleadings if those documents are of public record.

(Emphasis supplied).

112. In paragraph 6 of its Complaint against Laurine Spivey, the Phelan firm alleged that amounts "due on the mortgage" included $1,250 in "Attorney's Fees" and $550 for "Cost of Title."   In paragraph 7 of the Complaint, the Phelan firm claimed that its attorney's fees were "based on work actually performed" and were "in conformity with the mortgage and Pennsylvania law," both of which are requirements of GSEs like Fannie Mae.[37]

113. The claim identified in the paragraph above coincides with a statement published in the 2009 version of the Phelan firm's web site, which asserted that "[f]or foreclosures and bankruptcies involving mortgages secured by one to four family residential dwellings, our firm adheres to the Fannie Mae and Freddie Mac fee schedules.

---

[37] *See* Fannie Mae, Announcement 08-19**,** *New Foreclosure and Bankruptcy Attorney Network and Attorneys' Fees and Costs*, August 6, 2008 ("Fannie Mae Announcement 08-19") at 5 ("Fannie Mae reminds servicers of the *Servicing Guide's* requirements governing attorneys' fees, including the requirements that fees charged to borrowers be permitted under the terms of the note, security instrument, and applicable laws and be prorated to reasonably relate to the amount of work actually performed"), https://www.efanniemae.com/sf/guides/ssg/annltrs/pdf/2008/0819.pdf.

Any unusual work not covered by this schedule would be specifically approved by you [*i.e.,* servicer clients] prior to our taking action."

114.   The representations identified in paragraphs 112 and 113 above were false, misleading and belied by the fraudulent fee overcharges detailed below at pages 41-47, all of which substantially exceeded amounts authorized by Fannie Mae's fee schedule.

115.   Accompanying its Complaint, the Phelan firm filed a verification, also allegedly signed by Frank Hallinan.  The verification attested to the truth of the following "facts":

a)   Frank Hallinan was "attorney" for "Wachovia" in the foreclosure action against Bender;

b)   Frank Hallinan was "authorized" by "Wachovia" to make a verification on "Wachovia's" behalf;

c)   Statements in the Complaint were "based on information provided" by "Wachovia," which Frank Hallinan purportedly "believed to be true and correct to the best of its knowledge, information and belief"; and

d)   Frank Hallinan understood that his verification was made "subject to the penalties of 18 Pa.C.S. Sec. 4904 relating to unsworn falsifications to authorities," a second-degree misdemeanor requiring "a fine of at least $1000."

Except for the possible exception of subparagraph (d) above, all of the representations in Frank Hallinan's "verification" were false.

116.   When the Complaint was filed and at all times since, the Phelan firm and Hallinan knew or willfully disregarded the fact that they had no authority to act on behalf of Wachovia in connection with Laurine Spivey's mortgage.  Nevertheless, the Phelan firm, at the command of WFB and through fraudulent means, prosecuted a mortgage foreclosure action against her through default judgment, writ of execution and the scheduling of a Sheriff's Sale.

117.    The "assignment" (identified by the Phelan firm as "Document ID: 51649091" in the Philadelphia County recorder's office) did not convey ownership of Laurine Spivey's mortgage from Argent (the loan originator) to Ameriquest (the "seller" of a pool of mortgages packaged into the Park Place Trust).  Without such an assignment, Laurine Spivey's mortgage could not possibly have been sold by Ameriquest to the Park Place Trust. Legal ownership of Laurine Spivey's mortgage remained in the successor(s) to the assets of Argent -- an entity that passed out of legal existence in August 2007.[38]

118.    While the Phelan firm and its agents recorded their assignment in an ineffective attempt to convey ownership of the Giles' mortgage from _Ameriquest_ to Wachovia (in other words, from one non-owner to another), the assignment did not confer upon Wachovia legal standing to bring a mortgage foreclosure action against Laurine Spivey.  The chain of title to her mortgage had already been broken.[39]

119.    Even if the "assignment" recorded by the Phelan firm or its partners' employees and agents was sufficient to establish a chain of title leading to Wachovia (and it was not), Wachovia had no legal standing to prosecute a foreclosure action against Laurine Spivey for an even more fundamental reason: _Wachovia was not Trustee of the Park Place Trust on December 28, 2007, when the Phelan firm filed its foreclosure Complaint against Ms. Spivey.  Nor was Wachovia Trustee of the Park Place Trust on March 14, 2007, when the employees or agents of Larry Phelan, Frank Hallinan, and Dan Schmieg (without conveying_

---

[38]    _See_ above ¶ 82 n.31.

[39]    Ameriquest and Argent's disregard of their obligation to prepare and maintain customers' mortgage documents properly suggests that it is impossible for WFB and the Phelan firm to produce evidence establishing a chain of title for Park Place Trust mortgages through Ameriquest or Argent.  _See, e.g.,_ Joseph Rhee, _Document Dump: 40 Boxes of Ameriquest Mortgage Records Found in Dumpster_, ABC.com, Oct. 27, 2007, http://abcnews.go.com/blogs/headlines/2007/10/document-dump-4/; Atlanta NBC-TV affiliate video available at http://www.liveleak.com/view?c=1&i=4fb_1221763438.

*title from Argent to Ameriquest) recorded an ineffective "assignment" of Ms. Spivey's mortgage from Ameriquest to Wachovia.  <u>Nor was Wachovia Trustee of the Park Place Trust</u> <u>at any time since, including on February 21, 2008, when the Phelan firm obtained a default</u> <u>foreclosure judgment against Laurine Spivey in favor of "Wachovia."</u>* In basic terms, Wachovia had no legal authority to act on behalf of the Park Place Trust.  Neither WFB nor the Phelan firm had legal authority to act on behalf of Wachovia.

120.    This is because, as Wachovia senior vice president informed the Phelan firm by telephone, confirmed by letter and fax dated *<u>October 24, 2007</u>*, Wachovia had sold its entire corporate trust and institutional custody portfolio to U.S. Bank on *<u>December 30,</u>* *<u>2005</u>*.  After that sale, Wachovia no longer had an ownership interest in Laurine Spivey's mortgage, if it ever did, and it had *<u>no legal standing to sue Ms. Spivey in the foreclosure</u>* *<u>action that WFB directed the Phelan firm to bring on behalf of Wachovia on December 28,</u>* *<u>2007 – **more than two months after the Phelan firm and WFB received Mark Farmer's</u>** **<u>definitive word about Wachovia's lack of interest in the operations and activities of the</u>** **<u>Park Place Trust</u>***.

121.    Years later, Wachovia still appears as the legal owner of Laurine Spivey's mortgage in public records maintained by the Philadelphia County recorder's office.

122.     On February 21, 2008, the Phelan firm filed with the Philadelphia Court a document titled "Praecipe for Judgment and Assessment of Damages" against Laurine Spivey.  This court filing was purportedly signed by Dan Schmieg.[40]

123.    On February 21, 2008, the Phelan firm obtained a default foreclosure judgment against Laurine Spivey in favor of "Wachovia."

---

[40]    Compare different "signatures" ascribed to Dan Schmieg in Exhibit D.

124.    On February 26, 2008, the Phelan firm filed a praecipe for a writ of execution on the judgment obtained on behalf of "Wachovia."  The writ was issued.  A Sheriff's Sale of Laurine Spivey's home was scheduled.

125.    On March 12, 2008, the Phelan firm filed a "Praecipe to Substitute Verification to Civil Action Complaint in Mortgage Foreclosure" purportedly signed by Frank Hallinan.[41]  Attached to the praecipe was a "fill-in-the-blank verification" dated December 31, 2007, bearing the purported signature of Yolanda Williams, a well-known "Vice President of Loan Documentation" of ASC, WFB's mortgage servicing pseudonym. The "verification" contains no facts relating to Laurine Spivey's mortgage, but it includes only boilerplate references to unspecified allegations in an unidentified complaint.  Yolanda Williams' "verification" exemplifies the discredited practice that has come to be known as "robo-signing."[42]

126.    On May 7, 2008, the Phelan firm filed with the Philadelphia Court a document called "Motion to Reassess Damages," together with a supporting memorandum of law.  In

---

[41]  Compare different "signatures" ascribed to Frank Hallinan in Exhibit C.

[42]  In *Wells Fargo Bank N.A. v. Moise*, No. 13450/2009 (N.Y. Supreme Ct., Kings Co., April 27, 2010), the Court granted summary judgment against WFB for lack of standing in a foreclosure action in which a purported mortgage assignment was signed by Yolanda Williams in her "capacity" as Assistant Secretary of Mortgage Electronic Systems, Inc.   The Court held that the assignment was invalid because the notary's acknowledgment stated that she witnessed and acknowledged the signature, not of Ms. Williams, but of a Herman John Kennerty, whose name did not appear anywhere else on the document. N.Y. LAW J., Vol. 243, No. 101, May 27, 2010, at 28-29.  In *Wells Fargo Bank, N.A. v. Martin*, No. F-17240-09 (N.J. Super., Ch. Div., Sussex Co, Aug. 25, 2011), the Court also granted summary judgment against WFB for lack of standing in a foreclosure action in which an affidavit of lost note was signed by Yolanda Williams in her purported capacity as WFB's Assistant Vice President of Loan Documentation.  The Court disregarded Ms. William's affidavit because it was "so vague as to be unreliable."  *Id.* at 10-11.  In addition, the Court rejected a purported mortgage assignment executed by Herman John Kennerty, who was described by the Court as "one of the legion of Vice Presidents of Loan Documentation for Wells Fargo Bank, N.A." in a "thundering herd of ... out of control cases" in which Wells Fargo and other financial institutions failed to "adhere to basic business practices and ... record keeping."  *Id.* at 11-12 The Court's Order and Statement of Reasons is available at http://www.scribd.com/doc/66385201/Wells-Fargo-v-Martin.

those court filings, the Phelan firm identified the following "sums" that were purportedly incurred or expended "on behalf" of Laurine Spivey:

- "Legal fees" in an amount of $2,100

- "Costs of Suit and Title" in an amount of $1,333.40

- "Appraisal/Brokers Price Opinions" in amount of $285

- "Property Inspections/Property Preservation," $165.

127.   Together with its "Motion to Reassess Damages," the Phelan firm filed with the Philadelphia Court a proposed order incorporating the "sums" identified above.   On June 10, 2008, the proposed order was signed by the Philadelphia Court in the exact form submitted by the Phelan firm.

128.   On June 3, 2008, Laurine Spivey filed a petition for relief under Chapter 13 of the U.S. Bankruptcy Code.   The matter was brought in the U.S. Bankruptcy Court for the Eastern District of Pennsylvania, Docket No. 08-13648-elf.

129.   On August 5, 2008, two months after the filing of Laurine Spivey's Chapter 13 petition, the Phelan firm filed a praecipe informing the Philadelphia Court of Ms. Spivey's bankruptcy filing.

130.   On August 27, 2008, the Phelan firm filed a proof of claim in the name of "Wachovia" as a "creditor" in Laurine Spivey's Chapter 13 proceeding.   That document listed the following fees and expenses as part of the "prepetition arrearages" purportedly owed by Ms. Spivey to Wachovia:

- "Legal fees"  in the amount of $3,900

- "Legal Costs" in an amount of $6,691.90

- "BPO fees" in amount of $285

41

- ▪ "Property Preservation" costs of $210

- ▪ "Preparation and filing of proof of claim," $150.

131.    The mercurial foreclosure charges identified in the Phelan firm's Complaint, motion to "reassess damages" and "proof of claim" vacillated without comprehensible rhyme or reason.  They cannot be reconciled to reach any conclusion other than that the expense claims of the Phelan firm and WFB were grossly and systematically inflated.  Ultimately, the cascading overstated charges manufactured by the Phelan firm and WFB were aggregated into the bankruptcy proof of claim filed by the Phelan firm, which in turn formed the erroneous basis of the amount of "debt" incorporated in a Chapter 13 restructuring plan paid by Plaintiff Spivey on a monthly basis since March 10, 2009.

**Excessive Charges for "Legal Fees"**

132.    The claimed charges for "Legal Fees" were not actually or reasonably incurred by the Phelan firm or WFB.

133.    In its foreclosure Complaint against Laurine Spivey, the Phelan firm alleged that its legal fees were $1,250.  That representation is consistent with the flat-rate fee structure established by GSEs for legal work in foreclosure actions.  *See* Fannie Mae Announcement 08-19, Attachment 1, at 2-3 n.10 (Flat-rate fee "covers *all legal actions necessary to complete the standard foreclosure in Pennsylvania*, including motions to postpone or relist a sale and motions to reassess damages") and Fannie Mae Announcement 08-19 at 6 (Flat-rate fee includes "[p]reparing legal papers for entry of foreclosure judgment, whether by default or through summary judgment process").  (Emphasis supplied).

134.   Using the Fannie Mae flat-fee schedule as an objective benchmark of reasonableness for attorneys' fees in standard residential foreclosure actions (a uniform standard to which the Phelan firm claimed falsely to adhere),[43] the "Legal Fees" charged by the Phelan firm in its "Motion to Reassess Damages" filed on May 5, 2008  were inflated by about $850.  "Legal Fees" charged by the Phelan firm in its proof of claim filed on August 27, 2008 were inflated by about $2,600.  Laurine Spivey filed her Chapter 13 petition on June 3, 2008, *less than a month after the Phelan firm's motion to reassess damages*, yet the Phelan firm's bankruptcy proof of claim indicates that additional legal fees of $1,750 were incurred during the one-month pre-petition period between May 5, 2008 and June 3,  2008. It is likely that, during this brief time, the Phelan firm performed no legal work at all in Ms. Spivey's foreclosure case.

**Excessive Charges for "Costs of Suit and Title"**

135.   The claimed charges for "Costs of Suit and Title" or "Legal Costs" were likewise not actually or reasonably incurred by the Phelan firm or WFB.

136.    In its foreclosure Complaint against Laurine Spivey, the Phelan firm alleged that its "Cost of Title" was $550.  However, Frank Hallinan (the lawyer who signed and verified the Complaint) testified in other litigation that the Phelan firm's charge for title services "can vary anywhere from ... $200 to $300, possibly $350."[44] Hallinan's partner, Larry Phelan, also boasted about the "very low price" paid by the Phelan firm for "title products" procured from its wholly owned title company subsidiary, Land Title Services.[45]

---

[43]   *See* above at pages 12 n.9, 37.

[44]   Transcript of Deposition Testimony of Frank Hallinan taken on March 3, 2009 ("Hallinan Transcript") in the matter titled *Bank of New York v. Ukpe*, Docket No. F-10209-08 (N.J. Super., Ch. Div., Atlantic Co.) at 49, lines 1-5.  See http://www.scribd.com/doc/61750189/Hallinan-dep-1.

[45]   *See* above at ¶48.

Accepting the Phelan firm partners' statements at face value, a $550 charge for "Cost of Title" is overstated by at least $200.

137.    In its May 5, 2008 motion to reassess damages, the Phelan firm represented to the Philadelphia Court that $1,333.40 was incurred for "Costs of Suit and Title" in "Wachovia's" foreclosure action against Laurine Spivey.  By extreme contrast, the pre-petition "Legal Costs" asserted by the Phelan firm in its bankruptcy proof of claim filed on August 27, 2008 were reported to be in an amount of $6,691.90.  Given that there were fewer than 30 days between the May 5, 2008  filing of the Phelan firm's motion and the June 3, 2008 filing of Laurine Spivey's Chapter 13 petition, there is no conceivable justification for an additional amount of $5,353 arbitrarily piled into the same category of expense in "Wachovia's" proof of claim.

139.    The true explanation for such extravagant overcharges is provided above at ¶¶ 48-50.  By calculated design, excessive profits are extracted by the Phelan firm for Land Title Service's cheap "title products," which result in systematically inflated fees charged to distressed homeowners.  The "very low price" and value of LTS's "title products" bear no rational relationship to the severely marked-up amounts charged for them by the Phelan firm.  While the Phelan firm's fees for "title products" are excessive on their face, they are even more unconscionable in cases like Ms. Spivey's because they do not accomplish the essential purpose of identifying the actual owner of homeowners' mortgages.

**Excessive Charge for "Appraisal/Brokers Price Opinions"**

140.    The $285 charge attributed by the Phelan firm to "Appraisal/Brokers Price Opinions" was also not actually or reasonably incurred.

141.    As of December 10, 2010, Fannie Mae's maximum reimbursable rate for an "exterior BPO" was $80 and $105 for an "interior BPO."[46] The actual cost of a BPO is lower. According to the National Association of BPO Professionals, the cost of a BPO may be as little as $30."[47]

142.    As of April 2011, Bank of America's LandSafe title abstract subsidiary paid licensed real estate brokers $55 for each BPO they provide, out of which LandSafe extracts from brokers 10% of their fees for use of its proprietary system.

143.    After one foreclosure case in which nine BPOs were ordered and mischaracterized as "appraisals,[48] national counsel for WFB admitted to a Court that "only $50 of each invoice represented the actual cost incurred by WFB for a BPO."[49] The Court held that (a) "[t]he remaining amounts … were added to the actual costs by Wells Fargo" and (b) "these additional charges are an undisclosed fee, disguised as a third party vendor cost, … illegally imposed by Wells Fargo."[50] The $285 charge attributed by the Phelan firm on behalf of WFB for "Appraisal/Brokers Price Opinions" was likewise "illegally imposed" on Laurine Spivey.

144.    Moreover, a Bankruptcy judge in the Eastern District of Pennsylvania has in other litigation held that fees for discretionary appraisals or BPOs are not reimbursable at

---

[46] *See* Fannie Mae, Servicing Notice, *BPO Providers and Pricing Structure*, Dec. 10, 2010, https://www.efanniemae.com/sf/guides/ssg/annltrs/pdf/2010/ntce121710a.pdf.

[47] http://www.nabpop.org/Advocacy-BPOBrief-2.php.

[48] *In re Stewart*, 391 B.R. 327, 345 (Bankr. E.D. La. 2008), *aff'd in part, rev'd in part on other grounds*, 391 B.R. 577 (E.D.La. 2008).

[49] *Id.* at 346.

[50] *Id.*

all. *See In re Lisa Battle*, No. 07-12474-ELF (Bank. E.D.Pa. Order dated July 1, 2008), at 6 n.7 and 7 n. 10.[51]

**Excessive Charges for "Property Maintenance"**

145.    Neither the $185 charge for "Property Inspections/Property Maintenance" in the Phelan firm's motion to reassess damages nor the $210 amount for the same purported "service" asserted in its proof of claim was actually or reasonably incurred.

146.    As of March, 2011, Fannie Mae's maximum reimbursable rate for property inspection was $60.[52] The Phelan firm, on behalf of WFB, did not order properly inspection or maintenance services that could justify substantially higher charges of $185 and $210. This is another "default management service" that WFB has historically imposed on distressed borrowers without regard to the necessity of its loan administration.[53]

**Improper "Pre-Petition" Charge for Post-Petition "Proof of Claim"**

147.    The proof of claim filed by the Phelan firm with the bankruptcy court includes a charge of $150 for the "preparation and filing" of that same proof of claim on August 27, 2008, several weeks *after* Laurine Spivey filed her Chapter 13 petition on June 3, 2008. However, post-petition expenses are not properly included in a bankruptcy proof of claim.

148.    Section 502(b) of the Bankruptcy Code, 11 U.S.C. § 101 *et seq*., provides that a bankruptcy court "shall determine the amount of [a creditor's] claim in lawful United States currency *as of the date of filing the petition*...." (Emphasis supplied). The Phelan firm's

---

[51]    Available at http://www.scribd.com/doc/60103382/Cco-Poc-Obj-Order.

[52]    *See* Fannie Mae, Loan Servicing Solutions, *Form 571 Reference Guide*, March 2011, at 26, https://www.efanniemae.com/sf/servicing/pdf/571processguide.pdf.

[53]    *In re Stewart*, 391 B.R. at 344.

claim for payment of fees relating to preparation and filing of a post-petition proof of claim is improper as a matter of law.

149.    Although the Phelan firm admitted to the Ocean County Court in its foreclosure action against Charlie and Diane Giles that its assignment of mortgage to Wachovia was "incorrect" and that it had improperly named Wachovia as plaintiff in its foreclosure complaint,[54] the Phelan firm continued to prosecute foreclosure and bankruptcy actions against <u>numerous</u> other homeowners in the name of "Wachovia, as Trustee" of the Park Place Trust.  *See*, *e.g.*, *Wachovia Bank, N.A. v. Hrubosky*, No. 070102422 (Pa. C.P. Phila. Co.); *In re Hrubosky*, No. 08-15375 (Bankr. E.D. Pa); *Wachovia Bank, N.A. v. Bender*, No. 07-6730 (Pa. C.P. Berks Co.); *In re Bender*, No. 08-21193 (Bankr. E.D.Pa.); *Wachovia Bank, N.A. v. Smith*, No. F-1358107(NJ Super., Ch. Div., Sussex Co.) (sheriff's sale listed for August 31, 2010).[55]

150.    Despite the mortgage foreclosure scandal that unraveled nationally in September 2010 and metastasized in New Jersey in December 2010, the Phelan firm continues to prosecute foreclosure actions in the name of "parties" without legal standing to bring them.  *See*, *e.g.*, *U.S. Bank v. Spencer*, 2011 N.J. Super. Unpub. LEXIS 746, at *33-*34 (N.J. Super. Ch. Div. Bergen Co. March 22, 2011) (the Phelan firm, purportedly on behalf of U.S. Bank, "provided no documentation or support for its position [that U.S. Bank] is the trustee for [a RMBS trust], and therefore has not established its right to sue on behalf of [the Trust]").

---

[54]   *See* ¶ 97 above.

[55]   *See* http://www.scribd.com/doc/66551195/Mechile-Smith-Newark-Wachovia.

### C.   Other Homeowners Have Been Harmed By the Same Pattern
### of Fraudulent Misconduct by the Phelan Firm and WFB

151.   The fraudulently manufactured junk fees identified above are life-sustaining sums of money to families struggling to stay in their homes.  But for institutions like the Phelan firm and WFB, each overcharge, multiplied by thousands of homeowners, represents millions of dollars in unearned profit.

**The Phelan Firm**

152.   The Phelan firm is, as it justifiably says, the "premier default services operation" in Pennsylvania and New Jersey.  It gained prominence and wealth by running its automated foreclosure steamroller over the backs of everyday people like Charlie and Diane Giles, and Laurine Spivey.

153.   Victor Ukpe was a self-employed taxi driver from Nigeria, who in 2005 was trying to support five children, all under 10-years-old.

154.   At the height of the artificially inflated housing bubble pumped up by predatory subprime lenders like Countrywide and Ameriquest, Victor Ukpe had a passenger who worked as a mortgage broker.  During and after his ride, the broker was so convincing that Mr. Ukpe and his homemaker wife, Enoabasi, were led to believe they could afford to buy a house big enough to accommodate their sprawling family.  Victor and Enoabasi Ukpe applied for a $224,000 mortgage, even though their combined household adjusted gross income was just $12,198, an amount less than half the federal poverty guideline of $25,210 for a family of six.  Despite the Ukpe's noticeable inability to make their mortgage payments, Countrywide lent them the money to buy the house anyway. Predictably, they defaulted on the loan.

48

155.    On March 13, 2008, the Phelan firm and Rosemarie Diamond, purportedly on behalf of Bank of New York as Trustee for the Certificate Holders of CWABS, Inc., Asset-Backed Certificates Series 2005-AB-3 ("CWABS Trust"), filed a foreclosure complaint against the Ukpes in the Superior Court, Chancery Division, for Atlantic County, New Jersey, Docket No. F-10209-08.  The foreclosure action was assigned to the Hon. William C. Todd III ("Judge Todd").

156.    Represented by South Jersey Legal Services and co-counsel, Victor and Enoabasi Ukpe filed an answer, affirmative defenses, counterclaims and a third-party complaint against the Phelan firm and other parties purporting to have an interest in the Ukpe's mortgage.

157.    Lawyers for Victor and Enoabasi Ukpe alleged that there was insufficient evidence of Bank of New York's standing to bring the foreclosure action filed by the Phelan firm.  Specifically, the Ukpe's lawyers alleged that the Phelan firm's foreclosure complaint was based on a fraudulent assignment of a mortgage from MERS to Plaintiff Bank of New York, as Trustee of the CWABS Trust.

158.    In January 2009, Judge Todd considered these arguments and denied the Phelan firm's motions to dismiss the Ukpe's allegations.

159.    Among the evidence presented to Judge Todd were facts demonstrating that:

> Francis Hallinan, a partner at the Phelan firm, executed [an] assignment in his capacity as a MERS officer.…  The three Phelan firm named partners, including Hallinan, own Full Spectrum Holdings, which is comprised of Full Spectrum Legal Services, Inc. (FSLS) and Land Title Services.  *The in-house notary for FSLS, Thomas Strain, testified during deposition that over the previous three years, he falsely acknowledged tens of thousands of mortgage assignments for the Phelan firm, including the assignment in this case.*[56]

---

[56] *Bank of New York v. Ukpe*, 2009 U.S. Dist. LEXIS 115557, at *8-*9 (D.N.J. Dec. 9, 2009).

160.   On January 16, 2009, Judge Todd called a hearing to "get to the bottom of what it viewed as a possible systemic problem involving the alleged false notarization of assignments in which [Frank Hallinan] played a central role in the process."[57] Judge Todd "raised the issue of an appropriate remedy and recognized that the situation could impact a host of foreclosure cases.  Ultimately, the Court expressed a goal to get to the bottom of the matter and to make sure 'everybody gets it right.'"[58]

161.   By Order dated January 21, 2009, Judge Todd required the Phelan firm to produce Frank Hallinan and notary Thomas Strain at the hearing,[59] which was scheduled for April 20, 2009.  Judge Todd also ordered the Phelan firm to produce the "original" copy of Full Spectrum's "notarization logs."

162.   The hearing called by Judge Todd did not take place.  On April 9, 2009, Defendants improperly removed the Ukpe case to this Court, where it was assigned to U.S. District Judge Joseph H. Rodriguez.  By Order dated December 9, 2009, Judge Rodriguez remanded the case to Judge Todd's state court in Atlantic City.

163.   Soon after he was temporarily ousted from jurisdiction in the Ukpe matter by defendants' April 9, 2009 removal to federal court, Judge Todd warned Chancery Court judges throughout New Jersey about falsified mortgage assignments "associated" with the Phelan firm.[60]

---

[57]   Letter dated April 11, 2009 to the Hon. William C. Todd, III, P.J.Ch., from Abigail B. Sullivan, counsel for the Ukpes (emphasis supplied).  *See* http://www.scribd.com/doc/61754294/4-11-09-Letter-SJLS-to-Judge-Todd.

[58]   *Id.*

[59]   Judge Todd's January 21, 2009 Order at ¶ 9, http://www.scribd.com/doc/61754869/Judge-Todd-Order-1-21-09.

[60]   *See* Letter dated May 8, 2009 from the Hon. William C. Todd III to Abigail B. Sullivan of South Jersey Legal Services, Inc. and Dashika R. Wellington of Wilentz, Goldman & Spitzer, enclosing *ex parte* letter dated April

164.     When Larry Phelan learned what Judge Todd had done, he sent an *ex parte* letter to the Court dated April 29, 2009,[61] representing that the Phelan firm had, at its own expense, re-executed and re-recorded 2,921 mortgage assignments notarized by Thomas Strain at the behest of Frank Hallinan.[62] Larry Phelan's April 29th letter also asked Judge Todd to circulate among other Chancery Court judges notice of the "corrective actions" purportedly taken by the Phelan firm.

165.     Forewarned by Judge Todd, the presiding judge of the Chancery Court in Hudson County, New Jersey, the Hon. Thomas P. Olivieri ("Judge Olivieri"), scheduled a hearing on May 27, 2009 to address his own "concern" regarding another mortgage assignment "executed" by Frank Hallinan and "notarized" by Thomas Strain.  Judge Olivieri directed Mr. Hallinan to appear at the hearing.[63]

166.     At that hearing, Frank Hallinan and his co-counsel[64] told Judge Olivieri that the Phelan firm had recorded a new "corrective assignment" in the matter pending before him.[65] Of the Phelan firm's re-execution and re-recording of 2,921 mortgage assignments "signed" by Frank Hallinan and "notarized" by Thomas Strain, Phelan firm counsel explained to the Court, *"[W]e couldn't tell you on any given assignment which was or which*

---

29, 2009 from Larry Phelan to the Hon. William C. Todd III, http://www.scribd.com/doc/61755132/Phelan-Ex-Parte-Letter-to-Judge-Todd.

[61]  *Id.*

[62]  Thomas Strain has been described in press reports as "the face of New Jersey's robo-signing scandal."  *See* Kaja Whitehouse, *Report Rips NJ Foreclosure Robo-signing Notary*, N.Y. POST, Dec. 29, 2010, http://www.nypost.com/p/news/business/sign_of_the_times_wOvGHrYMdbzZqEVgonGR4K.

[63]  See Transcript of May 27, 2009 Hearing, *U.S. Bank, N.A. v. Sinchegarcia*, No. F-18446-08 (Super. Ct., Ch. Div., Hudson Co.) ("5.27.09 Hearing Tr.") at 6 (lines 6-11) and 8 (lines 9-16), http://www.lsnj.org/keyRecentDevelopments/Foreclosure/materials/EXHIBITNHearing.PDF.

[64]  Both Hallinan and his co-counsel, Daniel S. Bernheim 3d of Wilentz Goldman & Spitzer, appeared before Judge Olivieri in their ostensible capacity as lawyers representing "U.S. Bank National Association, as trustee." 5.27.09 Hearing Tr. at 3, lines 3-12.

[65]  *Id.* at 5, lines 4-11.

*wasn't [improper].  It was almost like asking the short order cook do you recall flipping which hamburger on which day."[66]*

167.    Although Judge Olivieri said he was no longer "as concerned" about the propriety of the assignment in the case before him given its re-execution by another Phelan firm lawyer and its re-notarization by another Full Spectrum employee,[67] his statements underscore the self-evident fact that the Phelan firm's professional responsibilities cannot be equated to a short order cook working for minimum wage at McDonald's:

> I feel very strongly that regarding the foreclosure process, sometimes there are actions taken simply to move the matter along more quickly, … whereby instead of doing it properly the first time, for the purpose of expediency it wasn't done properly. … [S]ometimes for the purpose of expediency and moving the matter along[,] certain formalities are overlooked or shunned or disregarded, and they may be simple formalities, they are important formalities.

> I think it is important that when a notary indicates that he or she saw the person, or the person was in his or her presence and signed the assignment, that that be accurate and not be something that is inaccurate….

> [G]oing forward I hope and trust that when other formalities – that when the [foreclosure] bar or the [foreclosing mortgagees] are faced with other formalities in the execution of documents regarding assignments, that these formalities are not overlooked….

> Honestly, the judges have spent a lot of time on this issue and it is unnecessary and the only reason why we are spending all this time is because a formality was overlooked or disregarded….

> [W]hen we overlook or shun or disregard formalities such as these notarizations, and if the Bench countenances overlooking those types of formalities, it is a slippery slope that we start to climb, overlooking perhaps other more substantive formalities, and this is too important of a process, meaning the foreclosure process, to overlook….

---

[66] *Id.* at 14, lines 10-19.

[67] *Id.* at 8, lines 18-25.

52

5.27.09 Hearing Tr. at 10, line 6 – 13, line 3.

168.    On January 16, 2009, Judge Todd, who became aware of a "systemic problem involving the alleged false notarization of assignments in which [Frank Hallinan] played a central role in the process," first raised the issue of "an appropriate remedy and recognized that the situation could impact a host of foreclosure cases."  On May 27, 2009, Judge Olivieri described the serious implications of the problems identified by Judge Todd.  On December 20, 2010, the Hon. Stuart Rabner, Chief Justice of the New Jersey Supreme Court, confirmed the prescience of observations by Judges Todd and Olivieri, and he ordered that immediate action be taken to remedy the problems.  *See* below at pages 61-64.

169.    As demonstrated above, the Phelan firm has often disregarded – and continues to disregard – the most fundamental "substantive formalities," including the Constitutional requirement that a party in whose name a mortgage foreclosure action is brought must have legal standing to sue.  The Phelan firm has often attempted to evade – and has evaded – this Constitutional requirement through fraudulent court filings and property records, including assignments from and to entities that do not own mortgages upon which foreclosure is sought.

170.    While the validity of foreclosure judgments obtained through deceptive means is not an issue in this litigation, the Phelan firm and WFB are liable for the *fraudulent means* they used to procure those judgments and thereby achieve their unlawful objective: the multiplication of unearned profits by the Phelan firm and WFB through the systematic piling on of fraudulently manufactured junk fees and other inflated expenses disguised as "reimbursable default management service" charges.

53

**Wells Fargo Bank, N.A.**

171.   Independent of its activities relating directly to the Representative Homeowners in this case, WFB has engaged in a longstanding pattern of institutionalized mortgage servicing abuse.

172.   For example, on April 28, 2008, the Hon. Elizabeth W. Manger ("Judge Manger") sanctioned WFB for the same kind of unlawful fee-gouging alleged here.[68] Among other things, Judge Manger found that WFB engaged in the practice of charging inflated BPO fees to distressed homeowners that were "disguised as a third party vendor cost" "illegally imposed by Wells Fargo." *See* above at ¶ 143.

173.   Judge Manger also found that WFB engaged in an unlawful practice (implemented through its robotic use of the Fidelity MPS computer platform) of charging fees to distressed homeowners for unnecessary property inspections -- even when homeowners' properties were occupied and not in any state of disrepair.   These "inspections" were never read or reviewed by any WFB employee, demonstrating that the charges purportedly incurred were fraudulently manufactured junk fees, unrelated to any legitimate interest of WFB in preserving its secured interest in borrowers' properties.[69]

174.   Through multiple evidentiary hearings, Judge Manger acquired a deep knowledge and understanding of WFB's mortgage servicing and accounting practices.   Her conclusions are highly relevant to the improper course of conduct alleged here.   Among other things, Judge Manger found that:

---

[68] *In re Stewart*, 391 B.R. 327, 345 (Bankr. E.D. La. 2008), *vacated in part on other grounds*, 2011 U.S. App. LEXIS 15029, at *11 (5th Cir. July 22, 2011) .

[69] *Id.* at 343-334.

a)  WFB's improper actions were "willful and egregious";[70]

b)  WFB's "own representatives have admitted that [WFB] routinely misapplied payments on loans and improperly charged fees";[71]

c)  "Wells Fargo has demonstrated a pattern of overcharging borrowers and misapplying payments";[72]

d)  "At the heart of the problem is Wells Fargo's failure to disclose to its borrowers/debtors ... the nature or amount of fees and charges assessed";[73]

e)  "Wells Fargo's practices are systematic....";[74] and

f)  WFB's persistent misconduct "reveals an arrogant defiance of federal law."[75]

175.   Other Courts have drawn the same conclusions about WFB's institutionalized

overcharges.  *See*, for example:

a)   *In re Moffitt*, 390 B.R. 368, 388 (Bankr. E.D. Ark. 2008) (WFB's "servicing procedures are not organized to ensure accuracy and accountability");

b)   *In re Haque*, 395 B.R. 799, 803, 804, 805 (Bankr. S.D. Fla. 2008) (WFB's "wayward accounting" was "not unique to this case" and resulted in a "systematic process of turning out unexamined and form pleadings" -- an "abuse of process" that required sanctions to deter the "continued recklessness" of WFB and its foreclosure lawyers);

c)   *In re Collins*, 2009 WL 1607737, at *7 (Bankr. S.D. Tex, June 8, 2009) (WFB asserted "intentionally inaccurate" claims;  and

d)   *In re Nibbelink*, 403 B.R. 113 (Bankr. M.D.Fla., 2009)(imposing $15,000 for punitive damages and $21,177 in attorney's fees based on findings that WFB acted in an "intentional and

---

[70]  *In re Jones*,  2009 Bankr. LEXIS 3317, at *20 (Bankr. E.D.La. Oct. 1, 2009).

[71]  *Id.* at *23-*24.

[72]  *In re Stewart*, 2008 Bankr. LEXIS 3226, at *43 (Bankr.E.D.La. October 14 2008).

[73]  *In re Jones*,  2009 Bankr. LEXIS 3317, at *24-*25.

[74]  *Id.* at *26.

[75]  *Id.* at *32.

egregious" manner by charging "improper fees" and attempting "to collect those improper fees ... by making numerous telephone calls and sending numerous ominous letters to Plaintiffs demanding that Plaintiffs become current or face foreclosure").

176.    WFB has likewise demonstrated a pattern of orchestrating the filing of foreclosure actions in the names of entities without legal standing to bring them – the same practice used by WFB and the Phelan firm in their wrongful prosecution of foreclosure cases "on behalf of Wachovia" against Charlie and Diane Giles, and Laurine Spivey.

177.    The following are other examples of WFB's institutionalized disregard of Constitutional legal standing requirements:

a)  *U.S. Bank, N.A. et. al. v. Ibanez et al.*, 2009 Mass. LCR LEXIS 134, at *9 (Mass. Land Court, Oct. 14, 2009), *aff'd*, 2011 Mass. LEXIS 5 (S.J.C. Jan. 7. 2011) ("[N]either U.S. Bank (in *Ibanez*) nor Wells Fargo (in *Larace*) was the holder of the mortgage (either on or off record) at the time notice of the foreclosure sale was given or at the time the sale took place.... [A]s a matter of law, the sales were invalid");

b)  *Wells Fargo Bank, N.A. v. Ford*, 418 N.J. Super. 592, 600; 15 A.3d 327, 331; 2011 N.J. Super. LEXIS 13 (App. Div. Jan. 28, 2011) ("Wells Fargo did not establish its standing to pursue this foreclosure action by competent evidence");

c)  *Wells Fargo Bank, N.A. v. Lupori*, 2010 PA Super 205; 8 A.3d 919, 922; 2010 Pa. Super. LEXIS 3818, at *7 (Pa. Super. Nov. 12, 2010) ("The alleged April 1, 2005 assignment ... to Wells Fargo was *dehors* the record as of the time of the default judgment. Since the record did not support entry of the default judgment, the trial court erred in declining to strike the judgment from the record");

d)  *Wells Fargo Bank v. Marchione*, 69 A.D.3d 204, 211; 887 N.Y.S.2d 615 (N.Y. App. Div., 2009) ("Wells Fargo had no standing to bring this action");

e)  *Wells Fargo v. Jordan*, 2009 Ohio 1092; 2009 Ohio App. LEXIS 881, at *11, 12 (Ohio App., Eighth Jud. Dist., Mar. 12, 2009), app. den., 123 Ohio St. 3d 1407; 2009 Ohio 5031; 914 N.E.2d 204; 2009 Ohio

LEXIS 2730 (Sept. 30, 2009) ("WFB lacked standing to bring a foreclosure action....");

f) *In re Tandala*, 438 B.R. 52, 57 (Bankr. S.D.N.Y., 2010) ("As Wells Fargo has failed to prove it owns the Note, it has failed to establish that it has standing to pursue its state law remedies with regard to the Mortgage and Property");

g) *Wells Fargo v. Farmer*, 19 Misc.3d 1141(A), 2008 WL 2309006, at *3 (N.Y. Sup. June 5, 2008). ("It is clear that plaintiff WELLS FARGO, with the invalid assignments of the instant mortgage and note from ARGENT, lacks standing to foreclose on the instant mortgage");

h) *Wells Fargo v. Reyes*, 20 Misc.3d 1104(A), 2008 WL 2466257, at *1, 6 (N.Y. Sup. June 18, 2008). (WFB "lacks standing to prosecute this matter because ... it does not now, and has never owned the subject mortgage"); and

i) *Wells Fargo Bank, N.A. v. Byrd,* 897 N.E.2d 722, 728; 178 Ohio App.3d 285, 292; 2008 Ohio 4603 (Ohio App., 2008) ("The trial court properly dismissed the foreclosure complaint filed by Wells Fargo in this case because, at the time the complaint was filed, it did not own the mortgage that was the basis for the suit")

178.    As the Hon. Keith C. Long observed in *Ibanez*, these are "not merely problems with paperwork or a matter of dotting i's and crossing t's. Instead, they lie at the heart of the [legal] protections given to homeowners and borrowers."[76] Judge Christopher A. Boyko also remarked that:

> There is nothing improper or wrong with financial institutions or law firms making a profit — to the contrary, they should be rewarded for sound business and legal practices. However, unchallenged by underfinanced opponents, the institutions worry less about jurisdictional requirements and more about maximizing returns. Unlike the focus of financial institutions, the federal courts must act as gatekeepers, assuring that only those who meet diversity and standing requirements are allowed to pass through.[77]

---

[76]   *Ibanez*, 2009 Mass. LCR LEXIS 134, at *61.

[77]   *In re Foreclosure Cases*, 2007 U.S. Dist. LEXIS 84011, at *8-*9 (N.D. Ohio, Oct. 31, 2007).

179.    Despite similar efforts of other judges, it was not until October 2010 (after high-profile news reports revealed that some mortgage servicers and their law firms had eviscerated those legal protections) that judicial, legislative and regulatory authorities declared that mortgage foreclosures abuse is a widespread national problem that requires fundamental institutional reform.

### D.    The Foreclosure Fraud Scandal
### Confirms Defendants' Unlawful Practices

180.    On October 13, 2010, the National Association of Attorneys General announced that:

> It has recently come to light that a number of mortgage loan servicers have submitted affidavits or signed other documents in support of either a judicial or non-judicial foreclosure that appear to have procedural defects.  In particular, it appears affidavits and other documents have been signed by persons who did not have personal knowledge of the facts asserted in the documents.  In addition, it appears that many affidavits were signed outside of the presence of a notary public, contrary to state law.  This process of signing documents without confirming their accuracy has come to be known as "robo-signing."  We believe such a process may constitute a deceptive act and/or an unfair practice or otherwise violate state laws.[78]

181.    On October 17, 2010, Housing and Urban Development Secretary Shaun Dovovan said that "revelations about foreclosure processing" are "shameful" and have "rightly outraged the American people."[79] Mr. Donovan promised that:

> A comprehensive review of the situation [is] underway and [the government] will respond with the full force of the law where problems are found.  The Financial Fraud Enforcement Task Force that President Obama established last November has made this issue

---

[78]    News Release, *50 States Sign Mortgage Foreclosure Joint Statement*, THE NAT'L ASSOC. ATTY. GEN, Oct. 13, 2010, http://www.naag.org/joint-statement-of-the-mortgage-foreclosure-multistate-group.php.

[79]    Shaun Donovan, *How We Can Really Help Families*, HUFFINGTON POST, Oct. 17, 2010, http://www.huffingtonpost.com/shaun-donovan/how-we-can-really-help-fa_b_765528.html.

> priority number one....  The message all these institutions are sending is the same: banks must follow the law -- and those that haven't should immediately fix what is wrong.

182.    On November 18, 2010, a House subcommittee held a hearing on "Robo-Singing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing."  Among testifying experts was Georgetown University Law Center Professor Adam J. Levitin, who explained:

> Servicers' business model ... encourages them to cut costs wherever possible, even if this involves cutting corners on legal requirements, and to lard on junk fees and in-source expenses at inflated prices.  The financial incentives of mortgage servicers also encourage them to foreclose, rather than modify loans in many cases, even when modification would maximize the net present value of the loan for investors.

> The chain of title problems are highly technical, but they pose a potential systemic risk to the US economy. ... At best they present problems of fraud on the court, clouded title to properties coming out of foreclosure, and delay in foreclosures that will increase the shadow housing inventory and drive down home prices.  At worst, they represent a systemic risk that would bring the US financial system back to the dark days of the fall of 2008.[80]

183.    On December 1, 2010, the Senate Banking Committee convened a hearing on "Problems in Mortgage Servicing From Modification to Foreclosure."  There, Fannie Mae Executive Vice President Terence Edwards testified that his organization was "closely monitoring the work performed" by members of its Retained Attorney Network.[81] Edwards said that Fannie Mae was planning further steps "to establish a more robust regimen for

---

[80] *See* http://financialservices.house.gov/Media/file/hearings/111/Levitin111810.pdf.

[81] *See* above at ¶ 21 n.6.

monitoring our approved attorney network to ensure compliance with proper procedures and operations," including "on-site monitoring and in-depth training."[82]

**Judicial Action in New Jersey**

184.    In New Jersey, Supreme Court Chief Justice Stuart Rabner directed his state's judicial system to take immediate steps to stop mortgage foreclosure fraud.

185.    On December 20, 2010, the Administrative Office of the Courts in New Jersey issued: (a) a press release,[83] (b) a Notice to the Bar concerning "emergent amendments" to court rules governing residential mortgage foreclosures in New Jersey, and accompanying Order by Chief Justice Rabner,[84] and (c) Administrative Order 01-2010, signed by the Hon. Glenn A. Grant, acting director of the Administrative Office ("Director Grant's Order").[85]

186.    On December 20, 2010, the Hon. Mary C. Jacobson, Presiding Judge of the Chancery Court in Mercer County, New Jersey, *sua sponte* initiated an action titled *In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities*, Docket No. F-059553-10 ("*Foreclosure Irregularities Matter*").   Judge Jacobson's Order required certain mortgage servicers, including WFB, to explain and justify their foreclosure practices to a Special Master appointed by the Court ("Show Cause Order") as a condition to continued prosecution of uncontested residential foreclosure actions in New Jersey.  *See* http://www.judiciary.state.nj.us/notices/2010/n101220c.pdf.

---

[82] *See* Testimony of Terence Edwards, December 1, 2010, at 8-9, http://banking.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=8081e67c-9d07-4e59-b0db-823834d7beeb.

[83] http://www.judiciary.state.nj.us/superior/press_release.htm.

[84] http://www.judiciary.state.nj.us/notices/2010/n101220a.pdf.

[85] http://www.judiciary.state.nj.us/notices/2010/n101220b.pdf.

187.   Judge Jacobson held that "the exigencies of the circumstances, especially the immediate need to restore integrity to foreclosure processing," required "an in-depth review ... to ensure that [mortgage servicers'] employees, agents, servants or third-party independent contractors acting on their behalf follow proper policies, procedures and processes."[86] Judge Jacobson identified WFB and others as having been "*implicated in irregularities* in connection with their foreclosure practices," which demonstrated "a *public record of questionable practices* that this court must address now in its supervisory capacity over the processing of foreclosure matters."[87]

188.   The public record identified by Judge Jacobson was summarized in Director Grant's Order.   Among other things, Director Grant singled out for special criticism fraudulent notarization practices of the Phelan firm and Full Spectrum, described more fully above at pages 50-54:

> In state court proceedings, Thomas Strain, an employee of a servicing company associated with the New Jersey and Pennsylvania law firm of Phelan, Hallinan & Schmieg, LLP (Phelan), admitted in a deposition to notarizing approximately fifty foreclosure-related documents per day, often outside the signer's presence.   After New Jersey Chancery Division judges expressed concerns related to Phelan's mortgage assignment practices, Phelan spent $175,000 to redo approximately 3,000 assignments that Strain had notarized.[88]

189.   Director Grant also highlighted deposition testimony of WFB employees who admitted that they did not review or have personal knowledge of the facts asserted in legal

---

[86] Show Cause Order at 2-4.

[87] *Id.* at 2 (emphasis supplied).

[88] Admin. Order at 4-5 (footnotes omitted).  *See* also Brian Ahearn, *When Lawyers Neglect the Legal Details*, BERGEN RECORD, Jan. 4, 2011 (citing "concern about Phelan's mortgage practices" expressed by New Jersey Chancery Division judges), http://www.northjersey.com/columnists/ahearn/ahearn_010511.html?page=all. and Mary Pat Gallagher, *Law Firm Hit With Racketeering Suit Over Alleged Wrongful Foreclosures*, 206 N.J.L.J, 388 (Oct. 31, 2011) (The Phelan firm "was made an example of last year when the judiciary took action against robo-signing and other improper foreclosure practices").

documents signed in mass-produced fashion, a process in which WFB relied instead on outside foreclosure counsel or other servicer employees for accuracy.[89]

190.   Based on information in the public record, the New Jersey judiciary:

- Effectively suspended uncontested foreclosure actions prosecuted by WFB and five other implicated servicers

- Required servicers to justify their actions with detailed non-public information provided to a special master charged with determining the sufficiency of the servicers' foreclosure practices and processes, and

- Established and implemented new court rules specifically requiring foreclosure law firms to identify steps they have taken to verify evidentiary support for factual statements in the legal documents they sign, including their compliance with Rule 4:64-1(b)(10), which requires that "if plaintiff is not the original mortgagee or original nominee mortgagee," a foreclosure complaint must provide "the name of the original mortgagee and a recital of all assignments in the chain of title."[90]

191.   On June 9, 2011, Chief Justice Rabner entered an order finalizing amendments to court rules governing residential mortgage foreclosures in New Jersey.[91] The Order requires foreclosure lawyers to execute certifications and affidavits providing specific information demonstrating that they have confirmed the accuracy of facts in foreclosure legal documents through direct communications with servicer employees.

192.   On August 15, 2011, based on the special master's report accepting assurances by WFB that new and improved foreclosure procedures could now be relied upon by New Jersey courts, Judge Jacobson entered an Order permitting WFB to resume

---

[89]  *Id.* at 5-6, 9-10 (footnotes omitted).

[90]  *Id.* at 14-18 (footnotes omitted).

[91]  http://www.scribd.com/doc/57947188/Residential-Mortgage-Foreclosure-Rules-and-Revised-Form-Certifications-Affidavits.

uncontested foreclosures.   The activities of WFB and other implicated servicers will continue to be monitored for one year.

**Federal Consent Orders and Government Investigations**

193.   On February 25, 2011, WFB filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2010, which incorporated by reference an Annual Report disseminated to shareholders.  In a footnote at page 170 of the Annual Report, WFB disclosed that:

> Several government agencies are conducting investigations or examinations of various mortgage related practices of Wells Fargo Bank.  The investigations relate to ... whether Wells Fargo's practices and procedures relating to mortgage foreclosure affidavits and documents relating to the chain of title to notes and mortgage documents are adequate.   *With regard to the investigations into foreclosure practices, it is likely that one or more of the government agencies will initiate some type of enforcement action against Wells Fargo, which may include civil money penalties.*  Wells Fargo continues to provide information requested by the various agencies.

(Emphasis supplied).

194.   As part of the government investigations disclosed by WFB, the Office of the Comptroller of the Currency ("OCC"), the Federal Reserve Board ("the Fed"), the Federal Deposit Insurance Corporation ("FDIC"), and the Office of Thrift Supervision ("OTS") jointly conducted "horizontal" examinations of foreclosure processing at 14 federally regulated mortgage servicers, including WFB ("Interagency Review").[92]

---

[92]   *See* Testimony of Julie L. Williams, First Senior Deputy Comptroller and Chief Counsel of the OCC, at July 7, 2011 hearing before subcommittees of the House Committee on Financial Services ("Williams Testimony") at 2-3, http://financialservices.house.gov/UploadedFiles/070711williams.pdf.

195.   On April 13, 2011, OCC, the Fed, FDIC, and OTS issued an Interagency Report,[93] concluding, among other things, that:

a)   Deficiencies in servicers' processes, procedures, controls, and staffing resulted in numerous inaccurate affidavits and other foreclosure-related documents.   Examiners found that most servicers had affidavit signing protocols that expedited the processes for signing foreclosure affidavits without ensuring that the individuals who signed the affidavits personally conducted the review or possessed the level of knowledge of the information that they attested to in those affidavits….[94]

b)   [T]he servicers reviewed generally did not properly structure, carefully conduct, or prudently manage their third-party-vendor relationships with outside law firms and other third-party foreclosure services providers. Failure to effectively manage third-party vendors resulted in increased reputational, legal, and financial risks to the servicers.[95]

c)   Servicers typically used third-party law firms to prepare affidavits and other legal documents, to file complaints and other pleadings with courts, and to litigate on their behalf in connection with foreclosure and foreclosure-related bankruptcy proceedings.   The servicers reviewed generally showed insufficient guidance, policies, or procedures governing the initial selection, management, or termination of the law firms that handled their foreclosures.[96]

d)   [P]roblems include instances in which law firms signed documents on behalf of servicers without having the authority to do so, or they changed the format and content of affidavits without the knowledge of the servicers.   These defects could, depending upon the circumstances, raise concerns regarding the legality and propriety of the foreclosure   even   if   the   servicer   had   sufficient

---

[93]   The Interagency Report is available at http://www.occ.treas.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf.

[94]   Interagency Report at 8.

[95]   *Id.* at 9.

[96]   *Id.*

documentation available to demonstrate authority to foreclose.[97]

196.    Having found that WFB and others engaged in "unsafe and unsound practices related to residential mortgage loan servicing and foreclosure processing," the OCC on April 13, 2011 announced formal enforcement action against WFB and others.[98] WFB entered into a Consent Order with the OCC,[99] requiring WFB to:

    a)  Provide robust oversight and controls of third-party vendors, including outside legal counsel and vendors who provide default and foreclosure processing services to ensure that those who act on their behalf comply with these obligations as well as all laws and regulations, both state and federal;

    b)  Implement a comprehensive "revision" of its foreclosure processes for the purpose of restoring "integrity" to the foreclosure process; those revisions must be identified in "detailed Action Plans" acceptable to federal government regulators; and

    c)  Engage "independent firms" approved by federal government regulators for the purpose of conducting a "look-back" investigation to identify borrowers who [limited to the narrow period from January 1, 2009 through December 31, 2010] suffered financial harm as a result of foreclosure processing deficiencies and to compensate them for financial injury.[100]

---

[97]   *Id.* at 9-10.

[98]   News Release No. 2011-47, *OCC Takes Enforcement Action Against Eight Servicers for Unsafe and Unsound Foreclosure Practices*, OCC, April 13, 2011 ("OCC News Release"),   http://www.occ.treas.gov/news-issuances/news-releases/2011/nr-occ-2011-47.html.

[99]   Consent Order dated March 31, 2011 in the proceeding entitled *In the Matter of Wells Fargo Bank, N.A.*, The Comptroller of the Currency of the United States of America, No. AA-EC-11-19, http://www.occ.treas.gov/news-issuances/news-releases/2011/nr-occ-2011-47k.pdf.

[100]   Williams Testimony at 5-7.  *See also* GAO-11-433 at 30.

197.    On April 13, 2011, the Fed also announced enforcement action against WFB,[101] which entered into a Consent Order similar to the one obtained by the OCC.[102] In its press release, the Fed stated that forceful government action was needed to "address a _pattern of misconduct_ and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing," which "represent _significant and pervasive compliance failures and unsafe and unsound practices_ at these institutions."[103]

198.    In Congressional testimony on May 26, 2011, former FDIC Chairman Sheila C. Bair emphasized that the OCC and Fed investigations and Consent Orders were not quick or all-encompassing solutions to the foreclosure fraud scandal:

> [O]ur examiners participated with other regulators in horizontal reviews of these servicers, as well as two companies that facilitate the loan securitization process.  In these reviews, federal regulators cited _"pervasive" misconduct in foreclosures_ and significant weaknesses in mortgage servicing processes.
>
> Unfortunately, the horizontal review only looked at processing issues. _Since the focus was so narrow, we do not yet really know the full extent of the problem_....The enforcement orders do not preclude additional supervisory actions or the imposition of civil money penalties.[104]

199.    As FDIC director Mark Pearce also testified, the OCC and Fed Consent Orders "do not fully identify and remedy past errors in mortgage-servicing operations of large institutions," including the problem of overstated "fees charged in the servicing process."[105]

---

[101]   Press Release, the Fed, April 13, 2011 ("Fed Press Release"), http://www.federalreserve.gov/newsevents/press/enforcement/20110413a.htm

[102] Consent Order dated April 13, 2011 in _In the Matter of Wells Fargo & Company_, Board of Governors of The Federal Reserve System, Docket No. 11-025-B-HC, http://www.federalreserve.gov/newsevents/press/enforcement/enf20110413a10.pdf

[103] Fed Press Release (emphasis supplied).

[104]   http://www.fdic.gov/news/news/speeches/chairman/spmay2611.html

[105] Statement of Mark Pearce at hearing before subcommittees of the House Committee on Financial Services on July 7, 2011, at 4 n.2, http://financialservices.house.gov/UploadedFiles/070711pearce.pdf

200.     Identification of "past errors" is not now complete, nor is it apparent that mortgage foreclosure abuses have been or will ever be adequately addressed.  In late July 2011, for example, Reuters and Associated Press reported that mortgage servicers and their lawyers continue to file questionable documents in foreclosure cases, including false mortgage assignments.[106]

201.     Amid this uncertainty, the coalition of states' attorneys general, working closely with the U.S. Department of Justice, continue negotiations for a settlement with WFB and four other major mortgage servicers that have been implicated in the foreclosure abuse scandal.  Law enforcement officials have demanded that WFB and other servicers pay as much as $25 billion in penalties and to comply with new uniform mortgage servicing rules.[107] However, the outcome of these negotiations, if any, is undetermined as of the date of this Complaint.

## V.   <u>CLASS ACTION ALLEGATIONS</u>

202.     The Representative Homeowners bring this lawsuit, individually and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of all members of the following Class:

> All homeowners during the period from January 1, 2005 through the present ("Class Period") who were:

---

[106] *See* Scot J. Paltrow, *States Negotiating Immunity For Banks Over Foreclosures*, REUTERS, July 20, 2011, ("Reuters Report") http://www.reuters.com/article/2011/07/20/foreclosure-banks-immunity-idUSL3E7IK4EN20110720; Michelle Conlin and Pallavi Gogoi, *Mortgage 'Robo-Signing' Goes On*, A.P., July 19, 2011, http://abcnews.go.com/US/wireStory?id=14100463.  See also Letter dated from Senator Robert Menendez et al., to federal regulators dated July 20, 2011, http://menendez.senate.gov/imo/media/doc/Letter%20to%20regulators%20on%20transparency%20in%20foreclosure%20reviews.pdf.

[107] Reuters Report; Gretchen Morgenson, *A Low Bid For Fixing a Big Mess*, N.Y. TIMES, May 14, 2011, http://www.nytimes.com/2011/05/15/business/15gret.html; David Savage, *Talks to Settle Foreclosure Probes Could Take Months*, L.A. TIMES, Mar. 25, 2011, http://articles.latimes.com/2011/mar/31/business/la-fi-foreclosure-talks-20110331.

(a)     Defendants in New Jersey or Pennsylvania mortgage foreclosure actions prosecuted by Phelan Hallinan & Schmieg, P.C. or Phelan Hallinan & Schmieg, LLP and

(b)     Damaged by one or both of the following abusive foreclosure practices:

   i)     Preparation, execution and notarization of fraudulent court documents and property records used to initiate and prosecute improper foreclosure actions in the name of Wachovia Bank, N.A. and/or U.S. Bank, N.A., as purported "Trustee for the Pooling and Servicing Agreement dated as of November 1, 2004, Asset-Backed Pass-Through Certificate Series 2004-WWF1," and

   ii)     Imposition of inflated or fabricated fees for "default management services" that exceed amounts specified in uniform fee schedules disseminated to foreclosure law firms by Fannie Mae and Freddie Mac or otherwise exceed prevailing industry standards.

203.   This litigation is properly maintainable as a class action.

204.   The Class is so numerous and geographically dispersed that joinder of all members is impracticable.   According to Frank Hallinan, the Phelan firm handled an estimated 24,000 to 26,000 foreclosure prosecutions in Pennsylvania and New Jersey during 2008 alone, a fraction of the foreclosures prosecuted by Phelan firm during the entire Class Period.

205.   There are questions of law and fact common to the Class.   These common questions relate to the existence of the pattern of wrongful conduct alleged, and to the type and common pattern of injury sustained as a result thereof.   The questions include but are not limited to:

a)   Whether Defendants falsified or caused the falsification of statements made in complaints, affidavits, verifications, certifications, motions and other legal documents filed in improper residential mortgage foreclosure proceedings brought in the name of Wachovia Bank, N.A. and/or U.S. Bank, N.A., as purported "Trustee for the Pooling and

Servicing Agreement dated as of November 1, 2004, Asset-Backed Pass-Through Certificate Series 2004-WWF1."

b)     Whether Defendants falsified or caused the falsification of mortgage assignments and other land records recorded with public agencies in connection with the filing of improper foreclosure actions brought in the name of Wachovia Bank, N.A. and/or U.S. Bank, N.A., as purported "Trustee for the Pooling and Servicing Agreement dated as of November 1, 2004, Asset-Backed Pass-Through Certificate Series 2004-WWF1."

c)     Whether Wachovia Bank, N.A. and/or U.S. Bank, N.A., had legal standing to initiate and prosecute mortgage foreclosure actions against homeowners on behalf of the "Pooling and Servicing Agreement dated as of November 1, 2004, Asset-Backed Pass-Through Certificate Series 2004-WWF1."

d)     Whether Defendants systematically overstated or fabricated the amount of "default management servicing" fees charged to homeowners, including, *inter alia*,

- Attorneys' fees not authorized by contract or otherwise permitted by law
- Fees for property title searches not authorized by contract or otherwise permitted by law
- Fees for "appraisals" and BPOs not authorized by contract or otherwise permitted by law
- Fees for property inspections and maintenance services not authorized by contract or otherwise permitted by law
- Charges for unspecified and undocumented "foreclosure fees and costs," including multiple or duplicated charges for the same "services" allegedly rendered.

69

e)    The duration, sequence and character of the conduct alleged in this Complaint, including particular acts performed by Defendants and others that deprived Plaintiffs and members of the Class of their legal rights and property.

f)    Whether the conduct alleged in this Complaint violated RICO.

g)    Whether the conduct alleged in this Complaint violated the NJCFA.

h)    Whether the conduct alleged in this Complaint violated the UTPCPL.

i)    Whether the conduct alleged in this Complaint states a cause of action for breach of contract, money had and received, and/or negligence under the common laws of the State of New Jersey and the Commonwealth of Pennsylvania.

j)    Whether Defendants' conduct, as alleged in this Complaint, caused injury to the person and property of the Representative Plaintiffs and other members of the Class.

k)    The appropriate measure of damages sustained by Plaintiffs and other members of the Class.

l)    Whether restitution and disgorgement of profits are appropriate equitable relief for the wrongful conduct alleged in this Complaint.

m)    Whether injunctive relief is warranted to restrain the Phelan firm from continuation of the wrongful conduct alleged in this Complaint, and

n)    Whether a forensic accounting firm and special master should be appointed to (i) quantify Defendants' ill-gotten gains to be disgorged to Plaintiffs and members of the Class; (ii) recommend business management and accounting procedures that the Phelan firm must adopt and implement to avoid future continuation of the wrongful conduct documented throughout this Complaint; and (iii) monitor the Phelan firm's compliance with business management or accounting procedures that may be ordered by the Court.

207.    The Representative Homeowners are members of the Class.  Plaintiffs' claims are typical of the claims of other Class members.  Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs' interests are aligned closely with, and are not antagonistic to, those of the other members of the Class.  In addition, Plaintiffs are represented by competent counsel experienced in the prosecution of class action litigation.

208.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

209.    Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate injunctive relief with respect to the Class as a whole.

210.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

211.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Members of the Class are readily ascertainable, *inter alia*, through records maintained in the regular course of business by the Phelan firm and WFB. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate substantively complex issues like those

asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## VI.  CLAIMS FOR RELIEF

### COUNT  ONE:  VIOLATIONS OF 18 U.S.C. § 1962(c) (RICO)

212.    On behalf of themselves and all others similarly situated, Plaintiffs re-allege and incorporate by reference each of the allegations in the preceding paragraphs of this Complaint.

213.    This cause of action, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against all Defendants on behalf of the Class.

214.    Plaintiffs, each member of the Class, and each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

215.    In violation of 18 U.S.C. § 1962(c), Defendants at all relevant times conducted the affairs of the association-in-fact enterprises identified below.   The affairs of this enterprise affected interstate commerce through a pattern of racketeering activity.

**A.    The Enterprise**

### The Phelan/Wells Fargo Foreclosure Enterprise

216.    The Phelan/Wells Fargo Foreclosure Enterprise (the "Enterprise") is an association-in-fact consisting of , *inter alia*, the following persons and entities:

    a)  Larry Phelan, Frank Hallinan, Dan Schmieg and Rosemarie Diamond;

    b)  Phelan Hallinan & Schmieg, LLP;

    c)  Phelan Hallinan & Schmieg, P.C.;

    d)  Full Spectrum Holdings LLC, Full Spectrum Services, Inc., Full Spectrum Legal Services, Inc., Full Spectrum Review Services, Inc.,

Foreclosure Review Services, Inc., FSS Acquisitions, Inc., LTS Acquisitions, Inc., Land Title Services of New Jersey, Inc., Land Title Services of Pennsylvania;

e)   WFB;

f)    Non-party Fannie Mae; and

g)   Non-party Freddie Mac.

217.    The Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of limiting costs and maximizing profits through rapid, automated prosecution of residential mortgage foreclosure lawsuits.  The Enterprise operated continuously throughout the Class Period.

218.    The Enterprise engages in, and its activities affect, interstate commerce.

219.    While all Defendants participate in and are part of the Enterprise, they also have an existence separate and distinct from the Enterprise.

220.    Members of the Enterprise are linked systematically through contractual relationships, financial transactions and coordinated activities, including similar understandings concerning the selection, duties, performance and oversight of the prosecution of mortgage foreclosure actions.

**B.    Predicate Acts of Mail and Wire Fraud**

**Fraudulent Schemes and Intent to Defraud**

221.    As alleged above, at the beginning of 2005, the Phelan firm adopted a "business model" whose purpose is to maximize profits and severely limit costs, while at the same time processing an exploding volume of foreclosure cases at breakneck speed and in assembly line fashion, all with only a handful of lawyers, a large support staff, and wholly-owned, non-legal "service" providers.

222.   The template used by the Phelan firm is calculated to, and does, generate systematic overcharges assessed to distressed homeowners for "default management services" that are unessential, unperformed, and unauthorized by contract or law.  To obtain unearned profits that this system is set up to manufacture, the Phelan firm files foreclosure lawsuits on the basis of untrue assertions of fact, which are included in court filings and property records that often contain falsified signatures and notarizations, all to facilitate the prosecution of foreclosure lawsuits in the name of entities without legal standing to sue.

223.   The Phelan firm acts under the direction and command of WFB and other mortgage servicers.  As a major source of revenue from their servicing operations, WFB and other institutions receive part of the proceeds of inflated and manufactured "default servicing" fees extracted from distressed homeowners by the Phelan firm and similar law firms.  WFB and other servicers regulate and control the activities of such law firms through their (a) use of default management "outsource" companies like LPS and CoreLogic; (b) selection of foreclosure law firms limited to those that are members of "attorney networks" run by LPS and CoreLogic or those that have achieved "approved attorney" or "designated counsel" status from Fannie Mae or Freddie Mac; and (c) monitoring of foreclosure lawyers' performance in meeting mandatory timelines through computerized mortgage servicing programs like LPS Desktop and VendorScape.

224.   Having achieved success in its industry, the Phelan firm has consistently met or exceeded the demands of WFB and other servicers.  In turn, given the tight institutional constraints within which it operates, the Phelan firm has taken little or no action without the express approval or willfully blind acquiescence of WFB and other servicer clients.

**Defendants' Fraudulent Use of Interstate Wire Facilities and U.S. Mail**

225.    Pursuant to these fraudulent schemes, mail and wire fraud was routinely committed by the Phelan firm and WFB.  The following are non-exhaustive examples of fraudulent misrepresentations made by Defendants to the Representative Homeowners through use of the U.S. Mail or interstate wire facilities.

226.    On April 18, 2007, employees or agents of Larry Phelan, Frank Hallinan, and Dan Schmieg caused to be recorded two purported assignments of Diane and Charlie Giles' mortgage with the Clerk of Ocean County, New Jersey.  *See* above at ¶¶ 81-85.  These assignments (ostensibly signed and notarized in Westchester County, New York, and transmitted to New Jersey by mail or interstate wire facilities) were false, misleading and unlawfully fabricated by the Phelan firm and WFB for the sole purpose of filing an improper foreclosure action against the Giles on behalf of "Wachovia Bank, N.A.," an entity without legal standing to sue. *Id.*

227.    On July 27, 2007, Debbie Williams, a Phelan firm legal assistant, sent a Notice of Sheriff's Sale to Charlie and Diane Giles via U.S. Postal Service, certified mail, return receipt requested, which was received by Mr. and Ms. Giles at 10:35 a.m. on August 1, 2007.  The Notice of Sheriff's Sale (like the Phelan firm's foreclosure Complaint and Certifications dated February 16, 2007 and its Certification of Default dated April 5, 2007) falsely identified Wachovia Bank, N.A. as plaintiff in the mortgage foreclosure action improperly prosecuted against them by the Phelan firm and WFB.  Wachovia Bank, N.A. did not own the Giles' mortgage or note and had no legal standing to sue.  *See* above at ¶¶ 80-85, 94-95, 97-102.

228.    On December 10, 2007, Jessica Hansbury, a Phelan firm employee, faxed a letter to Jerry Dasti, counsel to the Giles, falsely representing that Charlie and Diane Giles

owed WFB $7,817 in "Legal Fees and Costs through December 10, 2007" and "Property Inspections/BPO" fees in an amount of $340.   The falsity of the Phelan firm's misrepresentation is demonstrated by the removal of most of those manufactured fees on January 15, 2008, when the Giles were forced to sell their home at a significantly below-market value and to pay $2,500 for services of their own attorneys. *See* above at ¶¶ 103-105.

229.    On November 14, 2007, Oliver Ayon, a Phelan firm legal assistant, served by regular and certified U.S. Mail copies of the Phelan firm's Motion to Rescind and Correct (together with its supporting brief and attorney certification) to Charles and Diane Giles, and their attorney, Jerry J. Dasti.  The representations made in these court documents concerning the nature and circumstances of (a) the "incorrect" assignment to Wachovia and (b) the foreclosure complaint the Phelan firm erroneously filed in the name of Wachovia were false and misleading for the reasons detailed above at ¶¶ 97-102.

230.    On March 14, 2007, employees or agents of Larry Phelan, Frank Hallinan, and Dan Schmieg caused to be filed with the Philadelphia recorder's office a purported assignment of Laurine Spivey's mortgage from Ameriquest to Wachovia.  *See* above at ¶¶ 117-125.  This assignment (ostensibly signed and notarized in Orange County, California, and transmitted to Pennsylvania by mail or interstate wire facilities) was false, misleading and unlawfully fabricated by the Phelan firm and WFB for the sole purpose of filing an improper foreclosure action against the Ms. Spivey on behalf of "Wachovia Bank, N.A.," an entity without legal standing to sue. *Id*.

231.    On or about March 12, 2008, Frank Hallinan sent a "Praecipe to Substitute Verification" of the foreclosure Complaint dated December 28, 2007 (together with a purported verification of Yolanda Williams) by regular U.S. Mail to Laurine Spivey.  In

attesting to the accuracy of the allegations in the Complaint, the verification mailed by Frank Hallinan to Ms. Spivey made false and misleading representations that Wachovia Bank, as Trustee of the Park Place Trust, was the legal holder of Ms. Spivey's mortgage and note. *See* above at ¶ 125 and n.44.

232.   On or about May 5, 2008, Phelan firm attorney Michelle Bradford mailed to Laurine Spivey a motion to reassess damages that contained false and misleading representations concerning, *inter alia*, amounts purportedly due to "Wachovia" on Ms. Spivey's mortgage for legal fees, legal costs, cost of title work, and fees for BPOs and property inspections.  The false and misleading nature of these representations is detailed above at ¶¶ 126-127, 130-148.

233.   On or about August 27, 2008, through use of the U.S. Bankruptcy Court's Electronic Case Filing system, Phelan firm attorney Andrew L. Spivack filed and served on Laurine Spivey's counsel a proof of claim that contained false and misleading representations concerning, *inter alia*, amounts purportedly due to "Wachovia" on Ms. Spivey's mortgage for legal fees, legal costs, BPOs, property inspections and proof of claim preparation and filing. The false and misleading nature of these representations is detailed above at ¶¶ 126-127, 130-148.

### Defendants Depend On Interstate Wire Facilities and U.S. Mail For Most Business Communication

234.   The entirety of Defendants' business operations, not just their fraudulent activities, are carried out by an array of legal and mortgage servicing personnel, working across state boundaries, who engage in constant transfers of correspondence, legal documents, loan data, information, invoices, account statements, financial instruments and

currency.  These information transfers occur primarily through interstate wire facilities or U.S. Mail.[108]

235.    To the extent that the Phelan firm and WFB made any fraudulent misrepresentation to homeowners (and there is abundant evidence that they made thousands of misrepresentations to members of the Class), Defendants' systematic use of interstate wire facilities and U.S. Mail were an indispensable part of their fraudulent schemes.

**C.    Conduct of the Enterprise's Affairs**

236.    Throughout the Class Period, the Phelan firm and WFB exerted control over the Enterprise.  In violation of 18 U.S.C. § 1962(c), they conducted or participated in the conduct of the affairs of the Enterprise by (a) filing or directing the filing of foreclosure lawsuits on the basis of untrue assertions of fact, some of them in court filings and property records containing counterfeit signatures and sham notarizations, all of them intended to create the false appearance of legal standing to bring residential mortgage foreclosure actions; and (b) systematically inflating or fabricating junk fees charged to distressed homeowners for "default management services" that are unessential, unperformed, and unauthorized by contract or law;

237.    WFB conducted or participated in the conduct of the affairs of the Enterprise, *inter alia,* by:

    a)    Outsourcing selection and monitoring of foreclosure law firms to CoreLogic and/or LPS (including their corporate predecessors), which (i) collect high fees from the Phelan firm as a condition to its membership in "networks" of attorneys deemed eligible for "referrals" of foreclosure cases from

---

[108] See Certification of Timothy P. O'Brien dated May 4, 2011, filed in *In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities*, Docket No.  F-059553-10 (N.J. Super. Ch. Div., Mercer Co.). http://www.judiciary.state.nj.us/superior/F-59553-10-Wells%20Fargo/wells_fargo_1.pdf.

WFB, (ii) manage the flow of almost all information between WFB and the Phelan firm, and (iii) monitor the Phelan firm for the speed of its performance in meeting strict timelines required by Fannie Mae, Freddie Mac and others, the satisfaction of which is a condition to future referrals of foreclosure cases to the Phelan firm

b)      Directing, encouraging or permitting the Phelan firm to prepare, sign, notarize and record assignments of mortgages and notes that do not reflect actual transfers of ownership

c)      Directing, encouraging or permitting the Phelan firm to file complaints, affidavits, certifications, verifications, motions and other legal documents, which (a) contain false statements, including those attesting to personal knowledge of untrue factual assertions, and (b) are intended to (and do) mislead the Courts and homeowners concerning the legal standing of the purported mortgagees in whose names the Phelan firm brings suit

d)      Knowingly sharing in the proceeds of unlawfully inflated or fabricated junk fees charged to distressed homeowners for "default management services" ordered by the Phelan firm through its wholly owned affiliates, Full Spectrum and Land Title Services.

238.    The Phelan firm conducted or participated in the conduct of the affairs of

the Enterprise, *inter alia*, by:

a)      Developing and implementing a "business model" designed to adapt to foreclosure industry "changes" mandated by GSEs and outsourced default management companies hired by WFB and other servicer clients, including companies now known as LPS and CoreLogic.  Recognizing the profit-making limitations of the flat-fee structure of attorneys' fees for foreclosure work; the "strict timeframes" for completion of foreclosures; and the "very high" "outsource fees and other mandatory costs [that] all cut deep" into the Phelan firm's "profit margins," the Phelan firm created Full Spectrum and Land Title Services to provide title searches and other non-legal functions ancillary to foreclosures.  This was seen by the Phelan firm's as its "last areas of profit."[109] The benchmark of this business model is extremely low cost and extremely high speed, and disregard for

---

[109] *See above* at ¶¶ 48-50.

the quality, effectiveness and propriety of services allegedly performed by Full Spectrum and Land Title Services;

(b)     Meeting or exceeding "strict timelines" required by Fannie Mae, Freddie Mac, and others by any means possible, including willful failure to perform investigations necessary to determine the factual basis of allegations made in foreclosure complaints, affidavits, certifications, verifications, motions and other court documents.  Instead, the Phelan firm and its agents prepare, sign, notarize and file such documents, which (a) contain false statements attesting to the personal knowledge of facts asserted therein and (b) are intended to (and do) mislead the Courts and homeowners concerning the legal standing of the purported mortgagees in whose names the Phelan firm brings suit at the direction and command of WFB and other servicer clients;

c)      Preparing, signing, notarizing and recording of assignments of mortgages and notes that do not reflect actual transfers of ownership in order to manufacture superficial "support" for uninvestigated and factually baseless claims made by the Phelan firm in foreclosure complaints, affidavits, certifications, verifications, motions and other documents filed with Pennsylvania and New Jersey state courts at the direction and command of WFB and other servicer clients; and

d)      Through its wholly owned affiliates, Full Spectrum and Land Title Services, charging unlawfully inflated or fabricated junk fees to distressed homeowners for "default management services" ordered by the Phelan firm, a portion of which is kicked-back as profit to WFB and other servicer clients.

239.   In the foregoing ways and others, the Phelan firm and WFB, collectively and individually, benefit from their unlawful conduct and participation in the affairs of the Enterprise.

**D.  Defendants' Pattern of Racketeering Activity**

240.   Each Defendant conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

241.   Defendants' pattern of racketeering can be discerned within their fraudulent conduct directed to the Representative Homeowners.  *See* above at pages 23-48.

242.   Defendants' pattern of racketeering can be discerned within their fraudulent conduct directed to other homeowners, as described by federal and state  judges who have identified and condemned Defendants' unlawful activities.  *See* above at pages 49-59.

243.   Defendants' pattern of racketeering can be discerned within the actions taken by the New Jersey judiciary at the direction of Supreme Court Chief Justice Stuart Rabner in *In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities*, Docket No.  F-059553-10 (N.J. Super. Ch. Div., Mercer Co.).  *See* above at pages 61-64.

244.   Defendants' pattern of racketeering can be discerned within the investigations and actions of the Fed, OCC, FDIC and other federal regulators, including the *Interagency Review*, and the Complaints and Consent Orders announced on April 13, 2011.  *See* above at pages 64-68 and ¶ 197 (The Fed's press release specifically denounced the "*pattern of misconduct*" by WFB and other servicers).

245.   Defendants' pattern of racketeering can be also discerned within the investigations, settlement negotiations and potential prosecutions of state attorneys general and the U.S. Department of Justice, which are challenging the legality of foreclosure activities of the nation's largest mortgage servicers, including WFB.  *See* above at ¶ 201.

246.   On thousands of separate occasions, Defendants used the U.S. mails and interstate wire facilities in furtherance of their fraudulent schemes.  Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. §1961(1)(B).  Collectively, these violations constitute a

"pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), in which Defendants intended to defraud the Representative Homeowners and members of the Class.

247.   Defendants' racketeering activities constitute a common course of conduct, with similar pattern and purpose.  Each separate use of the U.S. mails and/or interstate wire facilities employed by Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims – the Representative Homeowners and members of the Class.  Each Defendant engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Enterprise.

**E.**   **Damages Caused by Defendants' Scheme**

248.   Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused the Representative Homeowners and members of the Class to be injured in their property.  These damages and injuries include, *inter alia*, (a) payment of inflated or manufactured foreclosure fees to avoid forced eviction from their homes; (b) payment of legal fees and costs to their own counsel to challenge Defendants' inflated or manufactured junk fees and/or Defendants' attempt to seize their property through improper foreclosure actions brought in the name of entities without legal standing to sue; and (c) loss of property value in distress sales or Sheriff's Sales caused by Defendants' improper foreclosure activities.

249.   Under 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiffs and members of the Class for three times the damages sustained by Plaintiffs and Class members, plus the costs of bringing this suit, including reasonable attorneys' fees.

**COUNT TWO: VIOLATIONS OF N.J.S.A. § 56.8-1 *et seq.*(NJCFA)**

250.    The allegations in each of the above paragraphs are incorporated by reference here.

251.    This Count is directed to all Defendants other than Rosemarie Diamond and the Phelan firm.

252.    As documented above, Defendants knowingly engaged in systematic scheme to (a) file or direct the filing of foreclosure lawsuits on the basis of untrue assertions of fact in court filings and property records, some of them containing counterfeit signatures and sham notarizations, all of them intended to create the false appearance of legal standing to bring residential mortgage foreclosure actions; and (b) inflate or manufacture junk fees charged to distressed homeowners for "default management services" that are unessential, unperformed, and unauthorized by contract or law.

253.    Defendants' systematic fraudulent misconduct has directly, foreseeably and proximately caused ascertainable damages and injuries to the Representative Homeowners and members of the Class, in an amount not currently quantified.   These damages and injuries include, *inter alia*, (a) payment of inflated or manufactured foreclosure fees to avoid forced eviction from their homes; (b) payment of legal fees and costs to their own counsel to challenge Defendants' inflated or manufactured junk fees and/or Defendants' attempt to seize their property through improper foreclosure actions brought in the name of entities without legal standing to sue; and (c) loss of property value in distress sales or Sheriff's Sales caused by Defendants' improper foreclosure activities.

254.    Defendants' misconduct constitutes acts, uses or employment of unconscionable commercial practices, deception, fraud, false pretenses, misrepresentations

of material fact, or the concealment, suppression or omission of material facts with the intent that others rely upon them, in connection with the sale or advertisement of merchandise or real estate in violation of the NJCFA.

255.    As a direct and proximate result of Defendants' fraudulent misrepresentations of material fact, Plaintiffs and members of the Class have sustained actual and statutory damages (including treble damages under N.J.S.A. 56:8-19), together with reasonable attorneys' fees and costs of prosecuting this action.

### COUNT THREE: VIOLATIONS OF 73 P.S. § 201-1 *et seq.* (UTPCPL)

256.    The allegations in each of the above paragraphs are incorporated by reference here.

257.    Defendants' practices constituted acts of trade or commerce within the meaning of 73 P.S. § 201-2(3).

258.    Defendants' practices constituted deceptive conduct that created a likelihood of confusion and/or misunderstanding within the meaning of 73 P.S. § 201-2(4)(xxi).

259.    As documented above, Defendants knowingly engaged in systematic scheme to (a) file or direct the filing of foreclosure lawsuits on the basis of untrue assertions of fact in court filings and property records, some of them containing counterfeit signatures and sham notarizations, all of them intended to create the false appearance of legal standing to bring residential mortgage foreclosure actions; and (b) inflate or manufacture junk fees charged to distressed homeowners for "default management services" that are unessential, unperformed, and unauthorized by contract or law; and (c) loss of property value in distress sales or Sheriff's Sales caused by Defendants' wrongful foreclosure activities.

260.    Plaintiffs and other members of the Class relied justifiably on Defendants' false and misleading representations, having no reason to suspect that a law firm whose attorneys owe an unqualified duty of candor to the court would intentionally, on behalf of WFB and other heavily regulated financial institutions, *inter alia*, (a) systematically file with the court verified or certified foreclosure complaints and other legal documents that contain material misrepresentations of fact; (b) systematically inflate or fabricate foreclosure fees charged to struggling homeowners; and (c) systematically commit mail and wire fraud, and engage in the pattern of racketeering identified above.

261.    Defendants' systematic fraudulent misconduct has directly, foreseeably and proximately caused ascertainable damages and injuries to the Representative Homeowners and members of the Class, in an amount not currently quantified.  These damages and injuries include, *inter alia*, (a) payment of inflated or manufactured foreclosure fees to avoid forced eviction from their homes; (b) payment of legal fees and costs to their own counsel to challenge Defendants' inflated or manufactured junk fees and/or Defendants' attempt to seize their property through improper foreclosure actions brought in the name of entities without legal standing to sue; and (c) loss of property value in distress sales or Sheriff's Sales caused by Defendants' improper foreclosure activities.  In addition to actual damages, Plaintiffs and members of the Class are entitled to statutory treble damages under 73 P.S. § 201-9.2, together with reasonable attorneys' fees and costs of prosecuting this action.

## COUNT FOUR: BREACH OF CONTRACT

262.    The allegations in each of the above paragraphs are incorporated by reference here.

263.    This Count is directed to WFB only.

264.    The Representative Homeowners and other Class members entered into contracts for mortgage loans for which servicing rights were assigned to WFB.  None of these contracts permitted WFB to charge defaulted borrowers more than costs or expenses actually and reasonably incurred for services actually performed in connection with any legal action to enforce the terms of the mortgages.  Nor did any of these mortgage contracts authorize WFB to cause the filing of foreclosure lawsuits on the basis of untrue assertions of fact in court filings and property records, some of which contain counterfeit signatures and sham notarizations, or to prosecute improper lawsuits brought in the name of entities lacking legal standing to sue.

265.    WFB breached mortgage contracts with the Representative Homeowners and Class members by causing and/or permitting its "third-party vendors," including the Phelan firm, Full Spectrum and Land Title Services, to charge homeowners for costs, fees and expenses in connection with foreclosure actions in amounts in excess of those actually or reasonably incurred.  WFB also breached the contracts through false and misleading court documents filed by the Phelan firm and through falsified mortgage and note assignments recorded by the employees or agents of Larry Phelan, Frank Hallinan, and Dan Schmieg.

266.    As a result of mortgage contract breaches by WFB, the Representative Homeowners and members of the Class were damaged by (a) the amount of costs, fees and expenses they overpaid in connection with foreclosure proceedings prosecuted against them by WFB and the Phelan firm; (b) the amount of legal fees and costs paid to their own counsel to challenge inflated or manufactured junk fees and/or attempts by WFB and the

Phelan firm to seize property through foreclosure actions brought in the names of entities without legal standing to sue; and (c) loss of property value through distress sales or Sheriff's Sales caused by Defendants' wrongful foreclosure activities.  The Representative Homeowners and Class members have sustained actual damages in an amount to be determined at trial, in addition to reasonable attorneys' fees and the costs of prosecuting this action.

## COUNT FIVE: MONEY HAD AND RECEIVED

267.   The allegations in each of the above paragraphs are incorporated by reference here.

268.   As documented above, Defendants demanded and collected money for purported foreclosure fees and costs that exceeded amounts permitted by contract or by Pennsylvania and New Jersey law.

269.   In the process of charging inflated or fabricated fees to the Representative Homeowners and other members of the Class, the Phelan firm and WFB have come into possession of money they had no right to receive or retain, either at law or in equity.

270.   It would be inequitable for Defendants to retain any such money or to exercise the use of such money.

271.   Defendants' inequitable retention and use of their money has damaged the Representative Homeowners and other Class members in an amount to be determined at trial.  As a result of Defendants' wrongful conduct documented above, Plaintiffs and members of the Class seek restitution and disgorgement of Defendants' ill-gotten gains.

## COUNT SIX:  NEGLIGENCE

272.   The allegations in each of the above paragraphs are incorporated by reference here.

273.   Defendants owed the Representative Homeowners and other Class members a duty of reasonable care in processing their foreclosure actions and in collecting only actual and reasonable costs incurred in connection with such actions.

274.   As documented above, Defendants breached their duty of due care by making, or causing to be made, misrepresentations of material fact relating to the amount of foreclosure fees purportedly owed by homeowners.

275.   As documented above, Defendants also breached their duty of due care by making, or causing to be made, misrepresentations of material fact in purported assignments of mortgages and notes, and in foreclosure complaints, certifications, verifications, motions and other court filings in foreclosure actions brought on behalf of entities that did not have legal standing to bring them.

276.   While there is abundant evidence demonstrating that Defendants made the foregoing misrepresentations of material fact with criminal and/or fraudulent intent, these misrepresentations and omissions were, at minimum, negligently made.

277.   As a direct and proximate cause of Defendants' negligence, the Representative Homeowners and other Class members sustained damages in an amount to be determined at trial.

## VII.  JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all non-equity claims asserted in this Complaint.

### VIII.   **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray that:

A.      The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B.      Defendants' conduct be determined to have violated the Racketeer Influenced and Corruption Act, 18 U.S.C. §1962(c).

C.      Defendants' conduct be determined to have violated New Jersey's Consumer Fraud Act, N.J.S.A. § 56.8-1 *et seq*.

D.      Defendants' conduct be determined to have violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq*.

E.      Defendants be found liable to the Representative Homeowners and other Class members under the common laws of the Commonwealth of Pennsylvania and the State of New Jersey for (1) breach of contract; (2) money had and received; and (4) negligence.

F.      Judgment be entered against Defendants for damages sustained by the Representative Plaintiffs and other Class members to the maximum extent allowed by law, together with the costs of this action, including reasonable attorneys' fees.

G.      Judgment be entered ordering an accounting, restitution and disgorgement of funds obtained by Defendants as a result of their wrongful conduct.

H.      The Court appoint a forensic accounting firm, at Defendants' expense, to audit the Phelan firm's files for the purpose of quantifying Defendants' ill-gotten gains; and

I.      The Court appoint a special master, at Defendants' expense, to (a) recommend business management and accounting procedures that the Phelan firm must

adopt and implement to avoid continued mortgage foreclosure abuses and (b) monitor compliance by the Phelan firm with business management or accounting procedures directed by the Court.

     J.   Plaintiffs and members of the Class have such other relief that the Court may deem just and proper.

Dated:   December 9, 2011                  Respectfully submitted,

                  **BHN LAW FIRM**

By:   _____

         **John G. Narkin**
         **Five Hidden Creek**
         **Swedesboro, New Jersey 08085-1857**
         **Tel: (856) 472-2402**

              **-and-**

         **HARWOOD FEFFER LLP**
         **Robert I. Harwood**
         **James G. Flynn**
         **488 Madison Avenue, 8th Floor**
         **New York,  New York 10022**
         **Tel: (212) 935-7400**

         **Attorneys for Plaintiffs**
         **and the Proposed Class**