IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
─────────────────────────
                        :
CHARLES GILES, et al.,   :
          Plaintiffs,    :
                        :          Civil Action
     v.                  :     No. 11-6239 (JBS/KMW)
                        :
PHELAN, HALLINAN & SCHMIEG,  :
L.L.P., et al.,          :          OPINION
          Defendants.    :
                        :
─────────────────────────
```

APPEARANCES:

John Narkin
Narkin LLC
1662 S. Loggers Pond Pl. # 31
Boise, ID 83706
     -and-
James G. Flynn
Robert I. Harwood
Harwood Feffer LLP
488 Madison Ave.
New York, NY 10022
     Attorneys for Plaintiffs Charles J. Giles, Diane Giles, and
     Laurine Spivey

Bradley L. Mitchell
Brian Phillip Sullivan
Steven J. Adams
Stevens & Lee, PC
Princeton Pike Corporate Center
100 Lenox Dr., Suite 200
Lawrenceville, NJ 08648
     Attorneys for Defendants Wells Fargo & Company and Wells
     Fargo Bank, N.A.

Kenneth Goodkind
Flaster Greenberg, PC
1810 Chapel Ave. W.
Cherry Hill, NJ 08002
     Attorney for Defendants Phelan Hallinan & Schmieg, LLP;
     Phelan Hallinan & Schmieg, P.C.; Lawrence T. Phelan; Francis
     S. Hallinan; Daniel G. Schmieg; Rosemarie Diamond; Full
     Spectrum Services, Inc.; and Land Title Services of New
     Jersey, Inc.

**SIMANDLE,** Chief Judge:

## I.   INTRODUCTION

Plaintiffs brought this proposed class action on behalf of all homeowners who were defendants in New Jersey or Pennsylvania foreclosure actions prosecuted by Phelan Hallinan & Schmieg, P.C. or Phelan Hallinan & Schmieg, L.L.P. and who were damaged by abusive foreclosure practices, including imposition of inflated default management fees and use of fraudulent documents to bring foreclosure actions on behalf of plaintiffs who lacked standing. The named Plaintiffs are Charles and Diane Giles, New Jersey residents, and Laurine Spivey, a Pennsylvania resident. The Giles and Spivey were defendants subject to default foreclosure judgments in the state courts of New Jersey and Pennsylvania respectively. The Giles independently sold their home before a sheriff's sale occurred. Spivey filed for bankruptcy and established a Chapter 13 restructuring plan.

Defendants are the law firms that prosecuted the foreclosure actions, individual partners and attorneys in the law firms, the mortgage servicer, the mortgage servicer's parent company, and title and mortgage search companies. Plaintiffs bring this action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56.8-1, *et seq.*; and the Pennsylvania Unfair Trade Practices and Consumer Protection Law

2

("UTPCPL"), 73 P.S. § 201, *et seq.*

This matter comes before the Court on three motions to dismiss and a Motion to Strike Plaintiffs' Notice of Additional Authorities, namely Defendant Wells Fargo Bank, N.A.'s Motion to Dismiss [Docket Item 27], Defendant Wells Fargo & Company's Motions to Dismiss [Docket Items 26], and the Phelan Party Defendants' Motion to Strike or Dismiss [Docket Item 20]. Defendants' Motion to Strike Plaintiffs' Notice of Additional Authorities [Docket Item 52] will also be addressed.

For reasons that follow, there are three primary holdings: (1) All of Plaintiff Spivey's claims are dismissed with prejudice because she cannot challenge bankruptcy proofs of claims in this forum; (2) the Giles' NJCFA claims are dismissed with prejudice because the New Jersey litigation privilege bars NJCFA claims concerning litigation statements and tactics complained of herein; and (3) the Giles' RICO claims are stricken without prejudice because the Amended Complaint is prolix and contains immaterial allegations, without prejudice to the Giles Plaintiffs' right to replead same in a Second Amended Complaint consistent with this Court's determinations applying Rules 8(a), 9(b), and 12(f), Fed. R. Civ. P.

## II.  BACKGROUND

In this section, the Court outlines this action's procedural

history and the factual and legal allegations in Plaintiffs'
Amended Complaint.

### A. Procedural History

This action first came before this court on a Motion for
Preliminary Injunction [Docket Item 5] filed by several
Defendants. The Court denied the Preliminary Injunction Motion
without prejudice. [Docket Item 11.] At oral argument for the
preliminary injunction, the Court encouraged Plaintiffs to
shorten their Complaint [Docket Item 1], which was 105 pages
long, excluding exhibits. Plaintiffs filed an Amended Complaint
[Docket Item 16] consisting of 90 pages and 277 paragraphs that
is the subject of the present Motions to Strike or Dismiss. The
Court heard oral argument on the Motions to Dismiss on September
18, 2012.

### B. Factual Background

In this section, the Court summarizes the Amended Complaint.
The Court has focused on the allegations that pertain to the
parties and events presently at issue and has disregarded
Plaintiffs' general allegations about the foreclosure industry
and the foreclosure crisis. The Court then describes the ten
Defendants. Next, the Court outlines the Giles' and Spivey's
factual allegations, Plaintiffs' class action allegations,
Plaintiffs' allegations regarding false signatures used in myriad
court proceedings, the relief Plaintiffs seek, and Plaintiffs'

4

legal claims.

### i. Other Foreclosure Proceedings and Investigations

The Amended Complaint is 90 pages long, containing 277 paragraphs. Plaintiffs have quoted congressional testimony, described myriad lawsuits relating to foreclosure practices, cited newspaper articles and press releases relating to the housing market collapse, chronicled government investigations, and, generally, provided a dissertation on mortgage industry operations, software programs, and economics. The Court will disregard all allegations that pertain to the general state of the real estate crisis in the United States.

Plaintiffs have also quoted liberally from other lawsuits involving some of the same Defendants, but different Plaintiffs. Plaintiffs claim that Defendants' fraudulent activities are described by: "federal and state judges who have identified and condemned Defendants' unlawful practices," (Am. Compl. ¶ 242); "the New Jersey judiciary . . . in In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities," (id. ¶ 243); "the investigations and actions of the Fed, OCC, FDIC and other federal regulators," (id. ¶ 244); and "the investigations, settlement negotiations, and potential prosecutions of state attorneys general and the U.S. Department of Justice," (id. ¶ 245). Many of these statements and averments are, at best,

attenuated to the conduct of the Defendants toward these Plaintiffs; at worst, the background averments are prejudicial to defendants because they confuse and obscure the central allegations of the Amended Complaint and make it difficult for Defendants to know what conduct they are charged with by these Plaintiffs, and harder still for the Court to analyze and interpret their prolix pleading. The problems caused by so much extraneous matter, and the remedy to cure it, are examined further below.

### ii. Defendants

Plaintiffs have brought this action against ten Defendants: Phelan Hallinan & Scmieg, LLP; Phelan Hallinan & Schmieg, P.C.; Lawrence T. Phelan; Francis S. Hallinan; Daniel G. Schmieg; Rosemarie Diamond; Full Spectrum Services, Inc.; Land Title Services of New Jersey, Inc.; Wells Fargo & Company; and Wells Fargo Bank, N.A.

Defendant Phelan Hallinan & Schmieg, LLC is "a high-volume mortgage foreclosure law firm" with its principal place of business in Philadelphia, Pennsylvania. (Am. Compl. ¶ 20.) Defendant Phelan Hallinan & Schmieg, P.C. has offices in Mount Laurel and Newark, New Jersey. (Id. ¶ 21.) Plaintiffs refer to these two entities, collectively, as "the Phelan Firm." The Phelan firm is the "premier default services operation in Pennsylvania and New Jersey." (Id. ¶ 152.) Defendant Lawrence T.

Phelan ("Larry Phelan") is the Phelan Firm's principal equity partner. (Id. ¶ 22.) Defendant Francis S. Hallinan ("Frank Hallinan") is an equity partner and administrator of the Phelan firm. (Id. ¶ 23.) Defendant Daniel G. Schmieg ("Dan Schmieg") is an equity partner in the Phelan firm. (Id. ¶ 24.) Defendant Rosemarie Diamond is "an attorney with the Phelan firm who has responsibility for the firm's New Jersey operations." (Id. ¶ 25.)

Defendant Full Spectrum Services, Inc. provides services to Pennsylvania and New Jersey law firms, "including process serving, mortgage and judgment searches, and publication of legal notices." (Id. ¶ 26.) It is based in Mount Laurel, New Jersey and is owned and controlled by Larry Phelan, Frank Hallinan, and Dan Schmieg. (Id. ¶ 26.) Full Spectrum Services used to be known as "Foreclosure Review Services, Inc." and "now operat[es] through an entity called FSS Acquisitions." (Id. ¶ 26.)

Defendant Land Title Services of New Jersey, Inc. ("Land Title Services") is a New Jersey corporation located in Mount Laurel, New Jersey. (Id. ¶ 27.) It "provides title searches and other real property services to the Phelan firm and its mortgage servicer clients." (Id. ¶ 27.) It is owned and controlled by Larry Phelan, Frank Hallinan, and Dan Schmieg. (Id. ¶ 27.)

Defendant Wells Fargo & Company "is a diversified financial services company" incorporated in Delaware and with executive offices in San Francisco, California. (Id. ¶ 28.)

Defendant Wells Fargo Bank, N.A. ("WFB") is a banking association that "originates and services residential mortgages through its division Wells Fargo Home Mortgage or its trade name America's Servicing Company." (Id. ¶ 29.) Its principal offices are in San Francisco, California, and it is chartered in Sioux Falls, South Dakota. (Id. ¶ 29.) WFB is a mortgage servicer: it collects homeowners' mortgage payments on behalf of financial institutions that own mortgage loan securities. (Id. ¶ 30.) Plaintiffs allege that, when homeowners fail to make payments or default on their mortgages, WFB must "cure the default (i.e. recover past due payments and costs incurred in doing so) and . . restore the income producing value of the mortgage assets, including if necessary, by foreclosure proceedings. . . ." (Id. ¶ 30.) The present action essentially challenges the means by which WFB, through its agent the Phelan firm, cured defaults.

### iii. Plaintiffs Charles and Diane Giles

Plaintiffs Charles J. and Diane Giles, husband and wife, were homeowners who resided in Ocean County, New Jersey. (Id. ¶ 18.) The Giles "fell behind on their mortgage," and the Phelan firm filed a foreclosure complaint against them on February 16, 2007 in the Superior Court, Chancery Division for Ocean County, New Jersey ("Ocean County Court"). (Am. Compl. ¶ 74.) The Phelan firm allegedly brought the foreclosure action at the direction of Wells Fargo Bank. (Id. 85.)

The foreclosure complaint alleged that the mortgage holder was Wachovia Bank, N.A. (Id. ¶ 75.) Rosemarie Diamond, a Phelan Hallinan & Schmeig, P.C. attorney, also allegedly certified in the foreclosure complaint that all necessary parties had been joined and that Ms. Diamond had conducted a title search to identify entities with an interest in the property. (Id. ¶ 78.)

Plaintiffs allege that the foreclosure complaint and Ms. Diamond's certifications were false because the Phelan firm had "no authority" to act on Wachovia's behalf (id. ¶ 80), and Wachovia was not the mortgage holder (id. ¶ 84).  Plaintiffs claim that Wachovia sold its mortgage portfolio on December 30, 2005, before foreclosure action against the Giles began. (Id. ¶ 85). On April 18, 2007, after filing the foreclosure complaint, Defendants allegedly filed two assignments with the County Clerk of Ocean County, New Jersey. (Id. ¶ 81.) The first assignment conveyed ownership of the Giles' mortgage from Argent (the loan originator) to Ameriquest Mortgage Company. (Id. ¶ 82.) The second assignment allegedly conveyed ownership of the Giles' mortgage from Ameriquest to Wachovia. (Id. ¶ 83.) The Giles Plaintiffs allege that neither of these assignments cured Wachovia's alleged standing deficiencies in the state foreclosure action. (Id. ¶ 85.)

The Giles did not contest the foreclosure complaint. (Id. ¶ 86.) On June 5, 2007, the Ocean County Court entered a default

9

judgment against the Giles, authorized a Sheriff's sale of their home, and held that Wachovia was entitled to recover $204,391.70 plus $2,193.92 in costs and legal fees. (Id. ¶ 87.) The Giles placed their house for sale (id. ¶ 88), and hired an attorney, (id. ¶ 89).

The Giles also solicited assistance from Wachovia's corporate headquarters, at which point "Wachovia found out that the Phelan firm was acting in its name without authorization." (Id. ¶ 93.) Wachovia's Senior Vice President and Assistant General Counsel communicated with a Phelan firm associate attorney and confirmed via letter that (1) Wachovia was not the holder of the Giles mortgage and (2) the foreclosure sale would be postponed until the associate attorney discovered the proper plaintiff and filed a corrective motion. (Id. ¶ 95.) On November 15, 2007, the Phelan firm filed a motion stating that Wachovia had been "incorrectly named" and that "U.S. Bank as Trustee" was the correct plaintiff. (Id. ¶ 97.) According to Plaintiffs, U.S. Bank also allegedly lacked standing. (Id. ¶ 99.)

The Giles eventually accepted a "low ball" offer to sell their home in December 2007 to "stave off what they were misled to believe was an inevitable loss of their home. . . ." (Id. ¶ 102.) They sold their home through a private sale on January 15, 2008 for $49,000 less than its alleged market value. (Id. ¶ 105.)

The Giles also allege that the Phelan firm subjected them to

10

invalid fees. On December 10, 2007, the Giles received a letter claiming that they owed $7,817 in legal fees and costs and $340 in property inspection fees. (Id. ¶ 103.) Their attorney objected to the "fraudulently manufactured junk fees." (Id. ¶ 104.) The objections "caused WFB to remove much of the bogus . . . fees." (Id. ¶ 105.) They paid $2,500 in legal fees to their attorney and "other counsel" at closing. (Id. ¶ 105.) The Complaint does not specify whether these "other counsel" were counsel conducting the real estate closing, Phelan firm attorneys recovering costs from the foreclosure proceeding, or some other counsel. Essentially, the Amended Complaint does not specify whether the Giles paid any fees to the Phelan Firm or WFB.

On January 18, 2008, the Ocean County Court granted the Phelan firm's Motion to Rescind and Correct the plaintiff's name and preserved the Giles' rights "as to all affirmative claims" resulting from the Phelan firm's "wrongful foreclosure activities." (Id. ¶ 106.) The Phelan firm voluntarily dismissed the foreclosure lawsuit. (Id. ¶ 106.)

### iv. Plaintiff Laurine Spivey

Plaintiff Laurine Spivey is a homeowner who resides in Philadelphia, Pennsylvania. (Id. ¶ 19.) On December 28, 2007, "at the direction of WFB," the Phelan firm brought a foreclosure action against Laurine Spivey in the Philadelphia Court of Common Pleas ("Philadelphia Court") on behalf of Wachovia Bank, N.A.

11

(Id. ¶ 110.) The Spivey foreclosure complaint stated that "amounts due on the mortgage included $1,250 in Attorney's fees and $550 for Cost of Title." (Id. ¶ 112.) Plaintiffs allege that "the Phelan firm and Hallinan knew or willfully disregarded the fact that they had no authority to act on behalf of Wachovia. . . ." (Id. ¶ 116.) And Plaintiffs also allege that, as with the Giles' action, Wachovia "had no legal standing to prosecute a foreclosure action against Laurine Spivey. . . ." (Id. ¶ 119.)

On February 21, 2008, the Phelan firm obtained a default foreclosure judgment against Laurine Spivey. (Id. ¶ 39.) And, on May 7, 2008, the Phelan firm filed a "Motion to Reassess Damages" with the Philadelphia Court, listing expenses incurred on Laurine Spivey's behalf. (Id. ¶ 126.) These sums included $2,100 for legal fees, $1,333.40 for costs of suit and title, $285 for appraisal/brokers price opinions, and $165 for property inspections/property preservation. (Id. ¶ 126.) On June 10, 2008, the Philadelphia Court issued an order granting the Phelan firm's motion and incorporating all these expenses. (Id. ¶ 127.)

On June 3, 2008, Laurine Spivey filed a petition for relief under Chapter 13 of the U.S. Bankruptcy Code. (Id. ¶ 128.) On August 27, 2008, the Phelan firm filed a proof of claim for Wachovia as creditor in Spivey's bankruptcy proceeding. (Id. ¶ 130.) The proof of claim listed $3,900 in legal fees, $6,691.90 in legal costs, $285 in broker price opinion fees, property

12

preservation costs of $210, and $150 for preparation and filing the proof of claim. (Id. ¶ 130.) These charges were incorporated into a Chapter 13 restructuring plan, and Plaintiff Spivey began making payments on March 10, 2009. (Id. ¶ 131.)

Plaintiffs allege that the expenses that the Phelan firm listed in the Spivey foreclosure complaint, the motion to reassess damages, and the proof of claim were "grossly and systematically inflated" and "were not actually or reasonably incurred." (Id. ¶¶ 131-32.)

### v. Class Action Allegations

Plaintiffs Diane Giles, Charles Giles, and Laurine Spivey brought this lawsuit as representative homeowners on behalf of a class. The class includes homeowners who, between January 1, 2005 and the present, were

> (a) Defendants in New Jersey or Pennsylvania mortgage foreclosure actions prosecuted by Phelan Hallinan and Schmeig, P.C. or Phelan Hallinan & Schmeig, LLP; and
> (b) were damaged by one or both of the following abusive foreclosure practices:
> > i) Preparation, execution and notarization of fraudulent court documents and property records used to initiate and prosecute improper foreclosure actions in the name of Wachovia Bank, N.A. and/or U.S. Bank, N.A. . . . and
> > ii) imposition of inflated or fabricated fees for default management services. . . .

(Am. Compl. ¶ 202.) Plaintiffs allege that the proposed class is numerous because, for example, the Phelan firm handled "an estimated 24,000 to 26,000 foreclosure prosecutions in

Pennsylvania and New Jersey during 2008 alone. . . ." (Id. ¶ 204.) They also allege that there are common questions of law and that the Giles and Spivey have typical claims. (Id. ¶¶ 205-207.) Plaintiffs have not yet filed a motion to certify the class.

### vi. False Signatures

The Complaint contains samples of different signatures by the same Defendant or Defendant's agent. Plaintiffs repeatedly imply that Defendants used false signatures. (E.g., Am. Compl. ¶ 86 ("the signature attributed to Ms. Diamond . . . does not bear the slightest resemblance to handwriting attributed to her [on other documents]").) In addition, Plaintiffs describe legal proceedings in New Jersey in which the Chancery Court expressed "concern" about a mortgage assignment executed by Frank Hallinan and notarized by a notary named Thomas Strain. (Id. ¶ 165.) The Phelan firm eventually re-executed and re-recorded 2,921 mortgage assignments that Hallinan had signed and Strain had notarized. (Id. ¶ 166.) Essentially, Plaintiffs allege that many Phelan firm documents were improperly signed or notarized. Plaintiffs have not explained whether they relied on these signatures or whether the foreclosure actions would have proceeded differently if signatures had been proper.

### vii. Relief sought

Plaintiffs seek recovery of actual and statutory damages resulting from Defendants' conduct. They also seek equitable and

injunctive relief including appointment, at Defendants' expense, of (1) a forensic accounting firm to audit Defendants' files and (2) a special master to recommend procedures to avoid foreclosure abuses and monitor compliance. (Id. ¶ 10.)

### viii. Claims for Relief

Plaintiffs' Amended Complaint alleges six claims for relief.

Counts IV, alleging Breach of Contract; V, alleging Money Had and Received; and VI, alleging Negligence, are all common law claims.  In their Opposition to WFB's Motion to Dismiss, Plaintiffs stated that they "do not contest dismissal of the common law claims asserted in Count IV (breach of contract), Count V (money had and received), and Count VI (negligence). . . ." (Pl. Opp'n to WFB's and Wells Fargo & Co.'s Mots. to Dismiss at 7, n.7.) The Court will not consider these Counts and will dismiss them with prejudice.

Count I alleges that Defendants violated 18 U.S.C. § 1962(c), the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Plaintiffs allege that there is an enterprise consisting of

> a)  Larry Phelan, Frank Hallinan, Daniel Schmieg, Rosemarie Diamond;
> b)  Phelan Hallinan & Schmieg, LLP;
> c)  Phelan Hallinan & Schmieg, P.C.;
> d)  Full Spectrum Holdings LLC, Full Spectrum Services, Inc., Full Spectrum Legal Services, Inc., Full Spectrum Review Services, Inc., Foreclosure Review Services, Inc., FSS Acquisitions, Inc., LTS Acquisitions, Inc., Land Title Services of New Jersey, Inc., Land Title Services of Pennsylvania;

e) WFB;
f) Non-party Fannie Mae; and
g) Non-Party Freddie Mac.[1]

(Am. Compl. ¶ 216.) Plaintiffs allege that the enterprise

"operated continuously throughout the Class Period" and is a

group "associated together for the common purpose of limiting

costs and maximizing profits through rapid, automated prosecution

of residential mortgage foreclosure lawsuits." (Id. ¶ 217.)

Plaintiffs claim that the Phelan firm's business model

"generate[s] systematic overcharges . . . that are unessential,

unperformed, and unauthorized by contract or law." (Id. ¶ 222.)

In addition, the Phelan firm "files foreclosure lawsuits on the

basis of untrue assertions of fact, which are included in court

filings and property records that often contain falsified

signatures and notarizations, . . . to . . . prosecut[e] . . .

foreclosure lawsuits in the name of entities without legal

standing to sue." (Id. ¶ 222.) The Phelan firm allegedly "acts

under the direction and command of WFB. . . ." (Id. ¶ 223.) And

---

[1] The Court notes that Plaintiffs have specified that Fannie
Mae and Freddie Mac are "non-part[ies]," but there are other
entities in this RICO enterprise membership list that are not
designated as "non-part[ies]" and that are not listed as
Defendants in the case caption, such as Full Spectrum Holdings,
LLC; Full Spectrum Legal Services, Inc.; Full Spectrum Review
Services, Inc.; Foreclosure Review Services, Inc.; FSS
Acquisitions, Inc.; LTS Acquisitions, Inc.; and Land Title
Services of Pennsylvania. Only parties who have been officially
listed in the caption will be considered as Defendants; any
future amended pleading must clarify the status of these entities
under RICO.

"the Phelan firm has taken little or no action without the express approval or willfully blind acquiescence of WFB. . . ." (Id. ¶ 224.)

Plaintiffs claim that, in order to effectuate this scheme, "mail and wire fraud was routinely committed by the Phelan firm and WFB." (Id. ¶ 225.) For example, the Phelan firm used the postal service, fax transmission, and the electronic court filing system to submit fraudulent assignments, documents, motions, and notices during the Giles and Spivey foreclosure proceedings. (Id. ¶¶ 226-33.)

Defendants' scheme caused damages because Plaintiffs paid "inflated and manufactured foreclosure fees" and legal fees to hire counsel. (Id. ¶ 248.) In addition, Plaintiffs lost property value. (Id. ¶ 248.)

Count II alleges violations of the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56.8-1 et seq. It is "directed to all Defendants except for Rosemarie Diamond and the Phelan firm."[2] (Id. ¶ 251.) It alleges the same scheme and damages described in the RICO discussion.

Count III alleges violations of the Pennsylvania Unfair

---

[2] The Court assumes that this statement indicates that Count II is against Defendants Larry Phelan, Frank Hallinan, Daniel Schmieg, Full Spectrum Services, Land Title Services, Wells Fargo & Company, and Wells Fargo Bank, N.A., and not against Defendants Rosemarie Diamond, Phelan Hallinan & Schmieg, LLP, or Phelan Hallinan & Schmieg, P.C.

Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §
201. Plaintiffs allege that Defendants' practices constituted
"acts of trade or commerce" (id. ¶ 257) and "deceptive conduct
that created a likelihood of confusion and/or misunderstanding"
(id. ¶ 258). Plaintiffs allege that they "relied justifiably on
Defendants' false and misleading representations, having no
reason to suspect that a law firm whose attorneys owe an
unqualified duty of candor to the court would intentionally" file
false documents with courts, inflate fees, and commit mail and
wire fraud. This Count also alleges the same scheme and damages
described in the RICO discussion.

## III. Standard of Review Under Fed. R. Civ. P. 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure
12(b)(6) may be granted only if, accepting all well-pleaded
allegations in the complaint as true and viewing them in the
light most favorable to the plaintiff, a court concludes that
plaintiff has failed to set forth fair notice of what the claim
is and the grounds upon which it rests. Bell Atlantic Corp. v.
Twombly, 550 U.S. 544, 555 (2007). A complaint will survive a
motion to dismiss if it contains sufficient factual matter to
"state a claim to relief that is plausible on its face." Ashcroft
v. Iqbal, 556 U.S. 662, 663 (2009). Although a court must accept
as true all factual allegations in a complaint, that tenet is

"inapplicable to legal conclusions," and "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Id. at 678.

Additionally, "if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." Phillips v. County of Allegheny, 515 F.3d 224, 236 (3d Cir. 2008).


**IV. Wells Fargo Bank's Motion to Dismiss**

This section outlines and analyzes WFB's arguments in its Motion to Dismiss. WFB attached mortgage contracts to its briefing, and subsection IV.B explains why the Court cannot consider them. The Court then explains that the Rooker-Feldman doctrine does not apply, bankruptcy law bars all of Plaintiff Spivey's claims, and the New Jersey litigation privilege bars the Giles' NJCFA claims. The Court declines to determine whether the litigation privilege also bars the Giles' RICO claims because, as explained in subsection V.B, the Court will strike, without prejudice, the Giles RICO claim because the Amended Complaint is unnecessarily prolix and to a great extent immaterial and must be re-pleaded to conform to the requirements of Rules 8(a) and 9(b), Fed. R. Civ. P.

**A. Wells Fargo Bank's Arguments**

Defendant Wells Fargo Bank, N.A. ("WFB") filed a Motion to

Dismiss Plaintiffs' Amended Complaint Pursuant to Federal Rules
of Civil Procedure 12(b)(1) and 12(b)(6). [Docket Item 27.] WFB
also joined the motion of the Phelan Defendants seeking to strike
the Amended Complaint under Rule 12(f) of the Federal Rules of
Civil Procedure, which asserts that large portions of the Amended
Complaint are immaterial or impertinent. WFB argued that New
Jersey's litigation privilege and Pennsylvania's judicial
privilege bar claims against WFB because the challenged
statements are protected litigation-based communications. WFB
then argued that the Rooker-Feldman doctrine, which precludes
federal courts' jurisdiction to hear lawsuits challenging state
court judgments, bars Plaintiff Spivey's claims. WFB also asserts
that Rhodes v. Diamond, Civ. No. 09-1302, 2010 WL 2804821 (E.D.
Pa. July 14, 2010), vacated and remanded, 433 F. App'x 78 (3d
Cir. 2011), bars Plaintiff Spivey's claims because the Rhodes
court held that "the proper forum to address challenges to the
propriety of a proof of claim was the bankruptcy court, not the
district court." (Def. WFB's Mem. Law Supp. Mot. Dismiss at 11.)

   WFB argued that Plaintiffs' RICO claim is insufficient
because Plaintiffs did not allege that WFB committed mail or wire
fraud. WFB argued that Plaintiffs' allegations of fraudulent use
of the mail or interstate wires are directed at the Phelan firm,
not WFB; that, even if these allegations did involve WFB, they do
not identify any misrepresentation; and that, at best,

Plaintiffs' allegations only highlight a disagreement regarding permissible charges under Plaintiffs' mortgages. WFB also argued that Plaintiffs' assertion that Wachovia was the improper plaintiff does not establish a scheme to defraud or fraudulent intent. WFB contended that Plaintiffs lack standing to assert RICO claims because they did not rely on any of the alleged misrepresentations and because the proximate cause of their injuries was their failure to make their mortgage payments, not the alleged misrepresentations.

## B. Consideration of Documents Outside the Amended Complaint

WFB attached mortgage contracts to its briefing, but the Court cannot consider these materials. "As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997). If these materials were integral to or referenced in the pleadings, the Court could potentially consider them because "a document integral to or explicitly relied upon in the complaint may be considered. . . ." Id. at 1426. But the mortgage contracts were not integral to or relied upon the pleadings. Plaintiffs have not alleged contract breaches; they have alleged RICO, NJCFA, and UTPCPL claims based on abusive litigation practices and excessive fees. The Court may not consider the mortgage contracts.

**C. The Rooker-Feldman Doctrine Does Not Apply**

WFB argued that the Rooker-Feldman doctrine bars Plaintiff Spivey's claims, but it does not. At oral argument, WFB clarified that Rooker-Feldman only barred Plaintiffs' withdrawn state law claims. But the Phelan Parties argued that Rooker-Feldman applies and that Plaintiffs were disingenuously attacking the heart of the state court judgments. When the Phelan Parties argued that Rooker-Feldman applied, they did not specify whether they were referencing only Spivey's claims or also the Giles' claims. As discussed infra, Spivey's claims will be dismissed with prejudice because this forum is inappropriate for challenging bankruptcy proofs of claims. WFB's counsel said that he was not arguing Rooker-Feldman applied to the Giles because there was a voluntary dismissal in the Giles' foreclosure action. A final judgment is mandatory for application of the Rooker-Feldman doctrine. Lance v. Dennis, 546 U.S. 459 (2006). The pleadings have not specified whether the voluntary dismissal of the Giles' foreclosure action constituted a final judgment, and the Court is uncertain whether the Phelan Parties would agree with WFB's characterization of the judgment. In the event that it was a final judgment, the Court will continue with its Rooker-Feldman analysis.

The Rooker-Feldman doctrine, which takes its name from the two Supreme Court cases that established it, Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923) and District of Columbia Court of

Appeals v. Feldman, 460 U.S. 462 (1983), prohibits a district court from exercising appellate jurisdiction over final state-court judgments. Lance v. Dennis, 546 U.S. 459, 463 (2006). The Third Circuit has four requirements for applying the doctrine: "(1) the federal plaintiff lost in state court; (2) the plaintiff complains of injuries caused by the state-court judgments; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 166 (3d Cir. 2010), cert. denied, 131 S. Ct. 1798 (U.S. 2011). The Supreme Court has emphasized that Rooker-Feldman is a "narrow doctrine" that "applies only in limited circumstances." Lance v. Dennis, 546 U.S. 459, 464-66 (2006) (internal citations omitted).

The doctrine does not bar Spivey's claims or the Giles' claims, even if the dismissal against the Giles was a final judgment. The Third Circuit has distinguished lawsuits based on a defendant's actions, even a defendant's conduct in state court litigation, from lawsuits in which the state court judgment itself is challenged: "when the source of the injury is the defendant's actions (and not the state court judgments), the federal suit is independent, even if it asks the federal court to deny a legal conclusion reached by the state court." Great W. Mining & Mineral Co. at 167. In Great Western, the Third Circuit

considered whether a federal district court could entertain claims from a plaintiff who lost in state court and who alleged a corrupt conspiracy between its adversaries and the Pennsylvania judiciary. The Third Circuit held that, "while Great Western's claim for damages may require review of state-court judgments and even a conclusion that they were erroneous, those judgments would not have to be rejected or overruled for Great Western to prevail. Accordingly, . . . the District Court properly exercised jurisdiction. . . ." Great W. Mining & Mineral Co. at 173. The Third Circuit has been clear: A federal district court may review a state court judgment and even conclude that it is erroneous so long as it does not overrule it.

In the instant case, Plaintiffs are not challenging the foreclosure judgments themselves: "While the underlying validity . . . of Defendants' foreclosure judgments is not an issue in this lawsuit, Defendants are liable for fraudulent practices they systematically employed in prosecuting wrongful foreclosure actions. . . ." (Am. Compl. ¶ 4). The Third Circuit has held that this distinction is proper. It recently considered Rooker-Feldman's applicability to a Plaintiff's challenge to a foreclosure proceeding and stated:

> [T]o the extent that [Plaintiff] is attempting to solicit direct federal review of the Pennsylvania courts' decisions, he is directly complaining of injuries caused by the state-court judgments and his efforts are therefore barred by Rooker-Feldman. But he is not

24

> prevented from otherwise attacking the parties to the foreclosure proceedings or alleging that the methods and evidence employed were the product of fraud or conspiracy, regardless of whether his success on those claims might call the veracity of the state-court judgments into question.

Conklin v. Anthou, 12-1466, 2012 WL 3802281 (3d Cir. Aug. 30, 2012); see also In re Sabertooth, LLC, 443 B.R. 671, 681 (Bankr. E.D. Pa. 2011) ("[A] claim that a judgment was procured by fraud is independent of the judgment and therefore, does not fall within the Rooker-Feldman doctrine, while a claim that the judgment itself is illegal does." (citing Great Western)).

Plaintiffs here are not challenging the state court judgments; they are challenging the Defendants' actions in procuring those judgments. The Third Circuit has held that the Rooker-Feldman doctrine does not bar such a lawsuit, even though the lawsuit may require review of the state court litigation and may hold that the state court judgments are erroneous. The Court will not dismiss Plaintiffs' claims on Rooker-Feldman grounds.

### D. Bankruptcy Law Bars Plaintiff Spivey's Claims Related to Allegedly Inflated Proofs of Claims

Defendant WFB correctly argues that Plaintiff Spivey cannot challenge allegedly inflated bankruptcy proofs of claims in this Court. "One of the fundamental purposes of the bankruptcy system is to adjudicate and conciliate all competing claims . . . in one forum. . . . [O]nce a debtor is in bankruptcy court, the debtor's remedies to attack an allegedly inflated proof of claim are

limited to those provided for in the Bankruptcy Code." In re
Abramson, 313 B.R. 195, 197-98 (Bankr. W.D. Pa. 2004) (internal
citation omitted); cf. Rhodes v. Diamond, 433 F. App'x 78, 80 (3d
Cir. 2011) ("claims arising from PHS's conduct in bankruptcy
proceedings—i.e., its filing of, and subsequent failure to amend,
allegedly inflated proofs of claim—cannot give rise to FDCPA or
state law causes of action") (analyzing a different action
relating to Phelan Hallinan & Schmeig's conduct of foreclosures).

The Abramson case involved facts quite similar to the case
at bar: a putative class action with plaintiffs who had lost
their homes through residential foreclosure proceedings and then
became debtors in bankruptcy proceedings. They sued a law firm
for purported violations of, inter alia, the UTPCPL. The Abramson
court held that "[t]he remedy for allegedly inflated claims is
through the objection process and, if necessary, through Rule
9011 or the equitable powers of the Bankruptcy Court set forth in
Section 105 of the Bankruptcy Code." Abramson at 198.

Plaintiffs argue that Abramson and other cases that WFB
cites are "cases in which bankruptcy courts refused to allow
debtors to prosecute bankruptcy adversary proceedings based on
bankruptcy-based claims also implicating the [Fair Debt
Collection Practices Act ("FDCPA")]." (Pl. Opp'n to WFB's and
Wells Fargo & Co.'s Mot. to Dismiss at 23.) Plaintiffs argue,
essentially, that the bankruptcy appeals process does not

preclude RICO claims in the same manner as FDCPA claims.
Plaintiffs cite In re Mullarkey, 536 F.3d 215 (3d Cir. 2008), as
support for this argument, but Mullarkey is inapposite.  It
involves whether a bankruptcy court had subject matter
jurisdiction over fraud and RICO claims challenging fraudulent
behavior that occurred during a prior bankruptcy proceeding. The
Mullarkey court held that the bankruptcy court had subject matter
jurisdiction over plaintiff's claims and could issue final orders
because the allegedly fraudulent activity arose during the
bankruptcy proceedings, thus making them core proceedings for
purposes of determining the bankruptcy court's authority.
Mullarkey at 223-224. Mullarkey does not stand for the
proposition that a plaintiff can challenge allegedly inflated
proofs of claims in a separate district court as long as she
makes a RICO claim.

     Plaintiffs also argue that Ms. Spivey's RICO claim arose
before she filed her bankruptcy petition and that "[i]t is
entirely incidental to Ms. Spivey's RICO claim that actual
damages caused by defendants' pre-petition fraudulent conduct are
now reflected in a Chapter 13 plan overloaded with improper
fees." (Pl. Opp'n to WFB's and Wells Fargo & Co.'s Mot. to
Dismiss at 24.) Plaintiffs have missed the mark: The point is
that Plaintiffs cannot challenge allegedly overinflated proofs of
claims in district court, regardless of when the fees that led to

those claims arose. Spivey's only alleged injuries are those fees, and they must be challenged in the court that codified them into a bankruptcy payment plan.

Spivey's allegations regarding inflated proofs of claims may be valid, but she may not pursue those claims here. The Court will grant, with prejudice to refiling in this Court, WFB's motion to dismiss all of Plaintiff Spivey's claims. Because Plaintiff Spivey is the only Pennsylvania resident in the case, the Court will also dismiss with prejudice Count III, which alleges violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201.

### E. New Jersey Litigation Privilege

In this section, the Court provides a general overview of the New Jersey litigation privilege and then considers the privilege's applicability to NJCFA and RICO claims.

#### i. New Jersey Litigation Privilege Overview

The New Jersey litigation privilege ensures that "[s]tatements by attorneys, parties and their representatives made in the course of judicial or quasi-judicial proceedings are absolutely privileged and immune from liability." Peterson v. Ballard, 292 N.J. Super. 575, 679 A.2d 657, 659 (N.J. Super. Ct. App. Div. 1996) (citing Erickson v. Marsh & McLennan Co., Inc., 117 N.J. 539, 569 A.2d 793 (1990)). The privilege is expansive. New Jersey courts "have extended the reach of the litigation

privilege even to statements made by attorneys outside the courtroom, such as in attorney interviews and settlement negotiations." <u>Loigman v. Twp. Comm. of Twp. of Middletown</u>, 185 N.J. 566, 889 A.2d 426, 433 (2006)*, 889 A.2d at 438. The privilege has four elements. It applies to "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." <u>Hawkins v. Harris</u>, 141 N.J. 207, 661 A.2d 284, 289 (1995) (internal citation omitted).

The litigation privilege is well-established and broadly applicable. <u>Loigman</u>, 889 A.2d at 435-37. "In New Jersey, the litigation privilege protects attorneys not only from defamation actions, but also from a host of other tort-related claims." <u>Id</u>. at 436. The New Jersey Supreme Court has noted, "If the policy, which in defamation actions affords an absolute privilege or immunity to statements made in judicial and quasi-judicial proceedings, is really to mean anything then we must not permit its circumvention by affording an almost equally unrestricted action under a different label." <u>Rainier's Dairies v. Raritan Valley Farms</u>, 19 N.J. 552, 117 A.2d 889, 895 (1955), <u>cited with approval by Loigman</u>, 889 A.2d at 436. Consequently, New Jersey courts have applied the litigation privilege to intentional and negligent infliction of emotional distress, <u>see e.g.</u>, <u>Rabinowitz</u>

29

v. Wahrenberger, 406 N.J. Super. 126, 966 A.2d 1091 (N.J. Super.
Ct. App. Div. 2009), material misrepresentation, Commercial Ins.
Co. of Newark v. Steiger, 395 N.J. Super. 109, 928 A.2d 126
(2007), and negligent misrepresentation, fraud, and malicious
interference with prospective economic advantage, Ruberton v.
Gabage, 280 N.J. Super. 125, 654 A.2d 1002 (1995). In Loigman,
the New Jersey Supreme Court noted that "[t]he spectrum of legal
theories to which the privilege has been applied includes
negligence, breach of confidentiality, abuse of process,
intentional infliction of emotional distress, negligent
infliction of emotional distress, invasion of privacy, civil
conspiracy, interference with contractual or advantageous
business relations, and fraud." Loigman 889 A.2d at 436 (internal
citation omitted).

The litigation privilege applies absent explicit abrogation.
When considering whether a defendant in a New Jersey Law Against
Discrimination ("LAD") claim could invoke the privilege, the New
Jersey Appellate Division looked to whether the LAD statute had
"abrogated the litigation privilege." Peterson, 679 A.2d at 659,
cited with approval by Loigman, 889 A.2d at 438. The court
ultimately concluded that the LAD did not abrogate the well-
established privilege, noting that "implied abrogation of the
litigation privilege is not favored." Id. at 662. In fact, it
appears under New Jersey law that the only state law claim from

30

which defendants expressly cannot seek protection through the
litigation privilege is malicious prosecution. Loigman, 889 A.2d
at 436 n. 4. Essentially, the New Jersey Supreme Court has
emphasized that the litigation privilege is intended to be
broadly applicable, particularly when statutes do not
specifically abrogate it.

### ii. The New Jersey Litigation Privilege Bars the NJCFA Claims

Plaintiffs argue that the litigation privilege does not
apply to the NJCFA, but the Court finds that it does. This Court
has previously found the litigation privilege bars NJCFA claims
because the statute's text does not abrogate the privilege and
because the privilege is generally so broad. Rickenbach v. Wells
Fargo Bank, N.A., 2010 WL 920869, *6 (D.N.J. Mar. 8, 2010)
(Simandle, J.). The New Jersey Supreme Court held, in Peterson,
that implied abrogation of the litigation privilege is not
favored; in applying New Jersey law, this Court cannot,
therefore, presume that the NJCFA abrogates the privilege absent
explicit statutory text or precedent from the New Jersey Supreme
Court.

Plaintiffs cite Gonzalez v. Wilshire Credit Corp., 207 N.J.
557 (2011), to argue that, after Rickenbach, the New Jersey
Supreme Court applied the NJCFA to post-foreclosure judgment
agreements involving extensions of credit. Gonzalez does not
discuss the New Jersey litigation privilege. It involved a

foreclosure judgment that the defendant servicing agent withheld executing provided that the plaintiff fulfilled the terms of successive, post-judgment agreements.  The agreements recast the original loan terms, essentially extending plaintiff credit beyond the original loan, and allegedly included illicit financing charges and miscalculations of monies due. The plaintiff did not speak or write English well, was pressured to sign the agreements without contacting her counsel, and was forced to purchase unneeded insurance coverage.

The New Jersey Supreme Court considered whether these post-judgment agreements were covered under the NJCFA, i.e. whether they were extensions of credit that would be covered or settlement agreements that would not be covered. The Gonzalez court held that the post-judgment agreements "constitute the extension of credit, or a new loan and that [the defendant's] collection activities may be characterized as subsequent performance in connection with the extension of credit," thus falling within activities covered by the NJCFA. Gonzalez at 581. The Court limited its holding:

> This case *in no way* suggests that settlement agreements
> in general are now subject to the CFA. Here, we are
> dealing with forbearance agreements. This case addresses
> only the narrow issue before us: the applicability of the
> CFA to a post-foreclosure-judgment agreement involving a
> stand-alone extension of credit. We hold only that, in
> fashioning and collecting on such a loan--as with any
> other loan--a lender or its servicing agent cannot use
> unconscionable practices in violation of the CFA.

Gonzalez at 586 (emphasis in original). The Gonzalez court was clear. It recognized the NJCFA's coverage of post-foreclosure-judgment agreements that involve credit extensions. It did not consider the litigation privilege; in fact, it determined that these post-foreclosure agreements are not litigation-based settlement agreements at all and, instead, are credit extensions that merit NJCFA coverage. These credit extensions are not litigation-based communications. Gonzalez does not indicate that NJCFA claims pertaining to communications made in furtherance of litigation are permitted despite the litigation privilege.

Plaintiffs argue that Gonzalez's language indicates the New Jersey Supreme Court's intention to combat the foreclosure crisis. For example, the Gonzalez court stated: "We are in the midst of an unprecedented foreclosure crisis in which thousands of our citizens stand to lose their homes, and in desperation enter into agreements that extend credit - post-judgment - in the hope of retaining homeownership." Gonzalez at 582. The Gonzalez court was certainly concerned about the foreclosure crisis and the ways in which post-judgment credit extensions can prey on unsophisticated consumers. But this concern does not indicate that the New Jersey Supreme Court was willing to abrogate the litigation privilege and, absent any indication otherwise, the Court will not interpret it as such.

Plaintiffs also argue that fraud on the court bars

33

invocation of the litigation privilege. They note that the New
Jersey Superior Court Appellate Division recently stated
"[a]ssuming, without deciding, that a party who has committed a
fraud upon the court may not invoke the litigation privilege."
Grinbaum v. Wolf, A-4305-09T2, 2011 WL 6112191 (N.J. Super. Ct.
App. Div. Dec. 9, 2011). The Grinbaum court provided no further
discussion of whether the litigation privilege contains a fraud
exception and, if it does, the contours of such an exception. The
Grinbaum court affirmed the dismissal because the plaintiffs
failed to establish the elements essential to show fraud on the
court and, therefore, it did not need to determine whether a
fraud exception existed. Grinbaum was an unpublished New Jersey
Appellate Division case; it referenced, via dicta, a possible
fraud exception and specifically said that it was not deciding
whether such an exception existed. This Court cannot use Grinbaum
to create a fraud exception to the litigation privilege,
particularly when this Court has been unable to find other
support for such an exception. In making this determination, the
Court is mindful of the New Jersey Supreme Court's explanation of
the purposes behind the litigation privilege's broad
applicability:

> To ensure that the many honest and competent lawyers can
> perform their professional duties while furthering the
> administration of justice, the litigation privilege may
> protect the few unethical and negligent attorneys from a
> merited civil judgment and damages award. That trade-off
> is the necessary price that must be paid for the proper

functioning of our judicial system. . . . We remain mindful that the extraordinary scope of the litigation privilege is mitigated to some degree by the comprehensive control that trial judges exercise over judicial proceedings, by the adversarial system, and by the sanctions faced by wayward attorneys through our disciplinary system.

Loigman, 889 A.2d 426, 438. The New Jersey Supreme Court has emphasized the litigation privilege's "extraordinary scope" and noted that attorneys' behavior can be challenged in other fora, such as disciplinary proceedings.

The Court concludes that the New Jersey litigation privilege bars the Giles' NJCFA claims.[3] The New Jersey courts have not applied a fraud exception to the litigation privilege, and the Gonzalez case did not change the privilege's scope.[4]

---

[3]Defendants have also challenged the NJCFA claims' merits, arguing that Plaintiffs are not consumers and have not shown ascertainable loss or reliance. Because the litigation privilege bars the claims, the Court will not assess the merits.

[4]Plaintiffs also argue that Spivey has NJCFA claims, urging that "the salutary policies served by the UTPCPL would not be impaired if Pennsylvania residents receive more protection under the NJCFA than what their own state provides." (Pl. Opp'n to WFB's and Wells Fargo & Co.'s Mot. to Dismiss at 36.) The assertion that the NJCFA should be applied to Spivey's Pennsylvania transactions is extravagant. Plaintiffs erroneously cite Dal Ponte v. Am. Mortg. Express Corp., 2006 U.S. Dist. LEXIS 57675 (D.N.J. Aug. 17, 2006) to support their argument, but that citation is inapposite because the Del Ponte court held that New Jersey businesses were still subject to the NJCFA, even when dealing with non-New Jersey residents: "there is no indication that the NJCFA excludes from its protections non-New Jersey residents who deal with New Jersey businesses." Id. at *19. Plaintiffs have not alleged that any events surrounding Spivey's foreclosure sale occurred in New Jersey or involved New Jersey residents. This Court cannot apply New Jersey law to events that occurred in Pennsylvania involving defendants and plaintiffs who

### iii. The New Jersey Litigation Privilege and the RICO Claims

Case law is unsettled regarding whether the New Jersey litigation privilege bars RICO claims, the Court declines to decide here whether the privilege bars RICO claims. As explained infra, the Giles' RICO claims will be dismissed without prejudice, and the Court therefore need not determine, at this time, whether the privilege applies.

As discussed supra, the New Jersey Supreme Court has held that the privilege should be construed broadly and that implied abrogation of the litigation privilege is not favored. In Loigman, the New Jersey Supreme Court held that the privilege bars federal § 1983 claims, stating "we are confident that the United States Supreme Court would find that the litigation privilege is applicable in the prosecution of § 1983 civil rights cases." Loigman v. Twp. Comm. of Twp. of Middletown, 185 N.J. 566, 585, 889 A.2d 426, 437 (2006).

Plaintiffs disagree with Loigman. They cite California federal cases holding that California's litigation privilege, which is similar to New Jersey's privilege, bars neither § 1983 nor RICO claims. See e.g., Winters v. Jordan, 2011 U.S. Dist. LEXIS 24525 *18 (E.D. Cal. Mar. 8, 2011)("California's absolute

---

are Pennsylvania residents. If the Pennsylvania legislature wishes to modify the UTPCPL, it will. This Court will not impose another state's laws on Pennsylvania residents with regard to conduct occurring in Pennsylvania.

litigation privilege does not apply to . . . claims alleging . . . . violations of the RICO statute").

Plaintiffs also analogize their RICO claims to FDCPA claims and argue that the Court should follow a Third Circuit case holding that the FDCPA supersedes the privilege. The Third Circuit held: "Common law immunities cannot trump the FDCPA's clear application to the litigating activities of attorneys. . . . [W]e will not disregard the statutory text in order to imply some sort of common law privilege. . . . [T]he New Jersey litigation privilege does not absolve a debt collector from liability under the FDCPA." Allen ex rel. Martin v. LaSalle Bank, N.A., 629 F.3d 364, 369 (3d Cir. 2011), cert. denied 132 S. Ct. 1141 (2012) (internal citations omitted). The Third Circuit's analysis emphasized that the FDCPA is intended to address attorneys' debt collection practices: "Attorneys . . . are regarded as debt collectors, and their conduct as such is regulated by the FDCPA. . . . [T]he term debt collector applies to attorneys who regularly, *through litigation,* try to collect consumer debts." Allen ex rel. Martin at 367 (internal citations omitted) (emphasis in original). The Third Circuit concluded the litigation privilege did not apply because of "the FDCPA's clear application to the litigating activities of attorneys." Allen at 369. In Allen, the Third Circuit did not hold that all federal statutes trump the litigation privileges; its holding was

specific to the FDCPA.

But there is United States Supreme Court precedent that indicates that state common law does not trump federal statutory rights. In Howlett By and Through Howlett v. Rose, 496 U.S. 356 (1990), the United States Supreme Court considered whether sovereign immunity barred a 42 U.S.C. § 1983 claim against a school board and held, "as to persons that Congress subjected to liability, individual States may not exempt such persons from federal liability by relying on their own common-law heritage." Howlett at 383. Howlett specifically involved sovereign immunity and a § 1983 claim, not a litigation privilege and RICO. But the Supreme Court's ruling indicates that state common law traditions cannot bar federal causes of action.

The Court declines to conclusively determine the issue because, as discussed infra, the Court will grant the Phelan Parties' Motion to Dismiss or Strike, which WFB incorporated, and strike the Giles' RICO claims without prejudice to re-pleading in a Second Amended Complaint. This issue is preserved for subsequent motion practice.

### F. The Pennsylvania Judicial Privilege Is Moot

The Court need not analyze whether the Pennsylvania judicial privilege bars Plaintiff Spivey's claims. The Court has already dismissed Plaintiff Spivey's claims with prejudice because this forum is inappropriate for challenges to bankruptcy proofs of

claims.

**G. Plaintiffs' RICO Claim**

As explained <u>infra</u> in section V.B., because the Amended
Complaint is unnecessarily and confusingly prolix and contains
immaterial allegations, the Court will grant the Phelan Parties'
Motion to Strike, which WFB incorporated in its Motion to
Dismiss. WFB joined in the Phelan Parties' Motion to Strike. At
this time, the Court makes no assessment of the merits of WFB's
arguments to dismiss Plaintiffs RICO claims under Rule 12(b)(6).
The Giles' RICO claim will be stricken without prejudice and with
leave to amend. Accordingly, with regard to the Giles' RICO
claims, WFB's Motion to Dismiss is itself dismissed, without
prejudice to raise the issue anew after the Giles Plaintiffs have
the opportunity to amend and focus their RICO claim.


**V. The Phelan Parties' Motion to Dismiss or Strike**

The Court next outlines the Phelan Parties' arguments in
their Motion to Dismiss or Strike pursuant to Rule 12(f). The
Court will grant the Phelan Parties' motion because the Amended
Complaint is unnecessarily and confusingly prolix and contains
immaterial allegations. The Court will then explain why the
Phelan Parties' Motion should be considered both as a Rule 12(f)
motion and as a Rule 12(b)(6) motion, which the Court will grant
in part.

## A. The Phelan Parties' Arguments

Defendants Phelan Hallinan & Schmieg, LLP, Phelan Hallinan & Schmieg, P.C., Lawrence T. Phelan, Francis Hallinan, Daniel G. Schmieg, Rosemarie Diamond, Full Spectrum Services, Inc, and Land Title Services of New Jersey, Inc. (collectively, the "Phelan Parties") filed a Motion to Dismiss or Strike the Complaint, In Whole or In Part. [Docket Item 20.] They argued that the Amended Complaint violated pleading requirements in the Federal Rules of Civil Procedure, was "prolix and overblown," and was "dominated by impertinent and otherwise improper allegations." (Phelan Parties' Br. Supp. Mot. to Dismiss or Strike, at 2.) They argued that the Complaint should be "stricken in its entirety because the sheer prolixity of the Complaint confirms that Plaintiffs have failed to comply with the 'short and plain statement' requirement of FRCP 8." (Id. at 11.)

They also argued that Plaintiffs' allegations are "prejudicial and inflammatory" to the Phelan Parties' reputations. (Id. at 4.) The Phelan parties claimed that the Amended Complaint used "inflammatory and scandalous language," such as Plaintiffs' allegations that fees were "junk fees" and that the Phelan firms "rammed" or "plowed" foreclosure lawsuits through the court system. (Id. at 7.) If the Court declined to dismiss the Complaint in its entirety, the Phelan Parties argued that all redundant, immaterial, and impertinent matter and all

inflammatory and scandalous statements should be stricken
pursuant to Fed. R. Civ. P. 12(f).

The Phelan Parties also argued that Plaintiffs impermissibly
utilized collective pleading to assert fraud in violation of Fed.
R. Civ. P. 9(b) because, they argued, Plaintiffs "improperly
defin[ed] the two separate Phelan Law Firms, PHS-PA and PHS-NJ,
as the same firm." (Id. at 2.) They argued that, in general, all
of Plaintiffs' fraud allegations should be stricken because they
lacked the specificity required by Rule 9(b). The Phelan Parties
also noted that allegations pertaining to Plaintiff Spivey are
immaterial because she was a bankruptcy debtor, and challenges to
bankruptcy charges must be brought in bankruptcy court.

**B. The Phelan Parties' Motion to Strike is Granted**

With regard to the Giles Plaintiffs' RICO claim, the Court
will grant the Phelan Parties' motion because Plaintiffs' Amended
Complaint is unnecessarily and confusingly prolix and contains
irrelevant material which frustrate the ability to adjudicate the
RICO claim. The present state of Plaintiffs' pleading is too
difficult and confusing for the Court to manage or to give proper
notice to Defendants of the contours of the RICO claim against
each Defendant. At this point, the Court has dismissed all state
law claims and all claims involving Plaintiff Spivey. The only
remaining Plaintiffs are the Giles and the only remaining claim
is Count I under RICO. The Plaintiffs' 90-page Amended Complaint

impedes the Court's ability to analyze the substance of the
Giles' RICO claim. The Court was able to assess the Rooker-
Feldman doctrine's applicability to this case, the propriety of
challenges to bankruptcy proofs of claims in this forum, and the
scope of the New Jersey litigation privilege and its application
to the NJCFA with regard to litigation misconduct. It is one task
for the Court to determine whether this forum is proper or
whether a claim is barred; it is another for the Court to delve
into the details of Plaintiffs' complex, prolix, and often
immaterial Amended Complaint with regard to civil RICO
allegations. This unnecessary prolixity "places an unjustified
burden on the district judge and the party who must respond to it
because they are forced to ferret out the relevant material from
a mass of verbiage." Wright & Miller, Federal Practice and
Procedure § 1281 at 709 (3d ed. 2004). Before the Court can
properly assess the Giles' RICO claim, Plaintiffs must focus,
consolidate, and clarify their RICO pleading.

The Amended Complaint is replete with allegations that
pertain to parties that are not present in this case,
particularly within the RICO section. For example, when outlining
the fraudulent schemes component of their RICO claim, Plaintiffs
allege that

> WFB and other servicers regulate and control the
> activities of such law firms through their (a) use of
> default management "outsource" companies like LPS and
> CoreLogic; (b) selection of foreclosure law firms limited

42

> to those that are members of "attorney networks" run by
> LPS and CoreLogic or those that have achieved "approved
> attorney" or "designated counsel" status from Fannie Mae
> or Freddie Mac; and (c) monitoring of foreclosure
> lawyers' performance in meeting mandatory timelines
> through computerized mortgage servicing programs like LPS
> Desktop and VendorScape.

(Am. Compl. ¶ 223.) The Court does not know who these outsource
companies are; nor can the Court determine how LPS, CoreLogic,
LPS Desktop, or Vendorscape are relevant to Plaintiffs' RICO
claims, if at all. Plaintiffs also allege that the Phelan firm
took no action without the approval or acquiescence of WFB and
"other servicer clients." (Am. Compl. ¶ 224.) To the Court's
knowledge, WFB is the only servicer client present in this
litigation.  Plaintiffs allege the enterprise consists of many
entities that are not parties to this case, including Fannie Mae;
Freddie Mac; Full Spectrum Holdings, LLC; Full Spectrum Legal
Services, Inc.; Full Spectrum Review Services, Inc.; Foreclosure
Review Services, Inc.; FSS Acquisitions, Inc.; LTS Acquisitions,
Inc.; and Land Title Services of Pennsylvania. (Am. Compl. 216.)
Defendants cannot be made to answer allegations pertaining to
parties that are not present in this case. Nor can the Court make
sense of Plaintiffs' allegations when they are so broad.

In addition to their allegations about entities that are not
parties, Plaintiffs also reference investigations and lawsuits
pertaining to the foreclosure industry generally. For example,
Plaintiffs claim that Defendants' pattern of racketeering can be

discerned from: "federal and state judges who have identified and condemned Defendants' unlawful practices," (Am. Compl. ¶ 242); "the New Jersey judiciary . . . in <u>In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities</u>," (<u>id.</u> ¶ 243); "the investigations and actions of the Fed, OCC, FDIC and other federal regulators," (<u>id.</u> ¶ 244); and "the investigations, settlement negotiations, and potential prosecutions of state attorneys general and the U.S. Department of Justice," (<u>id.</u> ¶ 245). These statements regarding judicial action and federal regulation are not clear averments of fact that the Court can make sense of or that the Court could order Defendants to answer.

Fed. R. Civ. P. 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Third Circuit has held that it can be proper for a district court to dismiss a prolix complaint under Rule 8 because that rule "underscore[s] the emphasis placed on clarity and brevity by the federal pleading rules." <u>In re Westinghouse Securities Litigation</u>, 90 F.3d 696 (3d Cir. 1996) (quoting Wright & Miller, <u>Federal Practice and Procedure</u> § 1217 at 169 (2d ed. 1990)). In that case, the district court "ordered plaintiffs to submit a third amended complaint containing only those allegations relevant to what were, in the court's view, the remaining viable claims." <u>Id.</u> at 703. In considering the district court's decision, the Third Circuit held that "[t]his does not

44

seem to us to constitute an abuse of discretion; indeed, it makes a tremendous amount of sense." Id. at 703.

The Court is mindful that a Rule 12(f) motion is not a vehicle for obtaining the outright dismissal of a complaint, but rather is generally useful to eliminate the redundant, impertinent, or immaterial matter therein. See Wright & Miller, Federal Practice and Procedure § 1380 at 390-391 (3d ed. 2004). Indeed, this Court is not dismissing Plaintiffs' RICO claim on this basis, but instead providing for its repleading to disentangle the basic elements that must be pled from the extraneous verbiage that dominates much of the Amended Complaint[5] and offends the "short, plain statement" requirement of Rule 8(a). The purpose of Rule 12(f) motion practice is to "simplify the pleadings and save time and expense by excising from a plaintiff's complaint [any matter] which will not have any possible bearing on the outcome of the litigation." Garlanger v. Verbeke, 223 F. Supp. 2d 596, 609 (D.N.J. 2002). Where Plaintiffs' RICO allegations at ¶¶ 212-249 refer back and incorporate "each of the allegations in the preceding paragraphs" (see ¶ 212), and where many of the incorporated paragraphs must be stricken, it only makes sense to call for re-pleading, as this

---

[5]In addition to extraneous matters addressed in the text above, the Court provides these additional examples of matters that must be stricken. Impertinent and prolix allegations include ¶5 n.1, 6 n.2, 7, 42, 43, 44, 55, 56 n. 19, 65-70, 100, 125 n.42, 143, 153-168, 180-183, 193-201.

Court now does.

The Court recognizes Plaintiffs have a challenging pleading burden because RICO claims are complicated, this case involves many Defendants, and Plaintiffs' RICO pleadings of fraudulent schemes are subject to Fed. R. Civ. P. 9(b), which requires particularity in pleading.[6] But these factors do not permit Plaintiffs to file a 90-page Amended Complaint that contains a substantial amount of irrelevant material. Even complicated cases are subject to Rule 8. The Westinghouse case discussed supra, in which the Third Circuit upheld a dismissal pursuant to Rule 8, was a proposed class action alleging fraudulent activity under the Securities Exchange Acts of 1933 and 1934. It is the complicated case that is most impaired when extraneous statements confuse the issues.

Moreover, unfortunately the Court cannot address the pleadings of the Amended Complaint or the validity of the Rule 12(b)(6) motion until the Giles Plaintiffs submit a pleading that

---

[6]Claims of mail and wire fraud which support an alleged RICO violation must satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b). Livingston v. Shore Slurry Seal, Inc., 98 F. Supp. 2d 594, 597 (D.N.J. 2000). Rule 9(b) states, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Contrary to Rule 9(b), the present Amended Complaint does not state with particularity the fraudulent scheme engaged in by each Defendant, so that each named Defendant is placed on notice of the factual grounds for that Defendant's RICO liability.

complies with Rules 8(a) and 9(b) and which does not offend Rule 12(f). The Court is persuaded that these pleading deficiencies can be cured by a proper Second Amended Complaint; if any Defendant then believes that the pleading fails to state a claim, an appropriate Rule 12(b)(6) motion may be filed.

The Court will grant the Phelan Parties' Motion to the extent of striking the remaining portions of the Amended Complaint pertaining to the Giles' RICO claim. The Court makes no assessment of the merits of WFB's arguments to dismiss Plaintiffs RICO claims under Rule 12(b)(6); such motion practice, if any, must await a proper RICO claim set forth in a second Amended Complaint. The Giles' RICO claim will be stricken without prejudice and with leave to amend.

### C. The Phelan Parties' Motion to Dismiss

In addition to moving to strike the pleading under Rule 12(f), the Court finds that the Phelan Parties have partially argued a Motion to Dismiss under Rule 12(b)(6). For example, in their brief, the Phelan Parties argued that Plaintiff Spivey's challenges to her bankruptcy charges must be brought in bankruptcy court, and that Plaintiffs' fraud allegations fail to meet the Rule 9(b) standard. At oral argument, the Phelan Parties' counsel joined WFB's argument that the NJCFA claims were barred by the litigation privilege. These arguments attack the merits and sufficiency of Plaintiffs' allegations, thus falling

within Rule 12(b)(6), and the Plaintiffs addressed these grounds in their opposition as well as at oral argument. The Court finds that: "Where, as here, a Rule 12(f) motion attacks the sufficiency of the allegations contained in a pleading, it is appropriate to convert that motion into one pursuant to Rule 12(b)(6)." Korman v. Trusthouse Forte PLC, CIV. A. 89-8734, 1991 WL 3481 (E.D. Pa. Jan. 11, 1991) (internal citation omitted). In some instances, "the technical name given to a motion challenging a pleading is of little importance inasmuch as prejudice to the nonmoving party can hardly result from treating a motion that has been inaccurately denominated a motion to strike as a motion to dismiss the complaint." Wright & Miller, Federal Practice and Procedure § 1380 at 392-393 (3d ed. 2004).

The analysis and grounds for dismissal discussed <u>supra</u> in the WFB section pertain to the Phelan Parties as well. Plaintiff Spivey's claims against the Phelan Parties will be dismissed with prejudice because she may only challenge bankruptcy proofs of claims in bankruptcy court. The Giles' NJCFA claims against the Phelan Parties will be dismissed with prejudice because the New Jersey litigation privilege bars their claims, as discussed above in Part IV.E.

## D. Plaintiffs Cannot Challenge Assignments Between Mortgage Holders

At oral argument, the Phelan Parties cited <u>Ifert v. Miller</u>, 138 B.R. 159, 163 (E.D. Pa. 1992), aff'd, 981 F.2d 1247 (3d Cir.

1992) and argued that Plaintiffs could not challenge the validity
of assignments transferring Plaintiffs' mortgages from one holder
to another. The Phelan Parties are correct: "The fact that the
assignors might have a valid cause of action against the assignee
because of fraud practiced upon them did not affect the legal
title of the assignee, and could not be proved by a defendant in
an action on the assignments." Ifert at 166 (internal citations
omitted). Plaintiffs may not, therefore, challenge any
assignments to which they were not a party, such as assignments
conveying ownership of the Giles' mortgage from Argent to
Ameriquest Mortgage Company to Wachovia. (Am. Compl. ¶¶ 82-83.)
It follows that such assignment cannot be the basis for a claim
by the Giles Plaintiffs in a subsequent proceeding.

## VI. Wells Fargo & Company's Motion to Dismiss

Defendant Wells Fargo & Company ("Wells Fargo & Co.") filed
a Motion to Dismiss. [Docket Item 26.] Wells Fargo & Co.
incorporated the reasons set forth in the Phelan Parties' and
WFB's Motions to Dismiss and also argued that "the Amended
Complaint contains no allegations whatsoever that Wells Fargo &
Company did anything to any Plaintiff at any time." (Wells Fargo
& Co. Br. Supp. Mot. Dismiss at 1.) Plaintiffs initially opposed
this motion but, at oral argument, Plaintiffs consented to
dismiss their claims against Wells Fargo & Co. All claims against

Wells Fargo & Co. are therefore dismissed with prejudice.

## VII.  Motion to Strike Plaintiffs' Notice of Relevant Court Filings

After the Motions to Dismiss had been fully briefed, Plaintiffs filed a Notice of Relevant Court Filings. [Docket Item 51.] Plaintiffs provided, in their Notice, a Complaint by the United States of America and 49 state attorneys general in United States v. Bank of America Corp., 1:12-cv-00361-RMC in the United Stated District Court for the District of Columbia and a proposed consent judgment filed in relation to United States v. Bank of America Corp. Plaintiffs contend that these documents are relevant and demonstrate that their claims are plausible under the Twombly standard.

Defendants WFB and Wells Fargo & Co. then filed a Motion to Strike Plaintiffs' Notice of Relevant Court Filings [Docket Item 52], which the Phelan Parties joined and supported [Docket Item 53]. Defendants argued that the Notice of Relevant Court Filings constituted an impermissible sur-reply in violation of Local Civil Rule 7.1(d)(6). In addition, Defendants argued that use of the consent judgment violates Fed. R. Evid. 408.

The Court will grant Defendants Motion to Strike and will not consider the materials in Plaintiffs' Notice of Relevant Court Filings. The Court recognizes the importance of settlement negotiations in litigation and is loathe to allow any settlement

agreement or consent judgment to support a claim where the party against whom it is offered did not admit liability. The Court supports the "promotion of the public policy favoring the compromise and settlement of disputes," Fed. R. Evid. 408. The Court holds that the consent judgment is not probative with regard to the motions presently before the Court, and it makes no determination whether the consent judgment may be admissible as evidence in the future.

## VIII. Conclusion

The Court therefore finds the following: (1) Count IV (breach of contract), Count V (money had and received), and Count VI (negligence) are dismissed with prejudice pursuant to Plaintiffs' voluntary dismissal; (2) claims against Defendant Wells Fargo & Company are dismissed with prejudice pursuant to Plaintiffs' voluntary dismissal; (3) all of Plaintiff Spivey's claims in Counts I, II, and III are dismissed with prejudice because she cannot challenge bankruptcy proofs of claims in this forum; (4) Count II (New Jersey Consumer Fraud Act) is dismissed with prejudice as to all Defendants because the New Jersey litigation privilege bars the Giles' NJCFA claims; (5) the Giles' RICO claims under Count I are stricken without prejudice to repleading because the Amended Complaint is unnecessarily and confusingly prolix, contains immaterial allegations, and lacks

51

particularity with respect to each Defendant's individual fraud-based liability; (6) any claims involving assignments to which Plaintiffs were not parties are dismissed with prejudice; and (7) Defendants' Motion to Strike Plaintiffs' Notice of Relevant Federal Court Filings is granted. Essentially, all of Plaintiffs' claims are dismissed with prejudice except for the Giles' RICO claims, which are stricken without prejudice to repleading in a Second Amended Complaint consistent with the Court's determinations herein.

As to the remaining claim, the Giles Plaintiffs are granted leave to file a Second Amended Complaint correcting the deficiencies noted herein under Rules 8(a), 9(b), and 12(f) in order to plead a civil RICO claim, within thirty (30) days of the entry of the accompanying Order. The docket remains open to receive any such amended pleading.

The accompanying Order will be entered.


  **09/28/12**                         **s/Jerome B. Simandle**
Date                                  JEROME B. SIMANDLE
                                      Chief U.S. District Judge

52